# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STAR COLBERT, ASSENAGON CREDIT SUBDEBT AND COCO, AXIOM LUX SICAV, and AXIOM EUROPEAN FINANCIAL DEBT FUND LIMITED Individually and on Behalf of All Other Credit Suisse Group AG AT1 Bondholders,<br><br>                    Plaintiffs,<br><br><br>            vs.<br><br>BRADY W. DOUGAN, ERIC VARVEL, JAMES L. AMINE, TIMOTHY P. O'HARA, DAVID MILLER, BRIAN CHIN, CHRISTIAN MEISSNER, GAËL DE BOISSARD, URS RÖHNER, TIDJANE THIAM, THOMAS GOTTSTEIN, SIR ANTÓNIO HORTA-OSÓRIO, ROBERT S. SHAFIR, LARA J. WARNER, RICHARD E. THORNBURGH, ANDREAS GOTTSCHLING, MICHAEL KLEIN, and NOREEN DOYLE,<br><br>                    Defendants. | Case No. 23 Civ. _____<br><br><br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>**DEMAND FOR JURY TRIAL** |

**Table of Contents**

I.      SUMMARY OF ALLEGATIONS……………………………………………....1

II.     JURISDICTION AND VENUE………………………………………………16

III.    PARTIES………………………………………………………………………18

        Plaintiffs………………………………………………………………………..18

        Defendants……………………………………………………………………19

IV.    STATEMENT OF FACTS……………………………………………………26

        A.     Trust Is Critical for a Financial Institution, and Directors and Managers of Financial Institutions Are Duty-Bound to Protect Trust and Confidence in the Institution……………………………………………..26

        B.     Trust in Credit Suisse Was Destroyed by the Toxic Culture Created Principally by Its New York Investment Bank's Excessive Risk-Taking and Self-Dealing……………………………………………………28

        C.     The Brady Dougan Era—The New York Investment Bankers Take Control……………………………………………………………28

               1.     Toxic Asset-Backed Securities…………………………......31

               2.     Criminal Tax Evasion…………………………………………34

               3.     Patrice Lescaudron's $1 Billion Fraud…………………….....36

               4.     "Dark Pools" Scandal……………………………………………36

               5.     Foreign Exchange Currency Manipulation………………..…...37

        D.     Tidjane Thiam Fails to Right the Ship—"Cultural Issues Can't Be Resolved Overnight"……………………………………………38

               1.     Tuna Boat Scandal……………………………………….....39

               2.     Worthless Collateralized Loan Obligations……………….....40

        E.     Thomas Gottstein Promised a "New Credit Suisse" But Was "Jettisoned . . . After a String of Seismic Scandals"……………….42

               1.     Malachite Failure……………………………………………42

               2.     Greensill Meltdown……………………………………………43

       3.        Archegos Scandal………………………………………………45

       a.     The Paul Weiss Report Confirms Systemic
Failures and a Dangerous Culture……………………………………46

       b.     Credit Suisse Senior Management Admits They
Failed to Manage Risk in the Investment Bank's Prime Services
Businesses……………………………………………………………47

F.      António Horta-Osório's Failed Cultural Shift…………………………..49

G.     Axel Lehmann's and Ulrich Körner's Inability to "'Stem the Loss
of Trust That Had Accumulated Over the Years'"……………………...51

V.     RELEVANT SWISS STATUTES AND DEFENDANTS' BREACHES
THEREOF……………………………………………………………………57

A.     Relevant Swiss Code of Obligations…………………………………58

B.     Defendants Violated Their Duties to the AT1 Bondholders……………59

VI.    CLASS ACTION ALLEGATIONS……………………………………………62

VII.   CLAIM ALLEGED…………………………………………………………..66

VIII.  REQUEST FOR RELIEF……………………………………………………67

IX.    JURY DEMAND……………………………………………………………..68

## I.  SUMMARY OF ALLEGATIONS

> "'*[T]he bank could not be saved. . . .  I apologize that we were no longer able to stem the loss of trust that had accumulated over the years . . . .*'"
>
> *Credit Suisse AG Chairman Axel Lehmann, April 4, 2023*
>
> "'*What we've seen over the past weeks has been years in the making.  We have seen scandal after scandal at Credit Suisse.  Banking is all about trust, and trust in Credit Suisse has been broken.*'"[1]

1.      Credit Suisse Group AG ("Credit Suisse" or the "Bank"), a 167-year-old international banking and financial services company, collapsed in mid-March 2023 because of a "*loss of trust*," which is the death knell for a bank.[2]

2.      This action is brought by STAR COLBERT, Assenagon Credit SubDebt and CoCo, Axiom Lux SICAV, and Axiom European Financial Debt Fund Limited (collectively, "Plaintiffs), individually and on behalf of all other holders of Credit Suisse Additional Tier 1 Capital ("AT1") bonds[3] from January 12, 2023, to March 19, 2023, inclusive (the "Class," as more fully defined below), against the above-referenced defendants (collectively, "Defendants") for Defendants' violations of law set forth herein and seeking damages and other relief requested below.[4]

---

[1]  Thierry Philipponnat, Chief Economist at Finance Watch: https://www.finance-watch.org/press-release/credit-suisse-when-trust-disappears/.

[2]  Marion Halftermeyer, *Credit Suisse Chairman 'Truly Sorry' for Failure to Stem Crisis*, Bloomberg (Apr. 4, 2023), https://www.bloomberg.com/news/articles/2023-04-04/credit-suisse-chairman-truly-sorry-for-failure-to-stem-crisis#xj4y7vzkg.

[3]  AT1 bonds, or "Additional Tier 1 Capital" bonds, are debt instruments at the bottom of Credit Suisse's capital structure, junior to other debt securities.  The AT1 bonds and the equity (stock) together formed "Tier 1" of Credit Suisse's core regulatory capital requirements.

[4]  In support of these claims, Plaintiffs allege the following upon personal knowledge with respect to those allegations pertaining to themselves, and upon information and belief based upon, among other things, a review of public filings, press releases, articles and reports, and investigations undertaken by counsel, as to all other allegations.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

***Defendants Violated Their Statutory Duties of Good Faith, Care, and Loyalty by Creating a Culture that Prioritized Profits Over Sound Management.***

3.       Under governing Swiss statutes, Defendants are directly liable to Plaintiffs and the other Class members, the AT1 bondholder creditors, for the billions of dollars of damage caused by Defendants' violation of their duties.  Defendants breached their statutory duties of good faith, care, and loyalty owed to Plaintiffs and the other Class members by, among other things, creating and perpetuating a culture at Credit Suisse that placed profits, excessive risk-taking, and self-dealing over sound risk management and compliance with the law.

4.       Defendants' culture of imprudent risk-taking for personal gain is confirmed in a 2021 report, commissioned by Credit Suisse, and published by the law firm Paul, Weiss, Rifkind, Wharton & Garrison LLP (the "Paul Weiss Report").  The Paul Weiss Report concluded that the Prime Services business within investment banking in Credit Suisse's New York Headquarters was plagued by "***a culture in which profits were prioritized over sound risk management***."[5]

5.       As described in the Paul Weiss Report and elsewhere, Credit Suisse's toxic culture created—and even encouraged—myriad scandals that eventually led to the inescapable and overwhelming conclusion in March 2023 that the bank was fatally plagued by incompetence and grift, and the senior leadership was incapable or unwilling to overhaul the corrupt foundation.

6.       Eventually, even Credit Suisse itself, speaking through its highest-ranking managers and directors, admitted that it suffered from, and, in the end, was brought down in

---

[5] *Credit Suisse Group Special Committee of the Board of Directors Report on Archegos Capital Management*, Credit Suisse (July 29, 2021), https://www.credit-suisse.com/about-us/en/reports-research/archegos-info-kit.html.

March 2023, by the overly aggressive and ethically challenged culture underlying the Bank's recidivism of accumulated scandals and misdeeds.

***Accumulated Loss of Trust in Executive Leadership and Credit Suisse's Culture Caused Credit Suisse's Failure***

7.      Because trust is the cornerstone of a banking institution, Credit Suisse's repeated missteps resulted in "major reputational damage" and "substantial losses," repeated quarterly to such a degree that Credit Suisse found itself "in a structural loss-making situation," and a "deep crisis of confidence" from its customers caused the Bank's ultimate failure in March 2023.[6]

8.      The accumulated "loss of trust," noted by Credit Suisse Chairman Axel Lehmann, was demonstrated by huge and accelerating outflows of client assets in March 2023. In other words, quite simply, vast swaths of people and institutions did not trust the Bank and raced to pull their money out before it was lost. The destruction of the bank resulted in Credit Suisse's AT1 bondholders suffering a $17 billion loss.

9.      An extraordinary consensus emerged among Credit Suisse's customers, the Bank's own lawyers, regulators, market participants, academics, and the financial press: Credit Suisse's directors and senior executives, and the rotten culture they instilled and fostered, destroyed trust in the bank, which led to its collapse.

10.      On March 16, 2023, summing up Defendants' repeated missteps and dereliction, well-known economist Thierry Philipponnat observed that "'[w]hat we've seen over

---

[6]  Marlene Amstad, Chairwoman, FINMA's Board of Directors, Media Event in Bern on Events Surrounding Credit Suisse (Apr. 5, 2023).

the past weeks has been years in the making.  We have seen scandal after scandal at Credit Suisse.  Banking is all about trust, and trust in Credit Suisse has been broken.'"[7]

11.     On March 23, 2023, in the midst of Credit Suisse's collapse, FINMA[8] President Marlene Amstad ("Chairwoman Amsted") stated that Credit Suisse failed because of "'*many scandals and bad decisions by management*.'"[9]

12.     And, on March 26, 2023, Swissinfo.ch reported:

> Switzerland's Finance Minister Karin Keller-Sutter denied government responsibility for the near-collapse of Credit Suisse Group AG in March, and instead **called the bank's management "arsonists**."
>
> Asked if her predecessor Ueli Maurer had done his job well, Keller-Sutter, who took over the post at the beginning of the year, told Tages-Anzeiger, "you have to be careful not to confuse firefighters and arsonists.  ***The board of directors and executive board are responsible for Credit Suisse—and not the government***."[10] [Emphasis added.]

13.     In response to Credit Suisse's spectacular flameout, and attendant crushing damages to Plaintiffs and the other Class members, the international financial press published numerous articles with titles like: "Credit Suisse: A Bank Sunk by Scandals"[11] and "How Scandal and Mistrust Ended Credit Suisse's 166-Year Run."[12]

---

[7] Alison Burns, *Credit Suisse: When Trust Disappears*, Finance Watch (Mar. 16, 2023), https://www.finance-watch.org/press-release/credit-suisse-when-trust-disappears/.

[8] FINMA, Swiss Financial Market Supervisory Authority ("FINMA"), is the Swiss financial regulator.

[9] *Finma Chair Accuses Credit Suisse of Lack of Cooperation*, Finews (Mar. 27, 2023), https://www.finews.com/news/english-news/56475-finma-chair-accuses-credit-suisse-of-lack-of-cooperation-marlene-amstad.

[10] *Swiss Minister Calls Credit Suisse Managers 'Arsonists,'* Swiss Info (May 26, 2023), https://www.swissinfo.ch/eng/bloomberg/swiss-minister-calls-credit-suisse-managers--arsonists-/48543518.

[11] *Credit Suisse: a bank sunk by scandals*, France 24 (Mar. 19, 2023), https://www.france24.com/en/live-news/20230319-credit-suisse-a-bank-sunk-by-scandals.

[12] Marion Halftermeyer & Myriam Balezou, *How Scandal and Mistrust Ended Credit Suisse's 166-Year Run*, Bloomber (Mar. 20, 2023), https://www.bloomberg.com/news/articles/2023-03-19/how-scandal-and-mistrust-ended-credit-suisse-s-166-year-history#xj4y7vzkg.

14.     This loss of trust can be traced, in part, to a string of headline-grabbing scandals that began during and after the 2007-2008 global financial crisis and continued unabated to the end.  And the common thread running through each scandal was the Bank's broken culture—*a culture that had originated with Credit Suisse's New York-based investment banking operation*, where reckless and self-serving executives chased short-term returns (and bonuses) from overly risky deals and went to any length—including, at times, unethical and illegal lengths—to acquire and retain high revenue customers.  In other words, as Paul Weiss noted, Credit Suisse's culture placed profits over sound risk management and compliance with the law, resulting in a series of very public scandals.

15.     The Paul Weiss Report certainly was not alone in observing the systemic problems at Credit Suisse.  On May 10, 2022, the *Financial Times* observed how the culture at Credit Suisse that placed profits over risk management was years in the making:

> The twin crises [the Archegos loss and closure of funds linked to Greensill] have been the most prominent in a string of scandals that have plagued the bank going back to the global financial crisis of 2008.
>
> *             *             *
>
> A common thread running through the bank's failings has been a risk department that was all too often overruled by commercially minded executives who were chasing higher returns from riskier deals, according to several current and former employees.[13]

16.     And while the scandals garnered headlines, it was the fear of what lurked beneath that ultimately led to the fatal loss of trust.  This concept was poignantly noted in an October 27, 2022 *New York Times* article: "*[f]ears about undiscovered financial land mines in*

---

[13]  Owen Walker, *Credit Suisse admits lax approach led to scandals*, Financial Times (May 10, 2022), https://www.ft.com/content/afdaaf7f-e4f0-477a-a52a-3e7e0692db4d.

*the bank's books have weighed heavily*."[14]   The highly-publicized scandals consumed headlines, and uncertainty—created by the unremitting string of scandals and blow-ups, and concern that there were more to come—drove Bank customers and clients to move their assets elsewhere. The market, in other words, rightly assumed that it was only seeing the tip of the iceberg.[15]

***Credit Suisse's Conservative Swiss Beginnings Are Overtaken by the Aggressive Risk-Taking of the New York Investment Bankers.***

17.      The beginning of the end for Credit Suisse begins and ends in New York. While Credit Suisse began as a conservative Swiss private bank, the vast majority of the people who were responsible for its demise were not staid Swiss bankers, but, rather, sharp-elbowed New York investment bankers.

18.      Credit Suisse's New York Investment Banking Division was the primary source of the bank's most significant publicly-reported scandals, and illegal and unethical conduct, over the past several years.   The Investment Banking Division, with its roots in Wall Street, was the principal source of Credit Suisse's toxic culture that valued short-term gain over long-term trust and led to countless scandals and billions of dollars of U.S. government penalties—and Plaintiffs' and the other Class members' losses, as alleged herein.

19.      The origin of the marked shift in the Credit Suisse culture can be traced to its acquisition of the aggressive, Wall Street, deal-driven investment bank, The First Boston

---

[14]  Michael J. de la Merced, *Credit Suisse Unveils Sweeping Revamp to Revive Its Fortunes*, N.Y. Times (Oct. 27, 2022), https://www.nytimes.com/2022/10/27/business/credit-suisse-restructuring.html.

[15]  Warren Buffett famously expressed it this way: "In the world of business, bad news often surfaces serially: you see a cockroach in your kitchen; as the days go by, you meet his relatives."  Berkshire Hathaway Inc., https://www.berkshirehathaway.com/letters/2014ltr.pdf (last visited June 20, 2023). Indeed, just a month before Credit Suisse finally collapsed, *Bloomberg* published an opinion entitled, "Credit Suisse Needs a Cockroach Exterminator," observing that Credit Suisse has had a deep infestation for years and the critters just keep coming."  Paul J. Davies, *Credit Suisse needs a cockroach exterminator*, Money Control (Feb. 17, 2023), https://www.moneycontrol.com/news/opinion/credit-suisse-needs-a-cockroach-exterminator-10109841.html.

Corporation ("First Boston").  Credit Suisse first invested in First Boston in the mid-1980s and, in 1996, took complete ownership of First Boston and rebranded it as "CS First Boston" or "CSFB."

20.      CSFB, headquartered in New York, operated as a separate entity from Credit Suisse until 2005, when CSFB was merged into Credit Suisse.  The next year, Credit Suisse dropped the First Boston/CSFB branding, as the former CSFB became the Credit Suisse Investment Banking.

***CSFB's Toxic Culture Spreads and Becomes Credit Suisse's Toxic Culture***

21.      But, while the First Boston name may have disappeared, First Boston's aggressive, risk-taking culture—which incentivized unethical, and sometimes criminal, behavior in the pursuit of short-term gains leading to lavish pay packages for its traders and executives—most certainly did not.  In fact, it became the ***dominant culture*** at Credit Suisse, especially after former CSFB trader Brady Dougan became Chief Executive Officer ("CEO") in 2007 and brought with him into senior management an entire cadre of CSFB alumni.

22.      Beginning in 2007, Credit Suisse became dominated by New York investment bankers and was plagued by a string of scandals, caused by profits and personal gain outweighing sound, long-term risk management.  From the beginning of defendant Brady Dougan's tenure starting in 2007 and through the present day, even though new CEOs and different Chairmen of the Credit Suisse Board of Directors promised sweeping overhauls and cultural changes, Credit Suisse was unable to change the fatal combination of aggressive, reckless deal-making and the failure to ensure adequate risk management and compliance with the law.  Indeed, and to the contrary, according to a 2012 *Reuters* article, "***Americans and investment bankers . . . gained in influence with the overhaul, deepening a cultural tug-of-war***

***between Credit Suisse's U.S.-focused investment bank and its less risky and more traditional Swiss-based private bank*.**"[16]

23.     The investment bankers—the New Yorkers—won that tug-of-war.  The ghost of CSFB haunted Credit Suisse for years and finally brought it down.

24.     This was noted in an October 27, 2022 *Reuters* article, stating that the scandals plaguing the Investment Banking Division caused the Bank to formulate a plan to shift away from the investment bank "as the bank attempts to put years of scandals behind it."[17]  FINMA's Chairwoman, Marlene Amstad, welcomed the "comprehensive strategic reorientation of its investment bank [as a] step in the right direction—towards risk reduction" in light of the "accumulation of incidents and scandals [that] severely damaged Credit Suisse's reputation.[18]

**Credit Suisse's New York Culture Spawned Repeated Scandals and Misconduct that Were Merely the Tip of the Iceberg**

25.     The toxic New York Investment Banking culture at Credit Suisse fostered and encouraged behavior that led to scandal after scandal, including criminal guilty pleas to tax evasion, money laundering, self-dealing, excessive risk taking, abandonment of compliance functions, lack of oversight, mismarking of securities, fraud, and currency manipulation, more fully described in the Statement of Facts, below.

26.     Credit Suisse management (and Swiss regulators) sought to right the ship, but their efforts were ultimately too little and too late.

---

[16] *Credit Suisse boss under pressure despite outsmarting rival*, Reuters (Dec. 3, 2012), https://www.reuters.com/article/creditsuisse-ceo/credit-suisse-boss-under-pressure-despite-outsmarting-rival-idUSL5E8MU8HS20121203.

[17] Noele Illien, Oliver Hirt & John O'Donnell, *Credit Suisse seeks billions from investors in make-or-break shake-up*, Reuters (Oct. 27, 2022), https://www.reuters.com/business/finance/credit-suisse-says-raise-4-billion-francs-capital-2022-10-27/.

[18] *See supra*, n.6.

27.     For example, the Greensill meltdown in March 2021 (the "Greensill Meltdown," discussed more fully below), prompted Swiss regulators at FINMA to begin an investigation.  In its February 2023 pronouncement, FINMA stated that "Credit Suisse seriously breached its supervisory obligations in this context [Credit Suisse's business relationship with financier Lex Greensill and his companies] with regard to risk management and appropriate organisational structures."[19]

28.     And, despite Defendants' repeated promises to address Credit Suisse's risk assessment and compliance shortcomings and to decrease the out-of-control risk taking by its New York investment bankers, FINMA's two-year investigation into the Greensill Meltdown found that Credit Suisse suffered from deficiencies in risk management and committed "a serious breach of Swiss supervisory law."[20]  FINMA further concluded that Credit Suisse failed to "adequately identify, limit and monitor risks in the context of the business relationship with Lex Greensill over a period of years."[21]

29.     Another example is the highly-publicized Archegos hedge fund meltdown in 2022, discussed more fully below.  Following that scandal, Credit Suisse commissioned the Paul Weiss Report, which found that "no one at CS—not the traders, not the in-business risk managers, not the senior business executives, not the credit risk analysts, and not the senior risk officers," appreciated the "serious risks" that were "not hidden" and "in plain sight from at least September 2020."[22]  Paul Weiss concluded that "no one at the bank acted swiftly and decisively

---

[19] Press Release, FINMA, *FINMA concludes "Greensill proceedings against Credit Suisse* (Feb. 28,2023), https://www.finma.ch/en/news/2023/02/20230228-mm-greensill/.

[20] *Id.*

[21] *Id.*

[22] *See supra*, n.5.

to try to mitigate the risks posed by Archegos" to Credit Suisse and further asserted that the New York-based Prime Services business within investment banking and Credit Suisse was plagued by "a culture in which profits were prioritized over sound risk management."[23]

30.     The Paul Weiss Report is a damning indictment of Credit Suisse's senior management, with the law firm concluding that Credit Suisse Executive Board members violated their duties to "prioritize risk management" and to create and enforce, across the enterprise "a [c]ulture of [r]esponsibility, [a]ccountability, and [r]espect for [c]ontrols."[24]

31.     Thereafter, in its 2022 Annual Report, released on March 15, 2023, Credit Suisse admitted that the Paul Weiss Report found "a failure to effectively manage risk in the Investment Bank's prime services business by both the first and second lines of defense as well as a lack of risk escalation."

32.     But the scandals discussed herein, including the Greensill Meltdown and the Archegos disaster, were merely the tip of the iceberg.  As FINMA Chairwoman Amstad revealed in a recent speech, in addition to the six publicly-disclosed enforcement actions against Credit Suisse, which "problems behind these proceedings were manifold . . . the six proceedings were not all of the enforcement measures that [FINMA] conducted against Credit Suisse.[25]

33.     In the end, the accumulated weight of these scandals, the fear of undiscovered financial landmines, and the corporate culture that spawned them, crushed Credit Suisse.  The destruction of trust falls squarely on the shoulders of Credit Suisse's directors and executives—

---

[23] *Id.*

[24] *Id.*

[25] *See supra*, n.6.

the Defendants here—for their collective years of breaching their duties of trust and care by enforcing a culture at Credit Suisse that placed profits over risk management.

***Credit Suisse's Self-Dealing Is Demonstrated by Secretly Seeking to Preserve Only Their Employees' AT1 Compensation When They Foresaw Impending Destruction of the Bank***

34.      As demonstrated by the toxic culture of self-dealing within the Bank, in January 2023, Credit Suisse secretly knew the end was near (but concealed the truth).  On January 12, 2023, Credit Suisse informed FINMA that it would no longer count Credit Suisse Employee AT1 bonds, referred to as Contingent Capital Awards ("CCAs"),[26] as Regulatory Core Tier 1 Capital, so that any further payments of interest or additional awards of CCAs by Credit Suisse to employees would not require any additional approval from FINMA.  Credit Suisse attempted this change to protect hundreds of millions of dollars in bonuses, deferred compensation, and other compensation granted in Employee AT1 bonds.  The executives and board members knew when they sent the January 12, 2023 email that the coupon payments for the AT1 bonds could be reduced or eliminated under resolution; the bonds would be written off under bankruptcy or, in the event of a sale, the bonds would very likely also be written off.  By this time in January, the insiders knew that Credit Suisse had experienced what FINMA Chair Amstad described as a "massive loss of confidence" by depositors.  They knew that Credit Suisse "recorded outflows of client funds on a globally and historically unprecedented scale.  Customer deposits declined by CHF 138 billion [$154 billion] in the fourth quarter 2022."[27]  Just a couple of weeks after the end of the quarter, they anticipated either bankruptcy or cancellation of the

---

[26]  CCAs are equivalent to AT1 Tier 1 Capital, with the only difference being that AT1s are offered to outside creditors, like Plaintiffs and the other Class members here, and CCAs are awarded to Credit Suisse executives and board members as bonuses, deferred compensation, or retentions payments.  There are an estimated $400 million to $700 million in granted or authorized AT1 CCA instruments for employees, executives, and board members.

[27]  *See supra*, n.6.

bonds and took aggressive steps to protect the enormous pool of Employee AT1 bonds used to pay a part of their compensation.

35.     So, nearly two months before the years of accumulated broken trust culminated in the collapse of Credit Suisse, Credit Suisse executives and board members—disappointingly, but unsurprisingly—took decisive and aggressive action to protect their own AT1 exposure while leaving Plaintiffs and the other Class members with a complete loss of value (approximately $17 billion).

### Credit Suisse Implodes in March 2023, Destroying All AT1 Bondholder Value

36.     The end, although long in the making, came a few months later, in March 2023. The accumulated "loss of trust" manifested in huge and accelerating outflows because people were pulling their money out of the Bank. By the end of 2022, customers had withdrawn $154 billion of deposits.[28]  During the week of March 13, 2023, Credit Suisse reached its internal liquidity limit at the Swiss National Bank ("SNB").  In response, on March 15, 2023, the Swiss government provided $43.5 billion USD in "extraordinary" liquidity assistance.  This assistance did not reassure customers and could not staunch the outflows.  As of March 16, 2023, a further $15.6 billion was withdrawn from customer accounts and based on the "foreseeable or continuing outflows" the government provided an additional $22.3 billion in "extraordinary liquidity support."  Despite the total of approximately $65.9 billion in support, customer withdrawals worsened at Credit Suisse caused by the erosion of trust.  By the end of March

---

[28]  *Id.*

2023, customers had withdrawn an additional $75 billion, bringing the total customer withdrawals since October 2022, to over 15% of the Bank's total assets.[29]

37.     By Sunday, March 19, 2023, the Swiss government and FINMA determined they had to act because, as Swiss Minister of Finance Karin Keller-Sutter put it, "***Credit Suisse would not have survived Monday***" (*i.e.*, the next trading day).[30]

38.     The government and FINMA concluded they had but a few viable options for Credit Suisse: bankruptcy, resolution, or a sale.  This dire situation was caused by the years of misconduct, malfeasance, and managerial negligence perpetrated by the Defendants in breach of their duties—by the "***arsonists***," as Minister Keller-Sutter later put it.  Despite FINMA taking decisive action, as Chairman Amstad observed, "[a]ll these tools are not there to impose a strategy on a bank or to restore the trust of clients.  This is the task of management, the boards of directors and ultimately the owners."[31]

39.     FINMA issued a Decree to Credit Suisse on March 19, 2023 to inform AT1 investors that Credit Suisse would be writing down the value of all outstanding AT1 bonds to zero.  FINMA noted and observed that Credit Suisse and (***primarily New York***) subsidiaries suffered "major reputational damage" and "substantial losses" repeated quarterly to such a degree that Credit Suisse found itself "in a structural loss-making situation" and that the Bank's ultimate failure resulted from a "deep crisis of confidence" from its customers.  FINMA further

---

[29]  Hann Ziady, *Depositors pulled $75 billion from Credit Suisse as it veered toward collapse*, CNN Business (Apr. 24, 2023), https://www.cnn.com/2023/04/24/investing/credit-suisse-bank-withdrawals-total/index.html.

[30]  Louise Guillot, *Swiss financial minister defends rushed takeover of Credit Suisse*, Politico (Mar. 25. 2023), https://www.politico.eu/article/swiss-finance-minister-defends-rushed-takeover-of-credit-suisse/#:~:text=To%20justify%20the%20move%2C%20which,achieve%20the%20goal%20of%20stabilization.%22.

[31]  *See supra*, n.6.

observed that the Bank had experienced "substantial liquidity outflows since October 2022" and the customer withdrawals accelerated from March 13 and 14, 2023. FINMA concluded that, as a result of the "major reputational damage," the "deep crisis of confidence," the accelerating customer withdrawals, and the resulting liquidity shortages, Credit Suisse had to zero out the value of all outstanding AT1 bonds to "prevent insolvency" and to "ensure the continued existence of [Credit Suisse]."[32]

40.    Credit Suisse's write-down of the value of all outstanding AT1 bonds was a result of a self-inflicted liquidity and collateral crisis that, in turn, was a product of the broken trust between the Bank and its customers from the years of accumulated scandals resulting from the Defendants' negligence and breaches of duties owed under Swiss law to Plaintiffs and the Class. As FINMA Chairwoman Amstad noted, "[s]trategic misjudgments on the part of the bank, the failure of the management or losing the trust of clients and investors are not supervisory offences . . . . Responsibility for action rests with . . . the board of directors."[33]

41.    But to be clear, the AT1 notes were worthless before the FINMA Decree. The FINMA Decree merely confirmed what was already true—the AT1 bonds were worthless. Everyone knew that the bonds would be wiped out under bankruptcy, resolution, "temporary public ownership (TPO) [*i.e.*, nationalization] [or] a takeover."[34] Defendants' managerial negligence destroyed the value of the Bank and its AT1 bonds. Indeed, FINMA's CEO confirmed the inevitability of the destruction of the AT1 notes:

---

[32] *Decree of the Swiss Financial Market Supervisory Authority FINMA in the Matter of Credit Suisse Group AG* (Mar. 19, 2023), https://www.finma.ch/en/news/2023/03/20230319-mm-cs-ubs/.

[33] *See supra*, n.6.

[34] *Id.*

Allowing the bankruptcy of troubled lender Credit Suisse would have crippled Switzerland's economy and financial center and likely resulted in deposit runs at other banks, Swiss regulator FINMA said Wednesday.

The bankruptcy plan, FINMA CEO Urban Angehrn said in a statement, was "de-prioritised early on due to its high tangible and intangible costs."  It would have *erased the holding company Credit Suisse Group, along with the parent bank Credit Suisse AG* and its branches, while retaining the Credit Suisse (Schewiz) AG entity because of its "systemic importance."

\*        \*        \*

Among FINMA's other options, the resolution recourse would have downsized Credit Suisse, with the Swiss National Bank supplying liquidity assistance loans backed by a federal default guarantee.  *The bank's equity and AT1 bonds would still have been written down to zero*, with other bondholders being bailed in.[35]  [Emphasis added.]

42.    Wherever located, Credit Suisse's directors and executives—including all of Credit Suisse's New York-based directors and executives—were bound by duties set out in the Swiss Code of Obligations ("CO").  Those duties were owed not only to Credit Suisse but also, by statute, *directly to its creditors*.  "The members of the board of directors and all persons engaged in the business management or liquidation of the company are liable both to the company and to the individual shareholders and creditors for any losses or damage arising from any intentional or negligent breach of their duties."  CO art. 754, §1.

43.    Plaintiffs, individually and on behalf of the other Class members—each of whom are or were creditors (as holders of AT1 notes)—bring this action under CO Article 754 to recover billions of dollars of damages on behalf of a Class consisting of holders of Credit Suisse AT1 notes, caused by Defendants' breaches of their statutory duties.

---

[35] Ruxandra Iordache, *Switzerland faced a full-scale bank run if Credit Suisse went bankrupt, Swiss regulator argues*, CNBC (Apr. 5, 2023), https://www.cnbc.com/2023/04/05/switzerland-faced-a-bank-run-if-credit-suisse-went-bankrupt-swiss-regulator.html.

44.      This action sounds in negligence—**conduct** in breach of statutory duties—and **not** in fraud based on **communications**—misrepresentations or omissions—made to the AT1 bondholders.  Plaintiffs expressly deny any intention to bring claims sounding in fraud and disclaim any inference of fraud that Defendants might contend lurks beneath the surface of the allegations set forth herein.

## II.  JURISDICTION AND VENUE

45.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332, because: (a) at least one member of the Class is a citizen of a state different from any defendant; and also because (b) at least one member of the Class is a citizen or subject of a foreign state and any defendant is a citizen of a state.  In addition: (a) the Class consists of at least 100 members; (b) the amount in controversy exceeds $5,000,000 exclusive of interest and costs; and (c) no relevant exceptions apply to this claim.

46.      The claims asserted in this action arise under Swiss substantive law (and not under the laws of any State).

47.      This action is not based on fraud or false or misleading statements by Credit Suisse in connection with the purchase or sale of securities, but, rather, on Defendants' conduct in breach of their statutory duties.  The exception in 18 U.S.C. §1921(c) regarding the purchase or sale of securities does not apply.  This claim is for bondholders who suffered damages and/or losses due to Defendants' negligence.

48.      This Court has personal jurisdiction over Defendants, as described more fully below, because they are citizens or domiciliaries of New York; had continuous and systematic contacts with New York; engaged in conduct that had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons in New York; and/or purposely availed themselves of the laws of the New York.  This Court has specific jurisdiction of the

defendants and the claim because of the affiliation between the forum and the specific controversy alleged herein.

49.     The Credit Suisse entity or entities that employed certain Defendants conducted business in New York (directly or through subsidiaries) and obtained billions of dollars in revenues each year from its activities in New York.  As such, Credit Suisse, and its directors and executives sued herein, have purposefully availed themselves of the privilege of accessing New York's commercial and financial markets for their business purposes and their personal economic gain, selling products and services to thousands of New York residents, and obtaining billions of dollars of revenue therefrom.

50.     While brought under Swiss substantive law, New York is the most appropriate forum for this action.  Most of the Defendants live or work in New York.  The conduct complained of happened primarily in New York.  Discovery will largely be New York-focused. As a former Credit Suisse CEO told the United States Senate, Credit Suisse "has deep roots in the United States.  Parts of today's Credit Suisse date back to the First Boston Corporation, a U.S. firm that has its roots going back to the 18th Century."[36]  The underlying cause of Credit Suisse's demise began in, and spread from, New York.  This case centers on the culture imported from CSFB and located in Credit Suisse's Investment Banking Division.  That Division has been run out of New York and was headed or co-headed by New Yorkers from 2004 until September 2022.  This is a New York-centric case.

---

[36] *Offshore Tax Evasion: The Effort to Collect Unpaid Taxes on Billions in Hidden Offshore Accounts Before the Permanent Subcomm. on Investigations of the of the S. Comm. on Homeland Sec. & Governmental Affairs*, 113th Cong. 20 (2014).

51.     Credit Suisse's New York Investment Banking Division was the primary source of the Bank's most significant publicly reported scandals, and illegal and unethical conduct, over the past several years.

52.     The Investment Banking Division, with its roots in Wall Street, was the principal source of Credit Suisse's toxic culture that valued short-term gain over long-term trust and led to countless scandals and billions of dollars of U.S. government penalties—and Plaintiffs' and the other Class members' losses, as alleged herein.

53.     Venue is proper in this Court under 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claim herein occurred in this District, at least one Defendant resides in the District, and most if not all Defendants are subject to the Court's personal jurisdiction with respect to the action.

III.    PARTIES

**Plaintiffs**

54.     Plaintiff STAR COLBERT is a holder of AT1 bonds.  STAR COLBERT is a fonds commun de placement, organized under the laws of France, and its address is c/o Axiom Alternative Investments at 39 Avenue Pierre 1er de Serbie, Paris, France 75008.  STAR COLBERT is the beneficial owner of its AT1 bonds, but acts under the direction of Axiom Alternative Investments.  STAR COLBERT has suffered damage and/or loss due to the conduct complained of herein.

55.     Plaintiff Assenagon Credit SubDebt and CoCo is a holder of AT1 bonds. Assenagon Credit SubDebt and CoCo is a fonds commun de placement, organized under the laws of Luxembourg, and its address is c/o Assenagon Asset Management S.A. at 1B Heienhaff L-1736, Niederanven, Luxembourg.  Assenagon Credit SubDebt and CoCo is the beneficial owner of its AT1 bonds, but acts under the direction of Assenagon Asset Management S.A.

Assenagon Credit SubDebt and CoCo has suffered damage and/or loss due to the conduct complained of herein.

56.    Plaintiff Axiom Lux SICAV is a holder of AT1 bonds.  Axiom Lux SICAV is a Société d'investissement à Capital Variable, organized under the laws of Luxembourg, and its address is 5, allée Scheffer, LU-2520 Luxembourg B196052.  Axiom LUX SICAV has suffered damage and/or loss due to the conduct complained of herein.

57.    Axiom European Financial Debt Fund Limited is a holder of AT1 bonds. Axiom European Financial Debt Fund Limited is a limited company organized under the laws of Guernsey, and its address is P.O. Box 650, 1st Floor, Royal Chambers, St. Julian's Avenue, St. Peter Port, GUERNSEY GY1 3JX.  Axiom European Debt Fund Limited has suffered damage and/or loss due to the conduct complained of herein.

**Defendants**

58.    Defendant Brady W. Dougan ("Dougan") is a citizen of the United States and of New York.  Dougan was CEO of Credit Suisse Group AG from May 2007 until June 2015. Dougan joined First Boston in 1990.  He was the Head of the Equities Division at CSFB for five years before he was appointed Global Head of the Securities division in 2001.  From 2002 to July 2004, he was Co-President, Institutional Services at CSFB, and from 2004 until the merger with Credit Suisse in May 2005, he was CEO of CSFB.  From May 2005 to year-end 2005, he was CEO of the Credit Suisse First Boston division at Credit Suisse.  In 2006 and 2007, prior to becoming CEO of Credit Suisse Group AG, he was CEO of the Investment Banking Division.

59.    Defendant Eric Varvel ("Varvel") is a citizen of the United States and of New York.  Varvel, a Dougan protégé and CSFB alumnus, became acting head of Credit Suisse's Investment Banking Division in September 2009 when the prior head of Investment Banking, Paul Calello (another New Yorker, Dougan protégé, and CSFB alumnus) stepped down for

health reasons.  Varvel removed the "acting" tag and formally became CEO of Investment Banking in July 2010.  He remained in that position until October 2014.  Varvel was appointed Global Head of Asset Management (within the Wealth Management Division) in 2016.  Varvel, who had management responsibility, was ousted as head of the asset management unit shortly after the Greensill scandal was revealed in March 2021.

60.    Defendant James L. Amine ("Amine") is a citizen of the United States and of Connecticut.  He worked in New York for many years, including when he was employed by CSFB (1997-2005) and Credit Suisse (2005-2019).  He also worked in New York prior to his tenure at CSFB, as a partner at Cravath, Swaine & Moore.  Amine was head or co-head of Investment Banking from October 2014-November 2019.

61.    Defendant Timothy P. O'Hara ("O'Hara") is a citizen of the United States and of New York.  He was a long-time Dougan protégé.  He was co-head of Investment Banking from October 2014 to November 2015, then became head of Global Markets from November 2016 until September 2016 when he was forced out by newly installed Credit Suisse CEO Tidjane Thiam after $1 billion in worthless Collateralized Loan Obligations and distressed credit, for which he was responsible, had to be written off.  Thiam publicly complained that O'Hara's group had concealed these risky positions from senior management.

62.    Defendant David Miller ("Miller") is a citizen of the United States and of New York.  He has worked in New York for many years.  He was head of Investment Banking from November 2019 until August 2020.  Thereafter he remained at Credit Suisse in senior investment banking roles.  Miller resides in this District.

63.    Defendant Brian Chin ("Chin") is a citizen of the United States and of New York.  Chin was head of Global Markets from September 2016 until August 2020, when he

became head of Investment Banking.  Chin was fired in March 2021 after the Archegos disaster, for which he was partly responsible.

64.       Defendant Christian Meissner ("Meissner") is a citizen of Austria who lives in New York.  He worked for Credit Suisse, with residency in New York, from November 2020 until September 2022.  He was CEO of the Investment Bank, with his headquarters in New York, from May 2021 until September 2022.

65.       Defendant Gaël de Boissard ("Boissard") is a French citizen.  He worked at CSFB/Credit Suisse from 2001 until October 2015.  Boissard, a Dougan protégé, was co-head of Investment Banking from January 2013 until October 2015, when he left the Bank, forced out by new CEO Thiam.  Following his departure, the Investment Bank had to take a $1 billion write-off related to the worthless Collateralized Loan Obligations and distressed credit.  Boissard worked primarily in the London office but spent a significant amount of time conducting Credit Suisse business in New York where his co-heads of Investment Banking were located.  From 2001 until January 2013, he held senior positions within Investment Banking.

66.       Defendant Urs Röhner ("Röhner") is a Swiss citizen.  Röhner left private law practice in 2004 to join Credit Suisse as General Counsel.  He became Vice Chairman of the Credit Suisse Board of Directors in 2009 and was elevated to Chairman (a full-time executive position) in 2011.  He stepped down as Chairman in 2021.  Röhner is a member of the New York Bar, having first been admitted in or about 1990 when he practiced in New York City with Sullivan & Cromwell.  Röhner has, and continues to have, numerous contacts with New York. He owns a home in Manhattan.  He spent a significant amount of time in New York in connection with his work for Credit Suisse.

67.     Defendant Tidjane Thiam ("Thiam") is a French and Ivorian citizen. According to his LinkedIn page, he currently resides in New York City.[37]  Thiam became CEO of Credit Suisse in 2015, replacing Dougan and remained in that role until February 2020. Thiam recognized soon after becoming CEO that the Bank's culture of lax risk management "was a problem."[38]  Thiam called for a "cultural change" after Credit Suisse was forced to write down over $1 billion of worthless Collateralized Loan Obligations and distressed credit.  Thiam noted that "'[c]ultural issues can't be resolved overnight'" and that "'[i]t will take a lot of continued effort to deal with those issues.'"[39]  Thiam initiated a "radical" restructuring of Credit Suisse that "began with shock and awe as [he] recast a bank that had come to be dominated by its markets trading businesses into one that would be dominated by its private banking and wealth management operations instead."[40]  But ultimately Thiam failed to roll back the influence of the U.S.-focused Investment Banking or to materially change the lax risk management culture. Worse, under Thiam, the risk function was downsized and de-emphasized with disastrous results.

68.     Defendant Thomas Gottstein ("Gottstein") is a Swiss citizen.  Gottstein became CEO when Thiam was forced out in February 2022.  He had numerous contacts with New York and made several visits to the Credit Suisse Investment Banking headquarters in New York while he was CEO.  Gottstein, like his predecessor Thiam, recognized the cultural issues

---

[37]  Tidjane Thiam, LinkedIn, https://www.linkedin.com/in/tidjane-thiam-652284140 (last visited June 20, 2023).

[38]  Joshua Franklin, *Credit Suisse faces tough questions after $1 billion write-downs*, Reuters (Apr. 4, 2016), https://www.reuters.com/article/us-credit-suisse-writedowns/credit-suisse-faces-tough-questions-after-1-billion-write-downs-idUSKCN0X12F9.

[39]  Owen Walker & Stephen Morris, *Former Credit Suisse chief Tidjane Thiam defends his record*, Financial Times (Nov. 29, 2022), https://www.ft.com/content/97b5d4c8-e000-4bdd-aaf4-b289397dc753.

[40]  Peter Lee, *The master strategist: How Tidjane Thiam brought a revolution to Credit Suisse*, Euromoney (July 31, 2018), https://www.euromoney.com/article/b199lzvsyn5m0j/the-master-strategist-how-tidjane-thiam-brought-a-revolution-to-credit-suisse.

caused mainly by the U.S.-focused Investment Banking and instituted another "restructuring." But Gottstein, like Thiam, was unable to rein in the excesses of the Investment Banking or to institute a disciplined approach to risk. The Greensill and Archegos disasters broke during Gottstein's term as CEO and in July 2022 he was forced out of Credit Suisse.

69.    Defendant Sir António Horta-Osório ("Horta-Osório") is a Portuguese and British citizen. Horta-Osório became Chairman of Credit Suisse's Board of Directors in April 2021. Almost immediately, he announced plans for another "restructuring." He stated his intention soon after he arrived to "take a look at the bank's risk management and culture following recent crises, as well as reviewing strategic options for the bank."[41] In November 2021, he "unveiled a new strategy focusing on risk management and doubling down on its wealth management business as it seeks to pursue a more sustainable growth."[42] The new strategy was, he said, designed to "'rebuild a culture of trust'" while acknowledging that there was "'no quick fix'" and it would be a "'continuous effort.'"[43] However, having set out to rebuild trust, he was forced to resign in January 2022 over his own ethical lapses. Horta-Osório had numerous contacts with New York and made several visits to the Credit Suisse headquarters in New York while he was Chairman.

---

[41] *New Credit Suisse chairman eyes risk and culture, strategic options*, Reuters (Apr. 30. 2021), https://www.reuters.com/business/finance/new-credit-suisse-chairman-eyes-risk-culture-strategic-options-2021-04-30/.

[42] *Credit Suisse focuses on risk management in restructuring plan*, The Asset (Nov. 4, 2021), https://theasset.com/index.php/article/45338/credit-suisse-focuses-on-risk-management-in-restructuring-plan. Horta-Osório's "restructuring plans include[ed] paring back its investment bank activities after it suffered multibillion losses." Farah Ghouri, *Credit Suisse chair Antonio Horta-Osorio says largest investors back bank overhaul*, City A.M. (Nov. 7, 2021), https://www.cityam.com/credit-suisse-chair-antonio-horta-osorio-says-largest-investors-back-bank-overhaul/.

[43] Farah Ghouri, *Credit Suisse chair Antonio Horta-Osorio says largest investors back bank overhaul*, City A.M. (Nov. 7, 2021), https://www.cityam.com/credit-suisse-chair-antonio-horta-osorio-says-largest-investors-back-bank-overhaul/.

70.    Defendant Robert S. Shafir ("Shafir") is a citizen of the United States and of New York.  He went to Credit Suisse in 2007 after 16 years at Lehman Brothers.  Shafir was a close associate of Dougan's, who installed him as a member of Credit Suisse's Executive Board in 2007.  He was the Joint Head of Private Banking and Wealth Management and the Regional CEO for the Americas from 2012 until 2015 when he left Credit Suisse.  He was the CEO of Asset Management from 2008 to 2012 and the CEO of the Americas region from 2007 to 2010.

71.    Defendant Lara J. Warner ("Warner") is a citizen of the United States and of New York.  She maintained a home in Pelham, New York, even during the years she worked in Zurich, Switzerland.  Warner was Chief Compliance and Regulatory Affairs Officer of Credit Suisse from October 2015 until February 2019, then became Chief Compliance and Risk Officer from February 2019, when those positions were combined, until she was fired in April 2021 in the wake of the Archegos disaster.  Warner had little or no background in risk management, having come from a background as an analyst for the Investment Banking Division.  Warner, with the acquiescence of her then-superiors, hollowed out the risk group, as found by the Paul Weiss Report.  Soon after she was fired, Credit Suisse hired back many of the senior risk managers she had previously terminated or forced out.

72.    Defendant Richard E. Thornburgh ("Thornburgh") is a citizen of the United States and of Florida.  A life-long investment banker, he spent many years living and working in New York City and continues to regularly conduct business in New York.  Thornburgh was a director of Credit Suisse Board of Directors from 2006 until 2016 and was Vice Chairman of the Board from 2014 until 2016.  He was a member of the Risk Committee of the Board from 2006 until 2016 and chaired that committee from 2009 until 2016.  He was paid $420,000 annually for serving as chair of the Risk Committee, in addition to his other Board compensation (which in

the aggregate exceeded $1 million for 2016, his last full year on the Board). Thornburgh began his investment banking career in New York with First Boston. From 1995 until 2005, he held a series of senior executive positions at CSFB and with Credit Suisse after it absorbed CSFB, including Chief Risk Officer. Thornburgh lived and worked in New York City the entire time he held his Board position. Thornburgh was uniquely well-placed to observe and exercise Board-level oversight with respect to the Investment Banking Division and its culture, compensation and risk practices.

73.    Defendant Andreas Gottschling ("Gottschling") is a German citizen. Gottschling was a Credit Suisse director from 2017 to 2021. From 2018 to 2021, he served as Chairman of the Risk Committee. Gottschling was chair of the Risk Committee when the Greensill and Archegos disasters blew up. He stepped down from the Board in February 2021, just before the 2021 Annual General Meeting when it became apparent that major institutional investors opposed his reelection to the Board. As Chair of the Risk Committee, Gottschling had numerous contacts with New York in connection with the events alleged herein.

74.    Defendant Michael Klein ("Klein") is a citizen of the United States and of New York. Klein, a life-long investment banker, was a Credit Suisse director from 2018 until 2022. He served on the Board's Risk Committee from 2018 until 2021. In February 2023, Credit Suisse announced that Klein had become a member of the Executive Board and that he would lead a spinoff of most of the Investment Banking Division into a newly reconstituted CS First Boston.

75.    Defendant Noreen Doyle ("Doyle") is a citizen of the United States and Ireland, and of New York. She was a Credit Suisse director from 2004 until 2017. Doyle was Vice-Chair and Lead Independent Director of the Board from 2014 until 2017. She was a

member of the Risk Committee during the following periods: 2004-2007, 2009-2014, and 2016-2017.

## IV. STATEMENT OF FACTS

A.     **Trust Is Critical for a Financial Institution, and Directors and Managers of Financial Institutions Are Duty-Bound to Protect Trust and Confidence in the Institution**

76.     "The whole principle of banking is built on trust."[44]

77.     Credit Suisse's webpage, "Trust & Expertise," recognizes the critical and interconnected roles of trust and compliance:

**Financial integrity**

Compliance operates as an independent Executive Board-level function at Credit Suisse, underscoring the high level of importance that we assign to this topic. The function's mandate is to oversee compliance matters for Credit Suisse, and it includes being a proactive, independent function that partners with the businesses by continuously challenging and supporting them to effectively manage compliance risk.

Recognizing the critical role of employees in helping to preserve financial integrity, we aim for the highest standards of personal accountability and ethical conduct from each member of our workforce. Credit Suisse employees at all levels of the organization, as well as the members of the Board of Directors, are obligated to adhere to Credit Suisse's Code of Conduct.[45]

78.     Credit Suisse's 2017 Annual Report stated that trust is essential in the finance business: "In finance, trust is essential to successfully pursue business opportunities."

---

[44]  Jannie Rossouw, *When banks go bust: the four factors at play – trust, confidence, contagion and systemic risk,* The Conversation (Mar. 22, 2023), https://theconversation.com/when-banks-go-bust-the-four-factors-at-play-trust-confidence-contagion-and-systemic-risk-202382.

[45]  *Trust & Expertise*, Credit Suisse, https://www.credit-suisse.com/about-us/en/our-company/corporate-responsibility/banking/trust-expertise.html (last visited June 20, 2023).

79.     In the same Annual Report, then-Chairman Urs Röhner stated: "Unquestionably, trust is the cornerstone of any long-term business relationship.  It has traditionally been the very foundation of banking and the basis on which we operate."

80.     "Trust is the cornerstone of the banking system.  It is a fundamental aspect that underpins the relationship between banks, customers, and other stakeholders. . . .  Trust is necessary for maintaining the stability of the financial system, fostering economic growth, and ensuring the efficient functioning of the banking sector. . . .  The relationship between customers and their banks is built on the premise of trust.  Customers trust banks to safeguard their deposits, facilitate transactions, and provide credit for personal and business purposes.  This trust is primarily founded on the belief that banks are competent and reliable institutions that adhere to a set of rules and regulations designed to protect the interests of their customers. . . . ***However, when trust is compromised, the consequences can be severe.  A loss of trust can lead to bank runs, as depositors rush to withdraw their funds, fearing that the bank may become insolvent. This can cause severe liquidity problems for banks, leading to a potential collapse of the financial system***."[46]

81.     Credit Suisse directors and senior management created a loss of trust, and the consequences were severe.

82.     Beginning with the Dougan era, when former CSFB bankers from New York came to dominate Credit Suisse and infuse it with their culture of lax risk management and ethically challenged conduct in the pursuit of short-term profit and the quarterly or annual bonuses that were tied to this short-term outlook, and continuing through successive

---

[46] Josh Luberisse, *The Importance of Trust in the Banking System*, Medium (Apr. 29, 2023), https://medium.com/fortis-novum-mundum/the-importance-of-trust-in-the-banking-system-2359469baecb.

administrations that proved unequal to the task of materially changing that culture, the Bank squandered the trust it had built over many decades.

83.     The "arsonists" in charge of Credit Suisse—directors, CEOs, and members of the Executive Board, especially those leading (among others) Investment Banking and the risk function—caused its ultimate death spiral and collapse.

**B.     Trust in Credit Suisse Was Destroyed by the Toxic Culture Created Principally by Its New York Investment Bank's Excessive Risk-Taking and Self-Dealing**

84.     Historically, Credit Swiss was a Swiss private bank catering to the wealthiest people in the world.  It was discrete, conservative, and secretive.

85.     But the traditional Swiss banking culture of Credit Suisse began to change when it invested in, then acquired, the aggressive Wall Street deal-driven investment bank known as First Boston Corporation.

86.     As discussed above, CSFB, headquartered in New York, instilled its aggressive, risk-taking culture into the entire company.  In fact, it became the dominant culture at Credit Suisse.  The ghost of CSFB haunted Credit Suisse for years and finally brought it down.

**C.     The Brady Dougan Era—The New York Investment Bankers Take Control**

87.     In 2007, only months after CSFB had been merged into Credit Suisse, former CSFB trader Brady Dougan (a New Yorker) became CEO of Credit Suisse.  He brought numerous CSFB alumni with him into the senior ranks of Credit Suisse management.

88.     By 2008, six of the eleven members of the Credit Suisse Executive Board had come out of CSFB, including (in addition to CEO Dougan) the heads of Private Banking, Investment Banking, and Asset Management, as well as the Chief Risk Officer and the head of Credit Suisse Europe, Middle East, and Africa.

89.     Dougan's acolytes were placed in positions where, by example and through incentives, they were able to inject their ethically challenged "Wall Street boys" culture, with its emphasis on personal profit stemming from outsized corporate risk, into the bloodstream of the bank as a whole.  Most of these CSFB "gunslingers" were New Yorkers.  And the domination of Investment Banking, by New Yorkers never changed.  Of the nine heads of the Investment Banking Division since it was absorbed by Credit Suisse in 2004, eight were New Yorkers.[47]

90.     During Dougan's time leading Credit Suisse as CEO, the power and influence of the Investment Banking Division, and of Dougan's disciples, grew.

91.     In 2012, Dougan orchestrated an internal reorganization that increased the influence of the Investment Banking Division while installing a Dougan lieutenant—Defendant Shafir, whose background was in investment banking—as co-head of the other Division (Private Banking and Wealth Management).  Three of the four divisional co-heads—the top four operating executives under CEO Dougan—were Dougan's people with investment banking pedigrees, while only one of the four was a Swiss banker.

92.     As a result, the risk-taking, ethically challenged, CSFB culture pervaded not only the Investment Banking Division where it started, but also continued to spread throughout the bank.

93.     Indeed, Defendant Dougan and his lieutenants overhauled Credit Suisse.  As noted in a *Reuters* article in 2012, "***Americans and investment bankers . . . gained in influence***

---

[47] Defendants Dougan, Varvel, Amine, O'Hara, Miller, Chin, and Meissner—all New Yorkers—ran the Investment Banking Division at some point between 2004 and 2022.  Paul Calello, a New Yorker, also ran the Investment Banking Division, and passed away in 2010.  The sole outlier, Defendant de Boissard, a Frenchman appointed by Dougan, acted for a time as co-head of the Investment Banking Division (along with New Yorkers) from his office in London.

*with the overhaul, deepening a cultural tug-of-war between Credit Suisse's U.S.-focused investment bank and its less risky and more traditional Swiss-based private bank.*"[48]

94.     Dougan also instituted or approved certain "profit-sharing schemes" and a program of huge "bonuses"—often in the form of participation interests in temporarily undervalued securities that the New York bankers expected, based on non-public information, to rebound and soar in value—that further worsened the risk culture by incentivizing risk-taking with the Bank's assets in order to create lavish bonus pools for the individual executives and traders.

95.     Specifically, in furtherance of their me-first culture, Dougan and his Investment Banking lieutenants caused very lucrative custom derivatives to be created to fund bonus and deferred compensation pools for the most senior Credit Suisse Managing Directors, known as "Partner Asset Facilities" or "PAFs."  The first such structure (PAF1) was created in 2009 to fund the 2008 bonus pool for senior Managing Directors.  It was funded with mortgage-backed securities ("MBS") at a time when such securities had fallen into disfavor.  But the MBS that were hand-selected to fund the bonus pool were actually quite valuable; in fact, they increased in value by 72% in 2009 alone.  The insiders, in other words, got some of the best and safest MBS the Bank had on its books—and at a significantly discounted price.  Another pool (PAF2) was created to fund the 2011 bonus pool.  It was funded with counter-party risk to enhance the Bank's regulatory capital position while providing a lucrative benefit to its executives.  But PAF2 was ultimately disallowed by regulators because Credit Suisse directly or indirectly guaranteed the payments to the executives via a set of swaps that left the ultimate risk on Credit Suisse.

---

[48] *See supra*, n.16.

96.     When the PAF2 program was disallowed, Credit Suisse substituted a different fund entitled "Contingent Capital Awards."  As more thoroughly discussed below, these securities were initially treated by Credit Suisse as Tier 1 bonds (*e.g.*, Credit Suisse Employee AT1 bonds) for regulatory purposes—that is, until January 12, 2023, when Credit Suisse informed FINMA that it wanted to remove these securities (but no others) from Tier 1, which would have protected them from an AT1 write-down.  It seems clear, in retrospect, that the senior Credit Suisse insiders, who were best placed to understand the existential danger the Bank was in and the likelihood of an AT1 ***write-down, were attempting to flee the ship before it sank. FINMA ultimately refused this*** preferential treatment for Credit Suisse insiders.

97.     The toxic New York culture manifested in a series of high-profile legal and financial disasters during, or arising from, the Dougan Era.  The specific acts of misconduct, malfeasance, and managerial negligence described in the preceding paragraphs were perhaps among the most public and egregious of the Dougan Era, but they were emblematic of deeper and broader problems at Credit Suisse—a cascade of individual acts enabled by a toxic culture, created by top leadership and particularly the top Investment Banking leadership in New York, that was progressively resulting in loss of trust.

### 1.     Toxic Asset-Backed Securities

98.     One example is the stew of greed, dishonesty, and managerial negligence flowing from the Asset-Backed Securities ("ABS") created and sold by the Structured Credit business within Investment Banking during 2005-2007.  Dougan was either CEO of the Investment Banking Division, or CEO of Credit Suisse itself, during this entire fiasco.

99.     Traders in Credit Suisse's Investment Banking Division created and sold billions of dollars of ABS in the form of Residential Mortgage-Backed Securities ("RMBS"), Commercial Mortgage-Backed Securities ("CMBS"), and Collateralized Debt Securities

("CDO"), packaging and selling to third-party investors such as pension plans what the Bank later admitted was "'complete crap'" and "'[u]tter complete garbage.'"[49]   Investors who purchased these securities from Credit Suisse lost untold billions of dollars.  As detailed below, many of these investors sued and recovered, in the aggregate, billions of dollars.

100.     Credit Suisse itself was forced to pay massive fines and settlements, ultimately more than $9 billion, for its role in structuring and selling these toxic RMBS, CMBS, and CDO securities.  This included a $5.28 billion settlement with the DOJ, which included a $2.48 billion fine.  The DOJ release announcing the settlement contained the following:

> "Today's settlement underscores that the Department of Justice will hold accountable the institutions responsible for the financial crisis of 2008," said Attorney General Loretta E. Lynch.  "Credit Suisse made false and irresponsible representations about residential mortgage-backed securities, which resulted in the loss of billions of dollars of wealth and took a painful toll on the lives of ordinary Americans.  Under the terms of this settlement, Credit Suisse will pay $2.48 billion as a fine for its conduct.  And Credit Suisse has pledged $2.8 billion in relief to struggling homeowners, borrowers, and communities affected by the bank's lending practices.  These sums reflect the **huge breach of public trust** committed by financial institutions like Credit Suisse."

> "Credit Suisse claimed its mortgage-backed securities were sound, but in the settlement announced today ***the bank concedes that it knew it was peddling investments containing loans that were likely to fail***," said Principal Deputy Associate Attorney General Bill Baer.[50]  [Emphasis added.]

101.     Credit Suisse was forced to take a massive $2.85 billion write-down on the RMBS inventory it had not been able to push out to investors and thus held at year-end 2007, attributing part of the problem to "mismarking" (*i.e.*, falsifying the value) of the securities.

---

[49]  Press Release, U.S. Department of Justice, *Credit Suisse Agrees to Pay $5.28 Billion in Connection with its Sale of Residential Mortgage-Backed Securities* (Jan. 18, 2017), https://www.justice.gov/opa/pr/credit-suisse-agrees-pay-528-billion-connection-its-sale-residential-mortgage-backed.

[50]  *Id.*

102.     One senior Credit Suisse Managing Director, Kareem Serageldin ("Serageldin"), pleaded guilty and went to prison for mismarking ABS securities. Serageldin held the position of Global Head of the Structured Credit Group in the Securities Department of Credit Suisse's Investment Banking Division and divided his time between the company's New York and London offices. As explained by the U.S. DOJ in the press release following the guilty plea:

> The deterioration throughout 2007 of the real estate market in the United States, including the subprime housing market, led to significant reductions in valuations of mortgage-backed securities. As mortgage delinquencies increased across the country, the value of the securities backed by these mortgages decreased and the market for them became increasingly illiquid.
>
> By late November 2007, SERAGELDIN was aware that the market for mortgage-backed securities had declined enormously. On November 28, 2007, SERAGELDIN told Higgs, Siddiqui, and a co-conspirator ("CC-1") that "the housing market [was] going down the tubes" and that they had to "find a way to sell these bonds," i.e., mortgage-backed bonds in ABN1. As SERAGELDIN recognized, "[t]hose bonds are going to start trading worse than the [ABX] Index." . . .
>
> From August 2007 through February 2008, SERAGELDIN, Higgs, Siddiqui, and their co-conspirators artificially increased the price of bonds in order to create the false appearance of profitability in the ABN1 trading book. Specifically, SERAGELDIN directed Higgs on numerous occasions to reach specific Profit & Loss ("P&L") targets on a daily and month-end basis. Higgs, in turn, instructed Siddiqui and another unnamed co-conspirator to mark the books so as to achieve the particular P&L targets specified by SERAGELDIN, rather than to reflect the fair value of the bonds.
>
> In order to reach specific P&L targets, SERAGELDIN, Higgs, Siddiqui, and their co-conspirators marked up bond prices without regard to fair market value; improperly offset mark-downs with gains realized in other parts of the book to avoid a P&L impact; and engaged in the practice of "reversing out," which involved freezing marks at a favorable point in time to achieve a desired P&L result.[51]

---

[51] Press Release, U.S. Department of Justice, *Former Credit Suisse Managing Director Pleads Guilty In Connection With Scheme To Hide Losses In Mortgage-Backed Securities Trading Book* (Apr. 12, 2013), https://www.justice.gov/usao-sdny/pr/former-credit-suisse-managing-director-pleads-guilty-connection-scheme-hide-losses.

103.    The DOJ also specifically noted that one of the reasons for this manipulation was "to secure significant year-end bonuses since the trading book's profitability was one of the factors in determining bonus amounts.  [Serageldin's] 2007 bonus was over $1.7 million, and his Incentive Share Unit Award was more than $5.2 million."[52]

104.    The bonuses and incentive awards available to ABS traders and other senior Investment Banking personnel encouraged unethical and illegal behavior, but that same behavior resulted in truly monumental bonuses and incentive awards for those at the top such as Dougan, who received a $100 million bonus for 2010 alone.

105.    In sum, the toxic ABS catastrophe—which happened on defendant Dougan's watch—was driven by greed that was incentivized by Investment Banking management and that cost Credit Suisse billions of dollars—but neither Dougan nor the other Defendants took effective steps to change that culture.  Rather, they doubled down and kept going.

## 2.    Criminal Tax Evasion

106.    In 2014, the U.S. Department of Justice announced that Credit Suisse had pleaded guilty to a criminal conspiracy to aid and assist U.S. taxpayers in filing false returns. Credit Suisse paid a $2.6 billion fine.[53]   As part of the plea agreement, Credit Suisse acknowledged that "it [had] operated an illegal cross-border banking business that knowingly and willfully aided and assisted thousands of U.S. clients in opening and maintaining undeclared

---

[52]  *Id.*

[53]  As the DOJ noted in its announcement, "Earlier this year, Credit Suisse paid approximately $196 million in disgorgement, interest and penalties to the Securities and Exchange Commission (SEC) for violating the federal securities laws by providing cross-border brokerage and investment advisory services to U.S. clients without first registering with the SEC.  That settlement with the SEC is also reflected in today's plea agreement."  Press Release, U.S. Department of Justice, *Credit Suisse Pleads Guilty to Conspiracy to Aid and Assist U.S. Taxpayers in Filing False Returns* (May 19, 2014), https://www.justice.gov/opa/pr/credit-suisse-pleads-guilty-conspiracy-aid-and-assist-us-taxpayers-filing-false-returns.

accounts and concealing their offshore assets and income from the IRS."[54]  Credit Suisse's New York culture of risk-taking and lack of oversight permitted the repeated criminal acts committed by hundreds of employees.  At the time, defendant Shafir—a Dougan protégé and former investment banker—was co-head of the Private Banking and Wealth Management Division, which was directly responsible for the criminal conduct and the fine.

107.    Prosecutors insisted on the corporate guilty plea and enhanced penalties were imposed because Credit Suisse's Directors and Officers permitted the obstruction of the criminal investigation.

108.    In 2014, U.S. Senate hearings further exposed the details of Credit Suisse's systematic and illegal tax-avoidance and money-laundering misconduct in the United States, revealing that the Private Banking and Wealth Management Division was a "willful accomplice" in tax evasion of billions of dollars.

109.    The New York State Superintendent of Financial Services commented on the guilty plea:

> Going forward, however, it is necessary that Credit Suisse and its top management go above and beyond to ensure the Bank is playing by the rules and that management acts to prevent misconduct within the firm.  Facilitating tax evasion was a strategy and business model that the firm engaged in for decades. It was decidedly not the result of the conduct of just a few bad apples.  It is therefore quite appropriate that the firm itself is today pleading guilty, and for our independent monitor to further review the elements of Credit Suisse's corporate governance that contributed to this wrongdoing.[55]

---

[54] *Id.*

[55] Press Release, New York State Department of Financial Services, *Statement of New York Superintendent of Financial Services Benjamin M. Lawsky Regarding Credit Suisse AG* (May 19, 2014), https://dfs.ny.gov/reports_and_publications/press_releases/pr1405191.

### 3.    Patrice Lescaudron's $1 Billion Fraud

110.    From approximately 2006-2015, Credit Suisse banker Patrice Lescaudron ("Lescaudron") stole well over $1 billion from clients over a period of at least eight years by forging client signatures.  Lescaudron, who admitted falsifying trades and hiding losses as part of a scheme that made him tens of millions of Swiss francs, was convicted in 2018 and subsequently took his own life.

111.    But Lescaudron's crime was also Credit's Suisse's failure.  Credit Suisse conducted and internal investigation (now hidden by Credit Suisse) and FINMA initiated enforcement proceedings.

112.    Lescaudron breached Credit Suisse's compliance regulations repeatedly, but was allowed to continue and, in fact, became one of the Bank's highest paid individuals.

113.    Defendant Lara Warner, a New Yorker and former Investment Banking Division executive, was head of compliance in the final years of Lescaudron's fraudulent scheme, but either failed to detect it or permitted it to continue.

### 4.    "Dark Pools" Scandal

114.    Credit Suisse's New York-based Investment Banking officials were also hit with penalties exceeding $100 million for their abuse of "dark pools."  In February 2016, then-New York Attorney General Eric Schneiderman announced that, "Barclays Capital Inc. and Credit Suisse Securities (USA) LLC will pay a combined $154.3 million to the State of New York and the SEC to settle investigations into false statements and omissions made in connection

with the marketing of their respective dark pools and other high-speed electronic equities trading services."[56]

### 5.    Foreign Exchange Currency Manipulation

115.    Credit Suisse's malfeasance led to even more trouble in New York when the New York State Department of Financial Services ("DFS") fined Credit Suisse $135 million for violating New York banking law, between 2008 and 2015, in connection with manipulating and rigging the foreign exchange currency market.  Superintendent Maria Vullo of the DFS stated:

> "Certain Credit Suisse executives in the bank's foreign exchange unit deliberately fostered a corrupt culture that failed to implement effective controls in its foreign exchange trading business, which allowed the bank's foreign exchange traders and others to violate New York State law and repeatedly abuse the trust of their customers over the course of many years. . . .  DFS will not tolerate any violations of law that threaten the integrity of our markets and undermine customer confidence."[57]

116.    The specific acts of misconduct, malfeasance, and managerial negligence described in the preceding paragraphs were perhaps among the most public and egregious of the Dougan Era, but they were emblematic of deeper and broader problems at Credit Suisse—a cascade of individual acts enabled by a toxic culture, created by top leadership and particularly the top Investment Banking leadership in New York—that was progressively resulting in loss of trust.

117.    Dougan, under pressure, announced his resignation from Credit Suisse in February 2015.  He remained in office until June 2015, then stepped down.  His legacy, and that

---

[56]  Press Release, Office of the New York State Attorney General, *A.G. Schneiderman Announces Landmark Resolutions With Barclays And Credit Suisse For Fraudulent Operation Of Dark Pools; Combined Penalties And Disgorgement To State Of New York And Sec Of Over $154 Million* (Feb. 1, 2016), https://ag.ny.gov/press-release/2016/ag-schneiderman-announces-landmark-resolutions-barclays-and-credit-suisse.

[57]  Press Release, New York State Department of Financial Services, *Dfs Fines Credit Suisse AG $135 Million for Unlawful, Unsafe and Unsound Conduct in Its Foreign Exchange Trading Business* (Nov. 13, 2017), https://www.dfs.ny.gov/reports_and_publications/press_releases/pr1711131.

of his New York investment banker lieutenants, weighed on Credit Suisse until the ignominious end in March 2023.

**D.    Tidjane Thiam Fails to Right the Ship—"Cultural Issues Can't Be Resolved Overnight"**

118.    Tidjane Thiam became CEO of Credit Suisse in July 2015.  He came from an insurance background, having previously been CEO of Prudential Insurance in the United Kingdom.

119.    He was an outsider in the world of international banking, which provided advantages initially, but also led to his ouster five years later.[58]

120.    When Thiam arrived at Credit Suisse, he initiated a strategic review with the intention of refocusing on banking for the world's wealthy and away from riskier securities activities.  "'We want to rebalance towards private banking and wealth management . . . as opposed to the investment bank,'" Thiam said in a July 2015 CNBC interview.

121.    During the strategic review, Thiam correctly concluded that the Investment Banking Division had been disproportionately elevated during Dougan's tenure, and that the culture and lax risk management that Dougan and his lieutenants had brought with them from their CSFB backgrounds and spread throughout the enterprise, was toxic.

122.    He correctly concluded that this culture and lax risk management regime had been largely to blame for the tax evasion scandal that had just cost Credit Suisse $2.6 billion in fines and a corporate criminal conviction; the RMBS disaster that ultimately would cost Credit Suisse over $9 billion; and for many, if not most, of the other breaches of trust, large and small, that Credit Suisse experienced over the Dougan years, and was still working through.

---

[58] *Tidjane Thiam signals strategy shift at Credit Suisse as profits soar*, The Guardian (July 23, 2015), https://www.theguardian.com/business/2015/jul/23/tidjane-thiam-strategy-shift-credit-suisse-profits-soar.

123.    In October 2015, Thiam announced a ***restructuring of the enterprise designed to shrink investment banking and cut costs***.  The Investment Banking Division was split in two divisions (Investment Banking and Global Markets), and the new Asia Pacific Division took over most investment banking functions in that region.  These were not small changes.  As described in a lengthy *Euromoney* article, the restructuring

> began with shock and awe as Thiam recast a bank that had come to be dominated by its markets trading businesses into one that would be dominated by its private banking and wealth management operations instead.
>
> Roles were reversed.  The super smart traders would no longer be the masters of Credit Suisse.  Rather, those that kept their jobs would now mainly serve the private bank that many traders had looked down on as the sleepier side of the business.[59]

### 1.    Tuna Boat Scandal

124.    Between 2012-2016, Credit Suisse's New York Investment Banking group created a series of corrupt and illegal transactions, known as the Tuna Boat Scandal, that ultimately led to Credit Suisse and the Investment Banking officials pleading guilty in criminal cases in the Eastern District of New York.  Credit Suisse suffered penalties of $547 million, and a monitor was imposed on the Bank.

125.    As a part of the Tuna Boat Scandal, Credit Suisse assembled an $850 million dollar loan, made in violation of Credit Suisse's internal due diligence and other lending protection procedures, for the purchase of tuna boats to create a self-sustaining fishing industry for Mozambique.  The Tuna Bonds defaulted and audits revealed that at least $500 million of loan/bond proceeds cannot be accounted for.  Prosecutors in the Eastern District of New York charged the Credit Suisse bankers with perpetrating an international unlawful scheme.

---

[59] *See supra*, n.40.

126.    Thiam was forced during his tenure to deal with a number of what he called "legacy issues," *i.e.*, issues that he had inherited from the Dougan years.  Some of these issues (such as the RMBS disaster) were known but unresolved when Thiam took over.   Others continued to surface after he arrived.

### 2.    Worthless Collateralized Loan Obligations

127.    One of the unknown legacy issues involved a huge number of illiquid positions, primarily involving Collateralized Loan Obligations and distressed credit, in the Global Markets Division headed by Defendant O'Hara, a New Yorker who previously had been a co-head of the Investment Banking Division and was a CSFB alumnus.

128.    Thiam publicly complained that he only learned about these positions, most of which originated from New York trading desks, in early 2016.  The aggregate value of these positions had to be written down by $1 billion in the first fiscal quarter of 2016.  This fiasco was largely the result of the bonus-driven culture in the New York trading operation; traders took larger and riskier positions in an effort to achieve large, short-term results that would be reflected in their bonuses and pay packages, adding to the Bank's risk in order to enhance their own personal bottom lines.

129.    Aside from legacy issues, during his tenure Thiam managed largely to avoid the huge headline-grabbing disasters that Credit Suisse experienced during or as a result of the Dougan Era.

130.    But Thiam was forced out of the Bank in the wake of a spying incident involving two of his most senior executives.

131.    Thiam made two very significant miscalculations that led to huge blow-ups after he left the Bank.

132.     *First*, Thiam and his executive team made critical changes that weakened the risk management and compliance functions as part of their aggressive cost-cutting strategy. They installed inexperienced leaders who had neither the background nor the temperament to push back on aggressive traders seeking to push the limits.   They downsized the risk management and compliance operations.  And they replaced experienced risk managers with less experienced and capable personnel.  These changes left Credit Suisse vulnerable to many serious problems, including but not limited to, the Archegos and Greensill blow-ups that took place in 2021, months after Thiam's departure, but for which he bears responsibility.

133.     *Second*, Thiam's decision to cut the capital available to the Investment Banking traders carried with it an unintended consequence.  The natural effect of the decision to reduce funding for trading would have been to reduce traders' pay and bonuses.  But, in part because sufficient controls were not in place to tame the avarice of Credit Suisse traders, they simply ramped up the risk to maintain their lavish paychecks.

134.     The combination of hollowing out the risk management and compliance functions and the increased risks in the Investment Banking and Global Markets Divisions (both led by New Yorkers) led not only to the Archegos and Greensill disasters, discussed below, but also to the widening impression that Credit Suisse was untrustworthy and out of control.

135.     While Thiam correctly understood that many of Credit Suisse's most pressing problems stemmed from the toxic culture and lax risk management he inherited, he was unable to fundamentally change the culture, fix the risk management and compliance deficiencies (which he actually worsened), or steer Credit Suisse away from the existential dangers they posed.

E.    **Thomas Gottstein Promised a "New Credit Suisse" But Was "Jettisoned . . . After a String of Seismic Scandals"**

136.    Defendant Thomas Gottstein, who had been head of Credit Suisse's Swiss Universal Bank Division under CEO Thiam, was appointed to replace Thiam in February 2020.

1.    **Malachite Failure**

137.    Almost immediately Gottstein was confronted with legacy challenges.    In March 2020, Malachite Capital Management ("Malachite") defaulted, causing Credit Suisse to suffer a $214 million loss.    The Malachite failure demonstrated, yet again, that Credit Suisse's risk management system and controls were fatally flawed.

138.    As Swissinfo.ch reported:

"Those losses arose from lack of discipline," the former executive said.    Just as with Archegos, senior managers at Credit Suisse got stuck in large positions negotiating on price while their peers aggressively sold out.

"There was systematic insensitivity at all levels," said a second person. "If you're the head of risk and you let a $60m loss go by, then a $200m loss, and you don't ask what the hell is happening here, what are you doing?"[60]

139.    One of the fatal failures was Credit Suisse's Investment Banking risk controls ignoring the fact that Malachite had accrued losses far in excess of its risk limits, exacerbated by the fact that Malachite was overleveraged on risky bets.

140.    Credit Suisse ordered an internal audit of the Malachite loss.    The internal audit concluded that Credit Suisse failed to fund and furnish reliable risk control systems and technologies properly resulted in a critical flaw.

141.    In July 2020, Gottstein announced ***yet another restructuring***, essentially reversing Thiam's 2015 restructuring by combining investment banking, global markets, and the

---

[60]  Stephen Morris, Tabby Kinder, Owen Walker & Robert Smith, *How Credit Suisse rolled the dice on risk management – and lost,* Swiss Info (Apr. 20, 2021), https://www.swissinfo.ch/eng/business/how-credit-suisse-rolled-the-dice-on-risk-management---and-lost/46548906

Investment Banking functions of the Asia Pacific Division into a larger, more powerful global Investment Bank. Defendant Brian Chin became head of the Investment Banking Division in August 2020.

142. The restructuring also combined the Chief Risk Officer and Chief Compliance Officer functions into one. Defendant Lara Warner became Chief Risk and Compliance Officer in August 2020.

143. The restructuring—which Gottstein touted as creating "a new Credit Suisse"— and the appointment of Chin and Warner, proved disastrous. Chin and Warner were both fired in less than a year, following the Greensill and Archegos disasters described below.

**2.    Greensill Meltdown**

144. In March 2021, Greensill Capital (UK) Ltd. ("Greensill"), a huge client of Credit Suisse's investment banking and asset management units, became insolvent.

145. Greensill was a global supply chain lender. Credit Suisse helped finance Greensill by sponsoring funds in which many of Credit Suisse's most important clients invested billions of dollars. With Greensill's meltdown, Credit Suisse was forced to suspend $10 billion of funds linked to Greensill, placing its own client's investments in jeopardy. This put Credit Suisse at odds with some of its most important clients and customers and set off legal and regulatory battles. Ultimately Credit Suisse may lose $2 billion or more.

146. In addition to the funds, Greensill and its founder, Les Greensill, had significant relationships with, and loans outstanding to, other parts of the Bank. Credit Suisse had warnings but ignored them.

147. A February 27, 2023 *Financial Times* story entitled "Credit Suisse Breached Supervisory Law Over $10bn Greensill Funds" stated:

The Swiss financial regulator [Finma] has concluded its two-year investigation into Credit Suisse's failings over the collapse of specialist finance firm Greensill Capital, finding there had been a "serious breach of Swiss supervisory law."

The implosion of Greensill in March 2021 caused Credit Suisse to suspend and close $10bn worth of funds that had lent money via the supply-chain finance business, trapping the savings of 1,000 of the Swiss bank's most prized clients.

\*        \*        \*

In a statement on Tuesday, Finma, the Swiss regulator, said that Credit Suisse had failed to "adequately identify, limit and monitor risks in the context of the business relationship with Lex Greensill over a period of years."  As a result, "Finma thus concludes that there has been a serious breach of Swiss supervisory law," it added.

\*        \*        \*

"Finma also found serious deficiencies in the bank's organisational structures during the period under investigation.  Furthermore, it did not sufficiently fulfil its supervisory duties as an asset manager," the regulator added.[61]

148.    Defendant Varvel—a New Yorker who formerly headed the Investment Banking Division and had been a Dougan protégé, was the head of the asset management unit in which the Greensill supply chain funds were housed.  Because of his responsibility for the debacle, he was ousted from that post on March 18, 2021, although he was permitted to continue as CEO of Credit Suisse Holdings (U.S.) and chairman of the investment bank.

149.    Defendant Warner was also implicated in the Greensill debacle along with other "senior Credit Suisse executives."  According to the *Financial Times*:

Senior Credit Suisse executives overruled risk managers to approve a $160m loan to Greensill Capital, which the collapsing finance group now has "no conceivable way" to repay, according to people familiar with the matter.

---

[61] Owen Walker & Robert Smith, *Credit Suisse breached supervisory law over $10bn Greensill funds*, Financial Times (Feb. 27, 2023), https://www.ft.com/content/90e1ddae-5ea6-4a88-8f8e-bf10cb3207fc.

Several people with direct knowledge of the loan said that it was initially rejected by London-based risk managers in the investment bank.

That decision was then overruled by senior executives at Credit Suisse, which had developed a lucrative multi-layered relationship with the financing firm and its Australian founder, Lex Greensill.  Eventually Lara Warner, the bank's chief risk and compliance officer, signed off on the loan in October, the people added.[62]

### 3.    Archegos Scandal

150.    The Greensill debacle was closely followed by the blow-up of Archegos Capital Management, which resulted in a $5.5 billion loss for Credit Suisse.  In late March 2021, Credit Suisse disclosed that it faced "'highly significant and material'" losses in connection with Archegos, a New York-based "family office" that managed the fortune made by former hedge fund manager Bill Hwang.[63]  Archegos made huge leveraged bets on a handful of publicly traded stocks.  Credit Suisse was one of its primary lenders.  But, here again, the investment bankers piled more risk onto the Bank's books, and the risk management group—and senior management—utterly failed to understand the risk or to manage it.[64]

151.    The head of the Investment Banking Division, Defendant Chin, and the Chief Risk and Compliance Officer, Defendant Warner, were both fired in the wake of the blow-up.

---

[62] Stephen Morris, Robert Smith, Arash Massoudi & Owen Walker, *Credit Suisse executives 'overruled' risk managers on $160m loan to Greensill*, Financial Times (Mar. 11, 2021), https://www.ft.com/content/ad2b8900-d9a4-4e45-bc74-0fc8dbc88b82.

[63] Owen Walker & Stephen Morris, *Credit Suisse lurches from one risk management crisis to the next*, Financial Times (Mar. 31, 2021), https://www.ft.com/content/928b263d-38fc-4484-beb9-3e2fc4c017cb.

[64] Adding to the *horribilis mensis*, on March 13, 2021, the *New York Times* published a story entitled "Whistleblower Says Credit Suisse Helped Clients Skip Taxes After Promising to Stop," suggesting (correctly, it now turns out) that the tax evasion activities for which Credit Suisse had pleaded guilty and paid a huge fine had not in fact stopped.  Katie Benner & Michael Forsythe, *Whistleblower Says Credit Suisse Helped Clients Skip Taxes After Promising to Stop*, N.Y. Times (Mar. 13, 2021), https://www.nytimes.com/2021/03/13/business/whistle-blower-credit-suisse-taxes.html.

a.    **The Paul Weiss Report Confirms Systemic Failures and a Dangerous Culture**

152.    Credit Suisse commissioned New York law firm Paul Weiss to conduct an investigation and create a report detailing what lead to the Archegos disaster.  Paul Weiss included in its report a section entitled, "CS Should Instill a Culture of Responsibility, Accountability, and Respect for Controls."[65]

153.    The Paul Weiss Report determined that management failures led to the disaster, especially in the New York Investment Banking division:

Our key observations revolve around a central point: ***no one at CS—not the traders, not the in-business risk managers, not the senior business executives, not the credit risk analysts, and not the senior risk officers— appeared to fully appreciate the serious risks that Archegos's portfolio posed to CS***.  These risks were not hidden.  They were in plain sight from at least September 2020, when CPOC first met and CS senior leaders discussed Archegos's concentrated, long-biased, volatile equity swap positions.  Yet no one at the bank acted swiftly and decisively to try to mitigate the risks posed by Archegos.  And when CS finally took steps to mitigate the risks, the actions it took were ineffective, too little, and too late.  Archegos defaulted on March 25, 2021.

These facts lead to a fundamental and inexorable conclusion: The Prime Services business was mismanaged.  This was due in part to a lack of competence (including a failure to appreciate obvious and severe risks) as well as ***a culture in which profits were prioritized over sound risk management and respect for controls***.  In recent years, CS had cut costs, resulting in significant turnover in the business and a less experienced workforce.  Additionally, managers wore multiple "hats," lacked clear roles and responsibilities, and failed to exercise effective oversight.  The result was a business that allowed Archegos to take outsized risks without protecting CS from outsized losses.

*            *            *

In addition to questions regarding the competence of CS business and Risk employees who failed to appreciate the significance of the escalating Archegos risks, there were ***significant deficiencies in CS's overall risk culture and the failure to prioritize risk management***.  This was evident not only as a result of the business's and Risk's failures to escalate Archegos despite numerous red

---

[65]  *See supra*, n.5.

flags, but also by the repeated accommodations that CS made for Archegos, including tolerating persistent limit breaches, as well as CS's lack of investment in personnel and systems.[66]

154.    The stated purpose of the Paul Weiss investigation was not limited narrowly to the Archegos default, but more broadly to examine the issues with culture, personnel, and business processes that left Credit Suisse exposed and led to the blow-up and huge losses.  The Report condemns senior management—including members of the Executive Board—for violating their duties not only in connection with the Archegos matter, but also for violating their obligations to "prioritize risk management" and to create and enforce, across the enterprise, "a [c]ulture of [r]esponsibility, [a]ccountability, and [r]espect for [c]ontrols."

   **b.    |Credit Suisse Senior Management Admits They Failed to Manage Risk in the Investment Bank's Prime Services Businesses**

155.    The formal response of Credit Suisse senior management to the Paul Weiss Report was published on July 29, 2021, stating that:

> We acknowledge the findings of the report based on the independent external investigation into Archegos Capital Management (Archegos) and would like to reiterate that our Board of Directors and Executive Board fully share the concerns raised by Paul, Weiss, Rifkind, Wharton & Garrison LLP (hereafter "Paul, Weiss Report").

> \*        \*        \*

> As previously outlined, the recent events have triggered a detailed review of the bank's risk governance with a particular focus on de-risking and improving limit monitoring and control processes, and strengthening risk oversight.  . . . [I]mproving risk culture and embedding risk management into every decision of the bank is an integral part of our strategy and will require ongoing effort . . . .[67]

156.    Credit Suisse's 2021 Annual Report contains the following admissions:

---

[66] *Id.*

[67] *Credit Suisse response to the Paul Weiss report*, Credit Suisse (July 29. 2021), https://www.credit-suisse.com/about-us/en/reports-research/archegos-info-kit.html.

For example, in respect of the Archegos matter, the independent report found, among other things, a failure to effectively manage risk in the Investment Banks's prime services business by both the first and second lines of defense as well as a lack of risk escalation.

157.    In December 2021, the Bank of England issued a letter regarding Credit

Suisse's failures that led to the Archegos disaster, stating:

> Our observations include weaknesses in the holistic management of risk across business units; narrow focus of onboarding arrangements and inadequate re-assessment of client relationships thereafter; ineffective and inconsistent margining approaches; and an absence of comprehensive limit frameworks.

> Many of the deficiencies set out in this letter are not new and have been observed before.  In particular it is highly concerning that lessons from the Global Financial Crisis have not been learned sufficiently and that necessary changes to business and risk management practices have not been embedded in firms' operations.  A number of the shortcomings are symptoms of a broader root cause. Their origins often stem from *a risk culture in which frontline business executives fail to take accountability for ownership of risk in their organisation; where the independent risk function lacks standing; and where senior management incentives do not promote safe, sound, and sustainable outcomes for the firm*.[68]  [Emphasis added.]

158.    Credit Suisse's 2022 Annual Report contains the following admissions:

> On July 29, 2021, we published the report based on the independent external investigation into Archegos, which found, among other things, a failure to effectively manage risk in the Investment Bank's prime services business by both the first and second lines of defense as well as a lack of risk escalation.

159.    Credit Suisse Chairman Axel Lehmann stated:

> It has become clear that the challenges of the past were not solely attributable to isolated poor decisions or to individual decision makers. . . . Within the organisation as a whole, we have failed too often to anticipate material risks in good time in order to counter them proactively and to prevent them" . . . [including] over a $5.5bn trading loss the bank suffered on the collapse of family office Archegos Capital last spring, the biggest in its history.[69]

---

[68]  Letter from Nathanaël Benjamin, David Bailey & Sarah Pritchard of the Bank of England to Chief Executive Officer (Dec. 10, 2021), https://www.fca.org.uk/publication/correspondence/dear-ceo-supervisory-review-global-equity-finance-businesses.pdf.

[69]  *See supra*, n.13.

160.     On May 10, 2022, the *Financial Times* reported:

The Archegos loss came just weeks after Credit Suisse was forced to close a group of funds linked to the specialist finance firm Greensill Capital, trapping $10bn of client money. . . .   The twin crises have been the most prominent in a string of scandals that have plagued the bank going back to the global financial crisis of 2008.

A common thread running through the bank's failings has been a risk department that was all too often overruled by commercially minded executives who were chasing higher returns from riskier deals, according to several current and former employees.

"We had historically weak compliance combined with high risk-taking businesses," says a former executive who worked in the bank's risk department. "The structure also made it very difficult to see total global risk—it was like playing hide and seek."[70]

161.     The toxic Credit Suisse culture did not begin during Gottstein's reign as CEO. But, critically, despite his promise of "a New Credit Suisse," Gottstein was not able to bring an end to or materially change this rotten culture.  Gottstein was ousted in July 2022 for his inability to instill and enforce a disciplined risk management system and a "[c]ulture of [r]esponsibility, [a]ccountability, and [r]espect for [c]ontrols."

## F.  António Horta-Osório's Failed Cultural Shift

162.     In December 2020, not long after Thiam's departure as CEO, and facing continuing headwinds, Credit Suisse reached agreement with celebrated Portuguese banker António Horta-Osório to become its new Chairman.

163.     Horta-Osório had led the revival of UK-based Lloyd's Bank as its CEO.  He was recruited to help re-establish Credit Suisse's business and reputation.  The plan was to install him as Chairman following a shareholder vote at the Annual General Meeting scheduled for the end of April 2021.

---

[70] *Id.*

164.    The series of disasters between December 2020 and late April 2021, including but not limited to Greensill and Archegos, and the management and other changes made in their wake, brought Horta-Osório's challenges into bright relief. He stepped into a Credit Suisse reeling from the series of scandals and missteps and in need of more than a cosmetic makeover.

165.    As reflected in the Paul Weiss Report and elsewhere, ***the main issue was culture—the lax risk culture, the ethically challenged culture Dougan and his CSFB gang had brought into Credit Suisse was again proving difficult to eradicate***.

166.    The headline of a July 2021 *Fortune* article cut right to the main issue:[71]

# FORTUNE

FINANCE · CREDIT SUISSE GROUP

## Credit Suisse report into $5.5 billion Archegos loss shows bank has a massive culture problem

BY **CHRISTIAAN HETZNER**

July 29, 2021 at 5:25 AM PDT

167.    Soon after arriving, Horta-Osório announced a strategic review. In November 2021, he announced yet another restructuring. But this time, the "overhaul" was explicitly "***more cultural than structural***," because the cultural issues had become so glaring. Thus, a *Wall Street Journal* article entitled, "*Credit Suisse Plans a Cultural Revolution*," noted that Horta-Osório's "primary objective is to strengthen the bank's risk culture."[72]

---

[71] Christian Hetzner, *Credit Suisse report into $5.5 billion Archegos loss shows banks has a massive culture problem*, Fortune (July 29, 2021), https://fortune.com/2021/07/29/credit-suisse-report-archegos-loss-bank-massive-culture-problem/.

[72] Rochelle Toplensky, *Credit Suisse Plans a Cultural Revolution*, Wall St. J. (Nov. 4, 2021), https://www.wsj.com/articles/credit-suisse-plans-a-cultural-revolution-11636035536.

168.     Indeed, Horta-Osório told reporters in November 2021 that his new strategy was designed to "***rebuild a culture of trust***" while acknowledging that there was "'no quick fix'" and it would be a "'continuous effort.'"[73]

169.     Unfortunately, Horta-Osório himself created a serious breach of trust through personal use of the corporate jet and by violating COVID restrictions and protocols.  As a result, Horta-Osório was ousted from his position as Chairman in January 2022, only nine months after he started.

170.     His effort to "'rebuild a culture of trust'" at Credit Suisse flamed out.

### G.  Axel Lehmann's and Ulrich Körner's Inability to "'Stem the Loss of Trust That Had Accumulated Over the Years'"

171.     In January 2022, Alex Lehmann replaced Horta-Osório as Chairman and soon thereafter, in July 2022, Körner replaced Gottstein as CEO.

172.     Lehmann and Körner instituted yet another restructuring plan.  A Credit Suisse press release dated October 27, 2022, began with this:

> Credit Suisse Group AG (Credit Suisse) today announces a series of decisive actions to create a simpler, more focused and more stable bank built around client needs.  The announcement follows a strategic review conducted by the Board of Directors and Executive Board, resulting in a radical restructuring of the Investment Bank, an accelerated cost transformation, and strengthened and reallocated capital, all of which are designed to create a new Credit Suisse.[74]

173.     The press release contained a lengthy quote from Lehmann:

"Over 166 years, Credit Suisse has built a powerful and respected franchise but we recognize that in recent years we have become unfocused.  For a number of months, the Board of Directors along with the Executive Board has been assessing our future direction and, in doing so, we believe we have left no stone

---

[73] *See supra*, n.43.

[74] Press Release, Credit Suisse Group AG, *Credit Suisse unveils new strategy and transformation plan* (Oct. 27, 2022), https://www.credit-suisse.com/media/assets/corporate/docs/about-us/media/media-release/2022/10/strategy-update-press-release-en.pdf.

unturned.  Today we are announcing the result of that process—a radical strategy and a clear execution plan to create a stronger, more resilient and more efficient bank with a firm foundation, focused on our clients and their needs.  At the same time, **we will remain absolutely focused on driving our cultural transformation**, while working on further improving our risk management and control processes across the entire bank.  I am convinced that this is the blueprint for success, **helping rebuild trust** and pride in the new Credit Suisse while realizing value and creating sustainable returns for our shareholders."[75]  [Emphasis added.]

174.    The release also quoted Körner as saying:

"This is a historic moment for Credit Suisse.  We are **radically restructuring the Investment Bank** to help create a new bank that is simpler, more stable and with a more focused business model built around client needs.  Our new integrated model, with our Wealth Management franchise, strong Swiss Bank and capabilities in Asset Management at its core, is designed to allow us to deliver a unique and compelling proposition for clients and colleagues while targeting organic growth and capital generation for shareholders.  **The new Executive Board is focused on restoring trust through the relentless and accountable delivery of our new strategy, where risk management remains at the very core of everything we do**."[76]

175.    Perhaps by this point in late 2022, stakeholders could have been forgiven for wondering if they had not heard similar assurances before.  But this restructuring appeared more "radical" than the others, not the least because of the intention to recreate Credit Suisse First Boston as a New York-based investment bank, and to spin it out of Credit Suisse.  Credit Suisse recognized the cancer and was trying to excise it.

176.    An article published in November 2022 skeptically asked: "What Magic Can Credit Suisse Leaders Pull out of Their Hats?"  This article included:

Lamenting the desolate state of Credit Suisse is not enough.  The situation begs the question of what options the bank on Paradeplatz still has.  What can the duo Axel Lehmann and Ulrich Koerner do to put CS back on the road to success?

*        *        *

---

[75]  *Id.*

[76]  *Id.*

Neither Koerner nor Lehmann have commented on Credit Suisse culture in recent weeks. ***This raises the question as to how much Swissness there is left in the bank, especially since the Swiss private bank was built on Swiss values.***

Recently, the answer to that question turned out to be negative, as lawyer Monika Roth recently said in an interview with the Neue Zürcher Zeitung. She said ***in the bank's international business, a different set of rules seems to apply, with a culture different from the Swiss unit. In Switzerland, the smallest infractions are punished, but international asset management, as long as it makes money, can get away with more***.[77]

177.    The end, although long in the making, came a few months later, in March 2023. The accumulated "loss of trust" manifested in huge and accelerating outflows because people were pulling their money out of the Bank. By the end of 2022, customers had withdrawn $154 billion of deposits.[78] During the week of March 13, 2023, Credit Suisse reached its internal liquidity limit at the SNB. In response, on March 15, 2023, the Swiss government provided $43.5 billion USD in "extraordinary" liquidity assistance. This assistance did not reassure customers and could not staunch the outflows. As of March 16, 2023, a further $15.6 billion was withdrawn from customer accounts and based on the "foreseeable or continuing outflows" the government provided an additional $22.3 billion in "extraordinary liquidity support." Despite the total of approximately $65.9 billion USD in support, customer withdrawals worsened at Credit Suisse caused by the erosion of trust. By the end of March 2023, customers had withdrawn an additional $68 billion, bringing the total customer withdrawals since October 2022 up to over 15% of the Bank's total assets.[79]

---

[77] Claude Baumann, *What Magic Can Credit Suisse Leaders Pull out of Their Hats?*, Finews (Nov. 24, 2022), https://www.finews.asia/finance/38118-credit-suisse-ulrich-koerner-axel-lehmann-cultural-change-executives-francesco-de-ferrari-wealth-management.

[78] *See supra*, n.6.

[79] Hann Ziady, *Depositors pulled $75 billion from Credit Suisse as it veered toward collapse*, CNN Business (Apr. 24, 2023), https://www.cnn.com/2023/04/24/investing/credit-suisse-bank-withdrawals-total/index.html.

178.     By the weekend of March 19, the Swiss government and FINMA determined they had to act because, as Swiss Minister of Finance Karin Keller-Sutter put it, "'***Credit Suisse would not have survived Monday***'" (*i.e.*, the next trading day).

179.     The government and FINMA concluded they had but a few viable options for Credit Suisse: bankruptcy, resolution, or a sale.  This dire situation was caused by the years of misconduct, malfeasance, and managerial negligence perpetrated by the Defendants in breach of their duties—by the "arsonists," as Minister Keller-Sutter later put it.  Despite FINMA taking decisive action, as Chairman Amstad observed, "[a]ll these tools are not there to impose a strategy on a bank or to restore the trust of clients.  This is the task of management, the boards of directors and ultimately the owners."

180.     FINMA issued a Decree to Credit Suisse on March 19, 2023, to inform AT1 investors that Credit Suisse would be writing down the value of all outstanding AT1 bonds to zero.  FINMA noted and observed that Credit Suisse and (***primarily New York)*** subsidiaries suffered "major reputational damage" and "substantial losses" repeated quarterly to such a degree that Credit Suisse found itself "in a structural loss-making situation" and that the Bank's ultimate failure resulted from a "deep crisis of confidence" from its customers.  FINMA further observed that the Bank had experienced "substantial liquidity outflows since October 2022" and the customer withdrawals accelerated from March 13 and 14, 2023.  FINMA concluded that, as a result of the "major reputational damage," the "deep crisis of confidence," the accelerating customer withdrawals, and the resulting liquidity shortages, Credit Suisse had to zero out the value of all outstanding AT1 bonds to "prevent insolvency" and to "ensure the continued existence of [Credit Suisse]."[80]

---

[80] *See supra*, n.32.

181.    Credit Suisse's write-down of the value of all outstanding AT1 bonds was a result of a self-inflicted liquidity and collateral crisis that, in turn, was a product of the broken trust between the Bank and its customers from the years of accumulated scandals resulting from the Defendants' negligence and breaches of duties owed under Swiss law to Plaintiffs and the Class.  As FINMA Chairwoman Amstad noted, "[s]trategic misjudgments on the part of the bank, the failure of the management or losing the trust of clients and investors are not supervisory offences . . . . Responsibility for action rests with  . . . the board of directors."[81]

182.    But to be clear, the AT1 notes were worthless before the FINMA decree. The FINMA decree merely confirmed what was already true—the AT1 bonds were worthless. Indeed, FINMA's CEO confirmed the inevitability of the destruction of the AT1 notes:

> Allowing the bankruptcy of troubled lender Credit Suisse would have crippled Switzerland's economy and financial center and likely resulted in deposit runs at other banks, Swiss regulator FINMA said Wednesday.

> The bankruptcy plan, FINMA CEO Urban Angehrn said in a statement, was "de-prioritised early on due to its high tangible and intangible costs."  It would have *erased the holding company Credit Suisse Group, along with the parent bank Credit Suisse AG* and its branches, while retaining the Credit Suisse (Schewiz) AG entity because of its "systemic importance."

> *            *            *

> Among FINMA's other options, the resolution recourse would have downsized Credit Suisse, with the Swiss National Bank supplying liquidity assistance loans backed by a federal default guarantee.  *The bank's equity and AT1 bonds would still have been written down to zero*, with other bondholders being bailed in.[82]  [Emphasis added.]

183.    It has recently come to light that in January 2023, Credit Suisse board members and executives were scheming behind the scenes to protect *themselves* from damage to

---

[81] *See supra*, n.6.

[82] Ruxandra Iordache, *Switzerland faced a full-scale bank run if Credit Suisse went bankrupt, Swiss regulator argues*, CNBC (Apr. 5, 2023), https://www.cnbc.com/2023/04/05/switzerland-faced-a-bank-run-if-credit-suisse-went-bankrupt-swiss-regulator.html.

the AT1 bonds.  Credit Suisse Board members and executives understood the dire situation within the Bank and the scale of customer withdrawals because of the deep crisis of confidence. On January 12, 2023, Credit Suisse informed FINMA that it would no longer count Credit Suisse Employee AT1 bonds, referred to as CCAs as Regulatory Core Tier 1 Capital so that any further payout Credit Suisse would make to employees would not require any additional approval from FINMA.  CCAs are equivalent to AT1 Tier 1 Capital with the difference being AT1s are offered to outside creditors, like Plaintiffs here, and CCAs were awarded to Credit Suisse executives and board members as bonuses, deferred compensation, or retentions payments.  There are an estimated $400 million to $700 million in granted or authorized AT1 CCA instruments for executives and board members, including for Defendants in this action.

184.    So, nearly two months before the years of accumulated broken trust, "deep crisis of confidence" and "major reputational damage" culminated in the collapse of Credit Suisse, Credit Suisse executives and Board members, unsurprisingly, took decisive and aggressive action to protect their own AT1 exposure over those of Plaintiffs and the Class. These actions not only reflect the toxic me-first culture of those at the top of Credit Suisse, but they demonstrate that senior executives and Board members were well-aware of the unprecedented customer withdrawals and the threat that represented to the continued existence of the Bank.

185.    This self-serving January 12, 2023, attempt by Credit Suisse executives and Board members to protect their own hundreds of millions of dollars of compensation over the interests of the other AT1 investors is emblematic of the rotten culture in the Bank and it is consistent with years of self-serving actions and practices.  According to *Bloomberg's*

calculations, "[in] the past dozen years, Credit Suisse put 35 billion francs into its annual bonus pools . . . . The total profits generated in that period: 35 million francs."[83]

186.    This shows that the senior Credit Suisse insiders, who were best placed to understand the existential danger the Bank was in and the likelihood of an AT1 write-down, were attempting to protect their own hundreds of millions of dollars in AT1 compensation.

187.    Despite this request, on March 19, 2023, FINMA issued a decree instructing Credit Suisse to inform AT1 creditors that Credit Suisse would write off and cancel all AT1 bonds.  Credit Suisse jumped into action to save the Employee AT1 bonds, but not for others, and sent a letter on March 20, 2023, asking FINMA to reconsider its March 19 Decree.  Credit Suisse reminded FINMA that it sent the January 12, 2023 e-mail, informing FINMA that it was removing the Employee AT1 bonds from Tier 1 so those bonds could be paid out without FINMA approval.

188.    On March 23, 2023, FINMA issued a sharp rebuke of Credit Suisse's request for special treatment for the Employee AT1 bonds.  FINMA denied the March 20, 2023 request for reconsideration and determined that the Employee AT1 bonds are covered by FINMA's March 19, 2023 Decree to write off and cancel AT1 bonds.

## V.    RELEVANT SWISS STATUTES AND DEFENDANTS' BREACHES THEREOF

189.    Directors and senior managers of Swiss stock companies are governed by Swiss statutory law, and in particular the Swiss Code of Obligations.  The Code sets forth the duties defendants owed and breached to the AT1 bondholders.

---

[83] Marion Halftemeyer, *Credit Suisse Employee Bonuses Tied to AT1 Bonds Also Wiped Out*, Bloomberg (Apr. 27, 2023), https://www.bloomberg.com/news/articles/2023-04-27/credit-suisse-employee-bonuses-tied-to-at1-bonds-also-wiped-out.

### A.    Relevant Swiss Code of Obligations

190.    The relevant provisions of the Code of Obligations include, but are not limited

to:

### Art. 716a

The board of directors shall have the following non-transferable and inalienable duties:

1.  The overall management of the company and issuing the required directives;

*          *          *

3.  Organizing the accounting, financial control and financial planning systems as required for management of the company;

4.  Appointing and dismissing persons entrusted with managing and representing the company;

5.  Overall supervision of the persons entrusted with managing the company, in particular with regard to compliance with the law, articles of association, operational regulations and directives;

### Art. 716b

1.  Unless the articles of association provide otherwise, the board of directors may delegate the management of all or part of the company's business in accordance with organisational regulations to individual members or third parties (executive board).

2.   In the case of companies whose shares are listed on a stock exchange, the management of the company's business may be delegated to individual members of the board of directors or to other natural persons.  The management of the company's assets may be delegated to natural persons or legal entities.

### Art. 717

1.  The members of the board of directors and third parties engaged in managing the company's business must perform their duties with all due diligence and safeguard the interests of the company in good faith.

### Art. 754

1.  The members of the board of directors and all persons engaged in the business management or liquidation of the company are liable both to the company and to the individual shareholders and creditors for any losses or damage arising from any intentional or negligent breach of their duties.

**Art. 759**

1.   Where two or more persons are liable for the losses, each is jointly and severally liable with the others to the extent that the damage is personally attributable to him or her on account of his or her own fault and the circumstances.

2.   The claimant may bring action against several persons jointly for the total losses and request that the court determine the liability of each individual defendant in the same proceedings.

### B.      Defendants Violated Their Duties to the AT1 Bondholders

191.      Defendants Urs Röhner and Sir António Horta-Osório (the "Chairman Defendants") had duties encompassing the entire enterprise during the time each was in office. The Chairmanship was a full-time job paying millions of dollars annually.   The Chairman Defendants had responsibility for oversight and supervision of those they appointed to manage Credit Suisse's business, including but not limited to members of the Executive Board.   They had responsibility for financial controls.   They had the responsibility of instilling "a [c]ulture of [r]esponsibility, [a]ccountability, and [r]espect for [c]ontrols."

192.      Defendants Röhner and Horta-Osório breached their duties by failing repeatedly in each of these areas, and as more specifically set out herein.   Their acts and omissions in breach of their duties render them responsible—and legally liable—for the misconduct, malfeasance, and managerial negligence described above and for the loss of trust that brought Credit Suisse down and caused the AT1 notes to become worthless.

193.      Defendants Brady W. Dougan, Tidjane Thiam, and Thomas Gottstein (the "CEO Defendants") had duties encompassing the entire enterprise during the time each was in office.   The CEO Defendants had responsibility for managing Credit Suisse as a whole.   They had responsibility for financial controls. They had responsibility for instilling "a [c]ulture of [r]esponsibility, [a]ccountability, and [r]espect for [c]ontrols."   Instead, they materially

contributed to Credit Suisse's toxic culture of excessive risk-taking, prioritizing short-term profits over long-term stability, permitting compensation structures that incentivized imprudent risk-taking, and not requiring diligent compliance and risk management.  They breached their duties by failing repeatedly in each of these areas, and as more specifically set out herein.  Their acts and omissions in breach of their duties render them responsible—and legally liable—for the misconduct, malfeasance, and managerial negligence described above and for the loss of trust that brought Credit Suisse down and caused the AT1 notes to become worthless.

194.     Defendants Brady Dougan, Eric Varvel, James L. Amine, Timothy P. O'Hara, David Miller, Brian Chin, Christian Meissner, and Gaël De Boissard (the "Investment Banking Head Defendants") had responsibility for managing the Investment Banking Division during their time in that position.  They had responsibility for financial controls.  They had responsibility for instilling "a [c]ulture of [r]esponsibility, [a]ccountability, and [r]espect for [c]ontrols."  Instead, they materially contributed to the toxic culture of excessive risk-taking, prioritizing short-term profits over long-term stability, permitting compensation structures that incentivized imprudent risk-taking, and not requiring diligent compliance and risk management. They breached their duties by failing repeatedly in each of these areas, and as more specifically set out herein.  Their acts and omissions in breach of their duties render them responsible—and legally liable—for the misconduct, malfeasance, and managerial negligence described above and for the loss of trust that brought Credit Suisse down and caused the AT1 notes to become worthless.

195.     Defendant Robert S. Shafir had responsibility for managing the Asset Management Division, and later the Private Banking and Wealth Management Division, when he served as head of those units and as a member of the Executive Board.  He had responsibility for

financial controls.    He was responsible for instilling "a [c]ulture of [r]esponsibility, [a]ccountability, and [r]espect for [c]ontrols."   Instead, he materially contributed to the toxic culture of excessive risk-taking, prioritizing short-term profits over long-term stability, permitting compensation structures that incentivized imprudent risk-taking, and not requiring diligent compliance and risk management.  He breached his duties by failing repeatedly in each of these areas, and as more specifically set out herein.  His acts and omissions in breach of his duties render him responsible and legally liable for the misconduct, malfeasance, and managerial negligence described above, and for the loss of trust that brought Credit Suisse down and caused the AT1 notes to become worthless.

196.    Defendant Lara J. Warner had enterprise-wide responsibility for compliance, and, subsequently, for compliance and risk management, and she served on the Executive Board. She bore direct responsibility for the Greensill and Archegos disasters.  She had responsibility for financial controls.   She had responsibility for instilling "a [c]ulture of [r]esponsibility, [a]ccountability, and [r]espect for [c]ontrols."   Instead, she materially contributed to the toxic culture of excessive risk-taking, prioritizing short-term profits over long-term stability, permitting compensation structures that incentivized imprudent risk-taking, and not requiring diligent compliance and risk management.  She breached her duties by failing repeatedly in each of these areas, and as more specifically set out herein.  Her acts and omissions in breach of her duties render her responsible—and legally liable—for the misconduct, malfeasance, and managerial negligence described above, and for the loss of trust that brought Credit Suisse down and caused the AT1 notes to become worthless.

197.    Defendants Richard E. Thornburgh, Andreas Gottschling, Michael Klein, and Noreen Doyle (the "Director Defendants") had duties encompassing the entire enterprise during

the time each was in office.  They had responsibility for oversight and supervision of those they appointed to manage Credit Suisse's business, including but not limited to members of the Executive Board.  They had responsibility for financial controls.  They had responsibility for instilling "a [c]ulture of [r]esponsibility, [a]ccountability, and [r]espect for [c]ontrols."  That is particularly the case because each was a member of the Risk Committee.  They breached their duties by failing repeatedly in each of these areas, and as more specifically set out herein.  Their acts and omissions in breach of their duties render them responsible—and legally liable—for the misconduct, malfeasance, and managerial negligence described above, and for the loss of trust that brought Credit Suisse down and caused the AT1 notes to become worthless.

198.    This Complaint contains allegations touching on criminality, bad faith, or intentional conduct.  But the standard for liability of "members of the board of directors and all persons engaged in the management . . . of the company" is negligence.  The claims asserted herein are based on that negligence standard, not on fraud or other intentional conduct.

199.    Because of the nature of AT1 bonds, Plaintiffs did not learn of the damage **in connection specifically with the AT1 bonds** until March 2023.

## VI.    CLASS ACTION ALLEGATIONS

200.    Plaintiffs bring this action as a class action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, individually and on behalf of all others similarly situated.

201.    Plaintiffs seek to represent the following class (the "Class"):

> **AT1 Bondholder Class**:  All holders who held Credit Suisse AT1 bonds between January 12, 2023 and March 19, 2023, inclusive.

202.    The AT1 bonds within the AT1 bondholder class are:

| Issuer Name | Issue Date | Issued Amount | ISIN | Coupon | Series | Maturity Type | Currency |
|---|---|---|---|---|---|---|---|
| Credit Suisse Group AG | 12/11/2013 | $2,250,000,000 | XS0989394589 | 7.500 | REGS | Perpetual Callable | USD |
| Credit Suisse Group AG | 12/11/2013 | $2,250,000,000 | US22546DAB29 | 7.500 | 144A | Perpetual Callable | USD |
| Credit Suisse Group AG | 6/18/2014 | $2,500,000,000 | XS1076957700 | 6.250 | REGS | Perpetual Callable | USD |
| Credit Suisse Group AG | 6/18/2014 | $2,500,000,000 | US225436AA21 | 6.250 | 144A | Perpetual Callable | USD |
| Credit Suisse Group AG | 3/22/2017 | SFr 200,000,000 | CH0360172719 | 3.875 | | Perpetual Callable | CHF |
| Credit Suisse Group AG | 7/16/2018 | $2,000,000,000 | USH3698DBW32 | 7.500 | REGS | Perpetual Callable | USD |
| Credit Suisse Group AG | 7/16/2018 | $2,000,000,000 | US225401AJ72 | 7.500 | 144A | Perpetual Callable | USD |
| Credit Suisse Group AG | 9/4/2018 | SFr 300,000,000 | CH0428194226 | 3.500 | | Perpetual Callable | CHF |
| Credit Suisse Group AG | 9/12/2018 | $1,500,000,000 | USH3698DBZ62 | 7.250 | REGS | Perpetual Callable | USD |
| Credit Suisse Group AG | 9/12/2018 | $1,500,000,000 | US225401AK46 | 7.250 | 144A | Perpetual Callable | USD |
| Credit Suisse Group AG | 6/6/2019 | S$ 750,000,000 | CH0482172324 | 5.625 | | Perpetual Callable | SGD |
| Credit Suisse Group AG | 8/21/2019 | $1,750,000,000 | USH3698DCP71 | 6.375 | REGS | Perpetual Callable | USD |
| Credit Suisse Group AG | 8/21/2019 | $1,750,000,000 | US225401AL29 | 6.375 | 144A | Perpetual Callable | USD |
| Credit Suisse Group AG | 9/11/2019 | SFr 525,000,000 | CH0494734384 | 3.000 | | Perpetual Callable | CHF |
| Credit Suisse Group AG | 1/24/2020 | $1,000,000,000 | USH3698DCV40 | 5.100 | REGS | Perpetual Callable | USD |
| Credit Suisse Group AG | 1/24/2020 | $1,000,000,000 | US225401AN84 | 5.100 | 144A | Perpetual Callable | USD |
| Credit Suisse Group AG | 8/11/2020 | $1,500,000,000 | USH3698DDA93 | 5.250 | REGS | Perpetual Callable | USD |
| Credit Suisse Group AG | 8/11/2020 | $1,500,000,000 | US225401AR98 | 5.250 | 144A | Perpetual Callable | USD |
| Credit Suisse Group AG | 12/9/2020 | $1,500,000,000 | USH3698DDD33 | 4.500 | REGS | Perpetual Callable | USD |
| Credit Suisse Group AG | 12/9/2020 | $1,500,000,000 | US225401AS71 | 4.500 | 144A | Perpetual Callable | USD |
| Credit Suisse Group AG | 6/23/2022 | $1,650,000,000 | USH3698DDQ46 | 9.750 | REGS | Perpetual Callable | USD |
| Credit Suisse Group AG | 6/23/2022 | $1,650,000,000 | US225401AX66 | 9.750 | 144A | Perpetual Callable | USD |

203.    To additionally satisfy the requirements of minimum diversity, class members include citizens of, *inter alia*, California, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana, Iowa, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New Jersey, North Carolina, Pennsylvania, Texas, Utah, Vermont, Virginia, Washington, Washington, D.C., and Wisconsin, as well as foreign countries.

204.    Excluded from the Class are Defendants; the judicial officers, and their immediate family members; all Credit Suisse employee AT1 bondholders and Court staff assigned to this case.  Plaintiffs reserve the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

205.    This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

206.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1)**.  The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  While Plaintiffs are informed and believe that there are thousands of

Class members, the precise number of Class members is presently unknown to Plaintiffs, but may be ascertained from books and records accessible to Defendants.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

207.     **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**.   This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a.  whether Defendants engaged in the conduct alleged herein;

b.  whether Defendants' alleged conduct violates applicable law;

c.  Whether Defendants intentionally or negligently breached their duties to Plaintiffs and the other Class members;

d.  whether Defendants' conduct caused Plaintiffs and the other Class members to suffer compensable losses;

e.  whether Defendants' conduct alleged herein violated Article 716a of the Swiss Code of Obligations;

f.  whether Defendants' conduct alleged herein violated Article 716b of the Swiss Code of Obligations;

g.  whether Defendants' conduct alleged herein violated Article 717 of the Swiss Code of Obligations;

h.  whether Defendants' conduct alleged herein violated Article 754 of the Swiss Code of Obligations;

i.  whether Defendants' conduct alleged herein violated Article 759 of the Swiss Code of Obligations;

j.  whether Plaintiffs and the other Class members are entitled to actual, statutory, or other forms of damages, or any other form of monetary relief;

k.  the amount and nature of relief to be awarded to Plaintiffs and the other Class members; and

l.  whether Plaintiffs and the other Class members are entitled to equitable relief.

208.     **Typicality – Federal Rule of Civil Procedure 23(a)(3)**.  Plaintiffs' claims are typical of the other Class members' claims, because Plaintiffs and each of the other Class members were holders of Credit Suisse AT1 bonds between January 12, 2023 and March 18, 2023, and have been similarly affected by Defendants' conduct.  Plaintiffs and each of the other Class members suffered damages as a direct proximate result of the same wrongful practices in which Defendants engaged.  Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the other Class members.

209.     **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4)**.  Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class that they seek to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.  The Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

210.     **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2)**.  Defendants have acted or refused to act on grounds generally applicable to Plaintiffs

and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

211.      **Superiority – Federal Rule of Civil Procedure 23(b)(3)**.  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for the Class members to individually seek redress for Defendants' wrongful conduct.  Even if the Class members could afford litigation the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.  Moreover, class actions like this one are not permitted in any Swiss forum and Class members would not be able to prosecute separate individual actions in Switzerland, given the size and complexity of the case, Swiss court filing fees, and cost-bonding requirements for non-Swiss residents.

**VII.    CLAIM ALLEGED**

**NEGLIGENT BREACH OF DUTIES**
**(Violation of Swiss Code of Obligations Articles 716a, 716b, 717, 754, and 759)**
**(Against All Defendants)**

212.      Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

213.    Defendants breached their duties of due care, diligence, prudence and loyalty to Credit Suisse's AT1 bondholders, including Plaintiffs and each of the other Class members, under Swiss law.

214.    Defendants' breaches of their duties of due care and loyalty caused damage to Credit Suisse's AT1 bondholders, including Plaintiffs and each of the other Class members.

215.    Defendants violated, and are liable under, the following statutory provisions: Swiss Code of Obligations Articles 716a, 716b, 717, 754, and 759.

216.    Credit Suisse AT1 bondholders, including Plaintiffs and each of the other Class members, as creditors, have been damaged and suffered losses due to Defendants' negligent breach of their duties to perform their duties with all due diligence and safeguard the interests of the company in good faith.

217.    Defendants' actions and failures to act were a substantial factor in causing the damages and losses to Plaintiffs and each of the other Class members, as alleged above.

218.    Defendants have sufficient assets in the United States that can be reached to satisfy all judgments.  Any insurance coverage of these Defendants or its officers or directors can be reached in the United States.

219.    Defendants are jointly and severally liable to each Class Member for damages in an amount to be proven at trial.

## VIII.    REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf the other Class members respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A.    Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiffs as Class Representatives, and appointing Plaintiffs' attorneys as Class Counsel;

B.    Awarding actual, direct, and compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding restitution and disgorgement of revenues, if warranted;

D.    Awarding injunctive relief as permitted by law or equity, including enjoining the Defendants from continuing those unlawful practices, as set forth herein, and directing the Defendants to identify, with Court supervision, victims of their conduct and pay them all monies required;

E.    Awarding Plaintiffs' Counsel reasonable fees and expenses in addition to and on top of damages;

F.    Awarding pre-judgment and post-judgment interest as provided by law; and

G.    Providing such further relief as may be just and proper.

## IX.    JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  June 20, 2023

s/ GREG G. GUTZLER

**DiCELLO LEVITT LLP**
Greg G. Gutzler
485 Lexington Avenue, Suite 1001
New York, New York  10017
Tel:  646-933-1000
ggutzler@dicellolevitt.com

68

**DiCELLO LEVITT LLP**
Patrick W. Daniels (*pro hac vice* forthcoming)
James D. Baskin (*pro hac vice* forthcoming)
Henry R. Rosen (*pro hac vice* forthcoming)
Roxana Pierce (*pro hac vice* forthcoming)
Caroline Robert (*pro hac vice* forthcoming)
4747 Executive Drive, Second Floor
San Diego, California  92121
Tel.:  619-923-3939
pwdaniels@dicellolevitt.com
jbaskin@dicellolevitt.com
hrosen@dicellolevitt.com
rpierce@dicellolevitt.com
cmrobert@dicellolevitt.com

**DiCELLO LEVITT LLP**
Adam J. Levitt
Mark S. Hamill (*pro hac vice* forthcoming)
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois  60602
Tel.:  312-214-7900
alevitt@dicellolevitt.com
mhamill@dicellolevitt.com

***Counsel for Plaintiffs and the Proposed Class***