UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————x

STAR COLBERT, ASSENAGON CREDIT
SUBDEBT AND COCO, and AXIOM LUX
SICAV, Individually and on Behalf of Other
Credit Suisse Group AG AT1 Bondholders,

        Plaintiff,

vs.

BRADY W. DOUGAN, et al.,

        Defendants.

————————————————————————x

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED: 3/20/24

23-cv-7297

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

McMahon, J.:

      In yet another action that follows the financial collapse of the Swiss corporation Credit

Suisse Group AG ("Credit Suisse"), three European investment funds – Star Colbert, Assenagon

Credit SubDebt and Coco, and Axiom Lux SICAV (the "Plaintiffs") – have filed a class action

lawsuit in the Southern District of New York on behalf of all Credit Suisse Additional Tier One

("AT1") bondholders (the "Class") from January 12, 2023 to March 19, 2023 (the "Class Period").

Plaintiffs' sole cause of action against the Defendants -- eighteen former Credit Suisse Directors

and Officers (the "Defendants") – arises under Swiss law: it alleges the Defendants'

mismanagement of the Swiss corporation and their alleged negligent breaches of statutory duties

that the Plaintiffs claim the Defendants owed Credit Suisse AT1 bondholders. The Defendants

have moved for dismissal on several grounds, including on the basis of *forum non conveniens*.

Recently, similar Swiss law claims against Credit Suisse directors, officers, and subsidiaries were pending before this court in *Stevenson v. Thornburgh*, No. 23 Civ. 4458, and *Lawtone-Bowles v. Thornburgh*, No. 23 Civ. 4813. Though a different class of plaintiffs brought those claims, some of the allegations and individual defendants overlap with this case. This court ultimately dismissed the *Stevenson* and *Lawtone-Bowles* Swiss law claims on the basis of *forum non conveniens*. No. 23 Civ. 4458, No. 23 Civ. 4813, 2024 WL 645187 (S.D.N.Y. Feb. 14, 2024)

For many of the same reasons, the Court will do the same in the instant action. Defendants' motion is granted and the Amended Class Action Complaint is dismissed as against all Defendants.


## BACKGROUND

I.   **Parties**

a.   **Plaintiffs**

Plaintiffs Star Colbert, Assenagon Credit SubDebt and Coco, and Axiom Lux SICAV are European investment funds that held Credit Suisse AT1 bonds. Compl. ¶¶ 1, 37–39. Plaintiffs have brought this action on behalf of all holders of Credit Suisse AT1 bonds during the Class Period – between January 12, 2023, and March 19, 2023, inclusive – who are alleged to have suffered damages and/or losses due to the Defendants' alleged negligent breaches of statutory duties they owed Credit Suisse AT1 bondholders under Swiss law. *Id.* ¶¶ 31, 204, 212, 218–20.

On March 19, 2023, the end of the proposed Class Period, the Swiss Financial Market Supervisory Authority ("FINMA") issued a decree (the "FINMA Decree") to Credit Suisse ordering the write-down the value of all outstanding AT1 bonds to zero. *Id.* ¶¶ 4, 77, 181, 183, 189. Credit Suisse had no choice but to comply, and it eliminated the entire value of the bonds.

Although it would seem that their losses were caused by order of the Swiss government, Plaintiffs argue that the FINMA Decree "was not the cause of the wipeout or of the holders' losses. The FINMA decree merely confirmed what was already true—the AT1 bonds were going to be wiped out, one way or another, on or about March 19, 2023. Loss of trust was the cause." *Id.* ¶ 183.

### b. Defendants

The Defendants are eighteen individuals: James Amine, Gaël de Boissard, Brian Chin, Brady Dougan, Noreen Doyle, Andreas Gottschling, Thomas Gottstein, Sir António Horta-Osório, Michael Klein, Christian Meissner, David Miller, Timothy O'Hara, Urs Röhner, Robert Shafir, Tidjane Thiam, Richard Thornburgh, Eric Varvel, and Lara Warner. *Id.* ¶¶ 40–57; 193–200. These eighteen individuals were members of Credit Suisse's Board of Directors, members of Credit Suisse's Executive Board, and Credit Suisse officers. *Id.* ¶¶ 40–57; 193–200. The Defendants' citizenships vary: Amine, Chin, Dougan, Doyle, Klein, Miller, O'Hara, Shafir, Thornburgh, Varvel, and Warner are U.S. citizens, *id.* ¶¶ 40–45, 52–54, 56–57; Boissard is a French citizen, *id.* ¶ 47; Gottschling is a German citizen, *id.* ¶ 55; Horta-Osório is a British and Portuguese citizen, *id.* ¶ 51; Meissner is an Austrian citizen, *id.* ¶ 46; Gottstein and Röhner are Swiss citizens, *id.* ¶¶ 48, 50; and Thiam is a French and Ivorian citizen, *id.* ¶ 49. I note that three of the named defendants – de Boissard, Röhner, and Horta-Osório – do not appear to have been served with process and so have not appeared in this case or joined in the motion to dismiss. Dkt. No. 32. The other fifteen defendants are the parties who have moved to dismiss. Dkt. Nos. 32, 51.

Plaintiffs assert that, based on the Defendants' roles as "Directors and senior managers" of Credit Suisse, a Swiss stock company that was governed by Swiss statutory law, the Defendants owed the Credit Suisse AT1 bondholders certain duties under Articles 716a, 716b, and 717 of the

Swiss Code of Obligations, and are liable for their negligent breaches of those duties pursuant to Articles 754 and 759 of the Swiss Code of Obligations. *Id.* ¶¶ 191–92, 217–21.

Many of the Defendants – Dougan, Doyle, Gottschling, Gottstein, Horta-Osório, Klein, Röhner, Thiam, and Thornburgh – are alleged to have had duties arising under Swiss law that "encompass[ed] the entire enterprise during the time each was in office." *Id.* ¶¶ 48, 51, 193. Defendants Dougan, Thiam, and Gottstein, as former members of the Credit Suisse Executive Board and Credit Suisse CEOs, are said to have been responsible for managing Credit Suisse "as a whole." *Id.* ¶ 195. Warner is alleged to have "had enterprise-wide responsibility for compliance, and, subsequently, for compliance and risk management." *Id.* ¶ 198.

Plaintiffs state that their Swiss law claim arises from "each Defendants' failures in connection with risk management, and more specifically the bad risk culture they instilled, then failed to fix." *Id.* ¶ 200. Plaintiffs allege that the Defendants perpetrated "years of misconduct, malfeasance, and managerial negligence" that eventually resulted in the FINMA Decree. *Id.* ¶¶ 180–81. Plaintiffs elaborate: "Credit Suisse's write-down of the value of all outstanding AT1 bonds was a result of a self-inflicted liquidity and collateral crisis that, in turn, was a product of the broken trust between the Bank and its customers from the years of accumulated scandals resulting from the Defendants' negligence and breaches of duties owed under Swiss law to Plaintiffs and the Class." *Id.* ¶ 182.

## II.    Factual Allegations

The facts below are drawn from the allegations in the First Amended Class Action Complaint (the "Complaint") and are presumed to be true for purposes of the motion to dismiss.

### a. Credit Suisse's AT1 Bonds

AT1 bonds are hybrid securities issued by banks – in this case, Credit Suisse – that meet the criteria for Tier 1 (or "going concern") regulatory capital. Compl. ¶ 74. In addition to AT1 bonds, Credit Suisse had another Tier 1 capital instrument: Credit Suisse Employee Contingent Capital Awards ("CCAs"). *Id.* ¶ 184. According to Plaintiffs, "CCAs are equivalent to AT1 Tier 1 Capital with the difference being AT1s are offered to outside creditors, like Plaintiffs here, and CCAs were awarded to Credit Suisse executives and board members as bonuses, deferred compensation, or retentions payments." *Id.* All Credit Suisse Employee CCA holders are excluded from the proposed Class. *Id.* ¶ 207.

AT1 bonds are "***subordinated*** to depositors, general creditors, and subordinated debt of the bank, meaning they are at the bottom of the bank's capital structure, sitting (in general) just above equity." *Id.* ¶ 74 (emphasis in original). AT1 bonds "are designed to ensure that bondholders bear losses before equity holders in certain circumstances." *Id.* ¶ 75.

AT1 bonds "have a '***principal loss absorption***' feature whereby they are either (depending on the specific terms of issue) (i) converted to common shares at a pre-set trigger point or (ii) written down to allocate losses to the instruments at the pre-set trigger point. The conversion or write-down is triggered when the bank's Common Equity Tier 1 (CET1) ratio drops below a specified point." *Id.* (emphasis in original). But "the bank's regulator can under certain circumstances trigger a conversion or write-down without regard to whether the pre-set trigger points have been crossed." *Id.*

Writing down the value of an AT1 Bond means that interest on the note ceases to accrue, the full principal amount of each note is automatically and permanently written down to zero, the bondholder loses its entire investment in the note, and all rights of the bondholders for payment of

any amounts under or in respect of the notes – save for certain interest-based exceptions – will become null and void. Ex. 1 to Grolimund Decl., at 1.

According to an excerpt from a Credit Suisse AT1 Bond offering memorandum, Credit Suisse's AT1 bonds' conditions, notes, and certificates were governed by, and construed in accordance with, the laws of Switzerland. *Id.* at 5. The offering memorandum also includes a provision that: "Any dispute which might arise based on these Conditions, the Notes and the Certificates shall fall within the exclusive jurisdiction of the courts of the city of Zurich and, if permitted, the Commercial Court of the Canton of Zurich, the place of jurisdiction being Zurich. The above-mentioned jurisdiction is also exclusively valid for the declaration of cancellation of the Notes." *Id.*

### b. Credit Suisse's Gradual Decline

After over one hundred years of operations as a financial institution, Compl. ¶ 1, Credit Suisse collapsed in mid-March 2023. Plaintiffs cite to an April 4, 2023 statement made by Credit Suisse's then-Chairman, Axel Lehmann, where he indicated that Credit Suisse's collapse was the result of the "loss of trust that had accumulated over the years." *Id.* ¶ 2. Plaintiffs identify trust, in this context, as "rest[ing] largely on the perceived ability of a financial institution to manage risk appropriately." *Id.* ¶ 7. Plaintiffs state that "'Loss of trust' is what happens when clients, customers and counterparties conclude that a bank's risk culture is broken—and that their own interests are being placed at risk as a result." *Id.* ¶ 9.

According to Plaintiffs, the loss of trust in Credit Suisse "began in the wake of unending, headline-grabbing scandals that began during and after the Global Financial Crisis and continued unabated to the end. The frequency and severity of the scandals, blow-ups, fines, and even criminal convictions led progressively and inexorably to the widely accepted view that Credit Suisse's

culture, particularly its 'risk culture,' was rotten and was not getting better." *Id.* ¶ 5. Plaintiffs assert that "The 'arsonists' in charge of Credit Suisse's risk culture—directors, CEOs, and members of the Executive Board, especially those leading (among others) [Investment Banking] and the risk function—caused its ultimate death spiral and collapse," *id.* ¶ 89, and "The former Credit Suisse directors and senior executives sued herein are responsible for the loss of trust, the resulting failure of the Bank and the losses incurred by the AT1 holders." *Id.* ¶ 3.

Plaintiffs claim that the "consensus view"[1] is that Credit Suisse's senior leadership caused its demise, *id.* ¶ 4, but identify Credit Suisse's New York Investment Banking Division as "the primary source of the bank's most significant publicly-reported scandals, and illegal and unethical conduct, over the past several years." *Id.* ¶ 78. Plaintiffs allege that beginning in 2007, when Defendant Dougan became CEO of Credit Suisse, "Credit Suisse's culture became dominated by New York investment bankers. The outgrowth of that toxic, high-risk culture was a string of scandals caused by the chase for profits (and bonuses) outweighing risk management." *Id.* ¶¶ 40, 85, 88. In the Complaint, Plaintiffs reference many so-called scandals, or "high-profile legal and financial disasters," that occurred during the so-called "Brady Dougan Era." *Id.* ¶ 101. Plaintiffs allege that: traders in Credit Suisse's Investment Banking Division sold toxic residential mortgage-backed securities, commercial mortgage-backed securities, and collateralized debt securities from 2005–2007, resulting in Credit Suisse's payment of more than $9 billion in fines and settlements for its role in structuring and selling the "toxic" asset-backed securities; in April 2013, one Credit Suisse senior employee pled guilty and went to prison for mismarking asset-backed securities; in 2014, Credit Suisse pled guilty to a criminal conspiracy to aid and assist U.S. taxpayers in filing

---

[1] This "consensus" seems to consist of the President of the Swiss Financial Market Supervisory Authority, the Swiss Finance Minister, a "well-known economist," and the "financial press." Compl. ¶ 4. Though Plaintiffs state, "The financial press published numerous articles with titles such as '*Scandal and Mistrust Ended Credit Suisse's 166-Year Run*,'" Plaintiffs only cite to one Bloomberg article to support this assertion. *Id.*

false returns and paid a $2.6 billion fine; the New York State Department of Financial Services fined Credit Suisse $135 million for violating New York banking laws by manipulating and rigging the foreign exchange currency market between 2008 and 2015; and Credit Suisse and some of its Investment Banking officials entered guilty pleas in the Eastern District of New York based on their participation in the "Tuna Boat Scandal," which involved a series of corrupt and illegal transactions by Credit Suisse's New York Investment Banking Group between 2012 and 2016. *Id.* ¶¶ 102–05, 107, 109–10. Plaintiffs assert that, "The specific acts of misconduct, malfeasance, and managerial negligence described . . . were among the most public and egregious of the Dougan Era, but they were emblematic of deeper and broader problems at Credit Suisse—a cascade of individual acts enabled by a toxic culture, created by top leadership and particularly the top IB leadership in New York—that was progressively resulting in loss of trust." *Id.* ¶ 111.

Dougan ceased to be the CEO of Credit Suisse in July 2015, but Plaintiffs assert that Credit Suisse's issues extended beyond the "Brady Dougan Era." *Id.* ¶ 120. Examples of those issues include the following: allegedly, in early 2016, Tidjane Thiam, who had succeeded Dougan as Credit Suisse's CEO, discovered a "huge number of illiquid positions" purportedly originating from New York trading desks and primarily involving Collateralized Loan Obligations and distressed credit in the Global Markets Division headed by Defendant O'Hara, a New Yorker – those positions had to be written down by $1 billion in the first fiscal quarter of 2016; during the tenure of Defendant Gottstein, who replaced Thiam as Credit Suisse CEO in February 2020, Malachite Capital Management defaulted, which caused Credit Suisse to suffer a $214 million loss; in March 2021, Greensill Capital (UK) Ltd. ("Greensill"), a global supply chain lender that was a "huge" Credit Suisse Investment Banking and Asset Management client, became insolvent, which forced Credit Suisse to suspend $10 billion of funds linked to Greensill and prompted a

FINMA investigation that found that Credit Suisse breached Swiss supervisory law in failing to adequately identify, limit, and monitor risks in its business relationship with Greensill and its founder; and in late March 2021, Credit Suisse disclosed that it faced highly significant and material losses -- to the tune of $5.5 billion -- because of its connections to Archegos Capital Management ("Archegos"), a New York-based family office that had received loans from Credit Suisse and made huge leveraged bets on a handful of publicly traded stocks. *Id.* ¶¶ 113, 121–22, 130–31, 138–41, 144.

Interestingly, this parade of scandals, extending over a decade and a half, "had little apparent and immediate impact on AT1 bond pricing – or risk to the AT1 bonds, as assessed by the market." *Id.* ¶ 76. This was allegedly because the write-down features meant that Credit Suisse's AT1 bonds were uniquely situated within Credit Suisse's capital structure (*id.* ¶ 74 n.37):

> These bonds were at the bottom of Credit Suisse's capital structure and were structured so they could be extinguished in certain circumstances involving severe, possibly existential, financial stress, when the Bank's independent existence was immediately threatened. But until such a situation developed, i.e., the Bank itself was going over a cliff, the AT1 bond holders were paid in full and on time, and the market valued the bonds at or near par. Thus, AT1 bonds were exposed to "cliff risk," i.e., the kind of long-term management failure that happened here, resulting in loss of trust and the collapse of the Bank.

*Id.* ¶ 27. According to Plaintiffs, "unless and until the Bank came under financial distress severe enough to threaten its continued independent existence, AT1 holders continued to be paid, and the market valued the bonds at or near par (adjusted for interest rate risk)." *Id.* ¶ 75.

Plaintiffs allege that in the wake of these "scandals," Credit Suisse executives who held CCAs "were scheming behind the scenes as early as January 2023 . . . to insulate themselves and former highly-placed executives from losses they anticipated in connection with the Tier 1 capital instruments, i.e., the CCAs and AT1 bonds." *Id.* ¶ 184. On January 12, 2023, Credit Suisse

informed FINMA that it would no longer count CCAs as Regulatory Core Tier 1 capital. *Id.*
Plaintiffs claim that this means that "nearly two months before the collapse of Credit Suisse, Credit
Suisse executives knew—based on their insider knowledge of the dire situation of the Bank, the
deepening crisis of confidence, and the scale of customer and client withdrawals—that the value
of Tier 1 capital component of their own compensation had evaporated or been dramatically
diminished." *Id.* ¶ 185.

Plaintiffs assert that "As [Credit Suisse's] 'culture risk failures' piled up, it became
apparent that more failures—more scandals, blow-ups, fines and material losses—were
increasingly likely. While the scandals garnered headlines, it was the fear of what lurked beneath
that ultimately led to the fatal loss of trust." *Id.* ¶ 6.

### c.  Credit Suisse's March 2023 Collapse

According to Plaintiffs, "The end for Credit Suisse, although long (gradual) in the making,
came suddenly in March 2023." *Id.* ¶ 18.

"During the week of March 13, 2023, Credit Suisse reached its internal liquidity
limit at the Swiss National Bank ('SNB'). On March 15, 2023, in an effort to stem the outflows,
the Swiss government began to provide 'extraordinary' liquidity assistance' – 'approximately
$65.9 billion in liquidity support over a few days.'" *Id.* ¶¶ 19–20, 174–177. But the "outflows of
client assets accelerated;" in total, "Clients pulled $75 billion in assets from Credit Suisse in the
first quarter of 2023." *Id.* ¶ 20. Plaintiffs contend that the asset outflows increased because of
clients' "erosion of trust" in Credit Suisse. *Id.* ¶ 177. And according to Plaintiffs, "Between March
10 and March 17, 2023, the [Tier 1] price dropped like a rock, from 82 to 25, losing almost 70%
in value before FINMA mandated that the AT1 bonds be written down to zero." *Id.* ¶ 77.

Plaintiffs state that "By the weekend of March 18–19, 2023, the Swiss government and FINMA determined they had to act immediately." *Id.* ¶¶ 21, 169. According to the Swiss Minister of Finance, "Credit Suisse would not have survived Monday," i.e., the next trading day. *Id.* ¶¶ 21, 179. Plaintiffs state that the Swiss government and FINMA "concluded they had but a few viable options for Credit Suisse: bankruptcy, resolution, nationalization, or a forced merger." *Id.* ¶¶ 22, 180. Per Plaintiffs: "***Under any of these scenarios—bankruptcy, resolution, nationalization, or forced merger—the AT1 bonds would have been wiped out***." *Id.* ¶ 22 (emphasis in original); *see id.* ¶¶ 24–25.

The Swiss government and FINMA proceeded to force a merger of Credit Suisse into one of its competitors, UBS Group AG ("UBS"), another Swiss corporation. *Id.* ¶ 23; *see* Belzer Decl. ¶ 4. The merger was facilitated by the March 19, 2023, FINMA Decree that, say Plaintiffs, "requir[ed] Credit Suisse to recognize the inevitable – the write-down of all outstanding AT1 bonds to zero." Compl. ¶¶ 23, 181, 189. Plaintiffs claim that FINMA had reached the following conclusion: "as a result of the 'major reputational damage,' the 'deep crisis of confidence,' the accelerating customer withdrawals, and the resulting liquidity shortages, Credit Suisse had to zero out the value of all outstanding AT1 bonds to 'prevent insolvency' and to 'ensure the continued existence of [Credit Suisse];'" "'it was necessary for the authorities to take action in order to prevent serious damage to the Swiss and international financial markets.'" *Id.* ¶ 181. Several days later, on March 23, 2023, FINMA determined that its decree also applied to Credit Suisse Employee CCAs. *Id.* ¶ 190. However, Plaintiffs assert that "While the FINMA Decree was the ultimate instrumentality by which the AT1 bonds were wiped out, it was the result of the bank collapsing, not the cause of its collapse (and resulting write-down of the AT1 bonds)." *Id.* ¶ 24.

11

Several months after the FINMA Decree, on June 12, 2023, Credit Suisse merged with and into UBS, with UBS being the absorbing company, which continues to operate, and Credit Suisse being the absorbed company, which effectively ceased to exist. Belzer Decl. ¶ 4.

## III.    Procedural History

On June 20, 2023, Plaintiffs commenced this action against the Defendants in the Eastern District of New York, invoking diversity jurisdiction. Dkt. No. 1. On August 15, 2023, Plaintiffs made, and the court granted, an unopposed motion to change venue from the Eastern District to the Southern District of New York, in light of the related cases (e.g., *Stevenson* and *Lawtone-Bowles*) proceeding before this court. Dkt. Nos. 6–7. On August 28, 2023, Plaintiffs submitted their Amended Class Action Complaint (the "Complaint") containing one cause of action – their Swiss law claim. Dkt. No. 15. Plaintiffs allege that all Defendants, through their negligent breaches of the duties they owed Credit Suisse AT1 bondholders, violated Arts. 716a, 716b, 717, 754, and 759 of the Swiss Code of Obligations.

On October 13, 2023, Defendants moved to dismiss the Complaint, advancing several arguments, including that Plaintiffs' claim should be dismissed on the basis of *forum non conveniens*. Dkt. No. 32.

For the reasons discussed below, the Court grants Defendants' motion to dismiss the Complaint on the basis of *forum non conveniens*.

## DISCUSSION

### I.    Plaintiffs' Claim Is Dismissed On *Forum Non Conveniens* Grounds

In their one and only claim for relief, Plaintiffs allege that Defendants, in their mismanagement of Credit Suisse, negligently breached their statutory duties in violation of Articles 716a, 716b, 717, 754, and 759 of the Swiss Code of Obligations, which regulates Swiss companies.[2]

Article 716(a) of the Swiss Code of Obligations lists a Board of Directors' non-transferable and inalienable duties under Swiss Law, which include: the "overall management of the company and the issuing of all necessary directives;" the organization of "the accounting, financial control and financial planning systems as required for management of the company;" the appointment and dismissal of "persons entrusted with managing and representing the company;" and the "overall supervision of the persons entrusted with managing the company, in particular with regard to compliance with the law, articles of association, operational regulations, and directives." Article 716(b), on the "Delegation of Business Management," states that, "Unless the articles of association provide otherwise, the board of directors may delegate the management of all or part of the company's business in accordance with [organizational] regulations to individual members or third parties (executive board)." If the company's share is listed on a stock exchange, "the management of the company's business may be delegated to individual members of the board of directors or to other natural persons. The management of the company's assets may be delegated to natural persons or legal entities." Article 717, titled "Duty of Care and Loyalty," provides that: "The members of the board of directors and third parties engaged in managing the company's

---

[2]    An English translation of Part Five: The Code of Obligations of the Swiss Civil Code can be found on the Swiss Confederation's online platform for federal law: https://www.fedlex.admin.ch/eli/cc/27/317_321_377/en, *archived at* https://perma.cc/GTM2-W37D.

business must perform their duties with all due diligence and safeguard the interests of the company in good faith." Article 754 states that, "The members of the board of directors and all persons engaged in the business management or liquidation of the company are liable both to the company and to the individual shareholders and creditors for any losses or damage arising from any intentional or negligent breach of their duties." Article 759 governs joint and several liability.

Plaintiffs claim that "Wherever located, Credit Suisse's directors and executive board members were bound by duties set out in the Swiss Code of Obligations ('CO'). Those duties were owed not only to Credit Suisse but also, by statute, directly to its shareholders and creditors." Compl. ¶ 13. Plaintiffs assert that "Credit Suisse AT1 bondholders, including Plaintiffs and each of the other Class members, as creditors, have been damaged and suffered losses due to Defendants' negligent breach of their duties to perform their duties with all due diligence and safeguard the interests of the company in good faith." *Id.* ¶ 220.

The Defendants argue that Plaintiffs' Swiss law claim should be dismissed on the basis of *forum non conveniens* and assert that: "This case does not belong in this Court. It belongs in Switzerland."

Whatever merit Plaintiffs' claim may have, it is this court's view that "This litigation raises another instance of the common cases in which plaintiffs commence lawsuits in United States courts to adjudicate disputes entailing alleged losses suffered from commercial transactions and other events that occur predominantly in a foreign country. . . . Plaintiffs' claims involve not an ordinary commercial dispute between two parties to a transaction, but matters of corporate governance that implicate the legal interests of countless third-party shareholders around the world, not just those litigants now before the Court." *In re Alcon S'holder Litig.*, 719 F.Supp.2d 263, 268 (S.D.N.Y. 2010).

This case is not even close. Plaintiffs, none of whom is an American, are suing exclusively for violations of Swiss law by the directors and officers of a Swiss corporation. They seek to recover for losses on bonds that were issued in Switzerland and whose terms are governed by Swiss law. Ex. 1 to Grolimund Decl., at 1. Those bonds were the subject of a mandatory write-down by order of the Government of Switzerland. *Id.* at 1, 2–4; Compl. ¶ 23. And the bonds contain a forum-selection clause that specifies Zurich as the exclusive location for any lawsuit "based on these Conditions, the Notes or the Certificates" or relating to the "cancellation of the Notes." Ex. 1 to Grolimund Decl., at 5.

In light of all this, the answer is obvious. New York has no business adjudicating this dispute. Defendants' motion is GRANTED.


### a.   The *Forum Non Conveniens* Doctrine

The *forum non conveniens* doctrine is a discretionary device that permits a court, in certain instances, to dismiss a claim even if the court is a permissible venue with proper jurisdiction over the claim. *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 100 (2d Cir. 2000) (citation and internal quotation marks omitted); *Olin Holdings Ltd. v. Libya*, No. 21-cv-4150, 2022 WL 8654507, at *7 (S.D.N.Y. Mar. 23, 2022). "The central purpose of a *forum non conveniens* inquiry is to determine where trial will be most convenient and will serve the ends of justice." *R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d 164, 167 (2d Cir. 1991).

Courts in this Circuit engage in a three-step process to determine whether *forum non conveniens* dismissal is appropriate. *See Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 154 (2d Cir. 2005). The first step requires the Court to determine the degree of deference to be afforded to the plaintiff's choice of forum. *Id.* at 153–54. Next, the Court examines whether

an adequate alternative forum exists. *In re Alcon*, 719 F.Supp.2d at 269 (citations omitted).

Finally, the Court must balance the private and public interest factors enumerated by the

Supreme Court in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947) that are implicated in the

choice of forum. *Olin Holdings Ltd. v. Libya*, 73 F.4th 92, 109 (2d Cir. 2023); *Wiwa*, 226 F.3d at

100; *Norex*, 416 F.3d at 153. The defendant has the burden of establishing that an adequate

alternative forum exists, and then showing that the balance of private and public interest factors

tilts heavily in favor of the alternative forum. *Olin Holdings Ltd.*, 73 F.4th at 109; *Wiwa*, 226

F.3d at 100.

Defendants urge this court to dismiss the Complaint on the basis of *forum non conveniens*

because Plaintiffs' choice of forum should be given no deference, Switzerland offers an adequate

forum to adjudicate claims of corporate mismanagement under Swiss law, and the *Gilbert* private

and public interest factors favor Switzerland.

### (1) Deference to Plaintiffs' Choice of Forum

While "generally, there is a strong presumption in favor of the plaintiff's choice of

forum," *Do Rosario Veiga v. World Meteorological Org.*, 486 F.Supp.2d 297, 303 (S.D.N.Y.

2007) (citations omitted), "the degree of deference to be given to a plaintiff's choice of forum

moves on a sliding scale depending on several relevant considerations," *Iragorri v. United Tech.*

*Corp.*, 274 F.3d 65, 71 (2d Cir. 2001):

> Factors to be considered include: "the convenience of the plaintiff's
> residence in relation to the chosen forum, the availability of
> witnesses or evidence to the forum district, the defendant's
> amenability to suit in the forum district, the availability of
> appropriate legal assistance, and other reasons relating to
> convenience or expense." On the other side of the equation,
> circumstances "generally indicative of forum shopping," *see Norex*,
> 416 F.3d at 155, include "attempts to win a tactical advantage

> resulting from local laws that favor the plaintiff's case, the habitual
> generosity of juries in the United States or in the forum district, the
> plaintiff's popularity or the defendant's unpopularity in the region,
> or the inconvenience and expense to the defendant resulting from
> litigation in that forum."

*Maersk, Inc. v. Neewra, Inc.*, 554 F.Supp.2d 424, 451 (S.D.N.Y. 2008) (citing *Iragorri*, 274 F.3d at 72). Though "a district court is not required to consider every single factor specifically in making this determination," *Cortec Corp. v. Erste Bank Ber Oesterreichischen Sparkassen AG (Erste Bank)*, 535 F.Supp.2d 403, 408 (S.D.N.Y. 2008) (citing *Norex*, 416 F.3d at 155), under the sliding scale, "the greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for *forum non conveniens.*" *Iragorri*, 274 F.3d at 71.

"However, where the circumstances indicate that the parties and material events bear no bona fide connection to the United States, or that in relation to the core operative facts in dispute the parties and events at best have only marginal links to the plaintiff's chosen venue, that choice of forum is not entitled to special deference," *Do Rosario Veiga*, 487 F.Supp.2d at 302, "Especially in a case where all claimants are foreign residents. . . ." *Rudersdal, EEOD v. Harris*, No. 1:18-cv-11072, 2020 WL 5836517, at *10 (S.D.N.Y. Sept. 30, 2020). In other words, "where the plaintiff's choice is determined to stem more from concerns of convenience, it is entitled to greater deference; where the choice indicates forum-shopping, it is entitled to less deference." *Maersk, Inc.*, 554 F.Supp.2d at 452.

Applying the sliding scale approach established by *Iragorri* to the instant action, Plaintiffs' choice of the Southern District of New York as the forum to litigate their Swiss law claim is entitled to little deference. *Olin Holdings Ltd.*, 2022 WL 864507, at *7; *see Cortec*

17

*Corp.*, 535 F.Supp.2d at 408; *Erausquin v. Notz, Stucki Mgmt. (Bermuda) Ltd.*, 806 F.Supp.2d

712, 725 (S.D.N.Y. 2011).

First, "when a foreign plaintiff sues in a United States forum such choice is entitled to

less deference because one may not easily presume that choice is convenient." *Pollux Holding*

*Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 71 (2d Cir. 2003) (citing *Piper Aircraft v. Reyno*,

454 U.S. 235, 256 (1981)); *see Calgarth Investments. Ltd. v. Bank Saderat Iran*, No. 95 Civ.

5332, 1996 WL 204470, at *5 (S.D.N.Y. Apr. 26, 1996). Further, in the Second Circuit,

deference to a plaintiff's choice of forum is diminished when the "plaintiff is a corporation doing

business abroad and can expect to litigate in foreign courts." *Guidi v. Inter-Continental Hotels*

*Corp.*, 224 F.3d 142, 147 (2d Cir. 2000); *see FUNB v. Arab Afr. Intern. Bank*, 48 Fed.Appx. 801,

803 (2d Cir. 2002); *Lazare Kaplan Int'l Inc. v. KBC Bank N.V.*, 337 F.Supp.3d 274, 297

(S.D.N.Y. 2018); *LaSala v. UBS, AG*, 510 F.Supp.2d 213, 223–24 (S.D.N.Y. 2007).

All of the named Plaintiffs, who seek to litigate a single claim arising under Swiss law in

the Southern District of New York, are European investment funds: Star Colbert is a fonds

commun de placement located in and organized under the laws of France, Compl. ¶ 37;

Assenagon Credit SubDebt and CoCo is a fonds commun de placement located in and organized

under the laws of Luxembourg, *id.* ¶ 38; and Axiom Lux SICAV is a Société d'investissement à

Capital Variable located in and organized under the laws of Luxembourg. *Id.* ¶ 39. All of the

named Plaintiffs hold AT1 bonds issued by Credit Suisse, which is a Swiss corporation. *Id.* ¶¶ 1,

14, 37–39. The terms of the bonds are governed by Swiss law and a Swiss court is designated as

the place of jurisdiction to hear disputes that are "based on" the bonds. Ex. 1 to Grolimund Decl.,

at 5. The write-down of the AT1 bonds was ordered by the Swiss government. Compl. ¶ 23.

Based on these facts, it would be unreasonable for the Court to conclude that the Plaintiffs were not on notice of possible litigation in foreign courts. *See Giro, Inc. v. Malaysian Airline System Berhad*, No. 10 Civ. 5550, 2011 WL 2183171, at *7 (S.D.N.Y. June 3, 2011). It would also be unreasonable to conclude that, especially for the European plaintiffs, the Southern District of New York is somehow a more convenient forum than one located in Europe – specifically, Switzerland.

Second, Plaintiffs are suing in a representative capacity. Of course, class action status is merely one consideration in the deference determination. *See Celestin v. Martelly*, No. 18-cv-7340, 2023 WL 6385339, at *5 (E.D.N.Y. Sept. 29, 2023). But Plaintiffs seek to represent "All holders who held Credit Suisse AT1 bonds between January 12, 2023, and March 19, 2023, inclusive," Compl. ¶ 204. As they allege in their Complaint, this includes foreign and U.S. citizens. *Id.* ¶ 206. Plaintiffs, in their opposition papers, assert that "the economic injuries caused by Defendants' negligence were visited upon many investors in New York in the order of hundreds of millions of dollars," Opp. Memo, at 14, without mentioning prospective Class members who are located elsewhere. In fact, "The proposed class framed in the complaint is a worldwide class." *Gilstrap v. Radianz*, 443 F.Supp.2d 474, 480 (S.D.N.Y. 2006).

Next, regarding the question of whether witnesses and evidence are more available in Plaintiffs' chosen forum than Defendants' preferred forum, it appears – as will be discussed in-depth when the Court considers the *Gilbert* private and public interest factors implicated by this case, *infra* pp. 33–52 – that based on the record, there are significant barriers to accessing foreign witnesses and evidence in the Southern District of New York. *See Norex*, 416 F.3d at 156; *Celestin*, 2023 WL 6385339, at *5.

Plaintiffs contend that the bulk of the relevant witnesses and documents is located in the United States, and principally in New York, while Defendants argue that the evidence is concentrated in Switzerland. But Plaintiffs seem to disregard that, in order to mount this case, they will likely need to call current and former employees of Credit Suisse, FINMA, and Credit Suisse's successor, UBS – the majority of whom is most likely located in Switzerland. Additionally, supporting documents will likely be located where Credit Suisse held its Board of Directors meetings – which was in Switzerland. Belzer Decl. ¶ 7. Further, Defendants represent that "Records of Board meetings, including agendas and minutes of such are all stored on Swiss servers." *Id.*

As to the question of the Defendants' amenability to suit in the Southern District of New York, Plaintiffs claim that eleven of the eighteen Defendants are U.S. citizens who live in New York. Compl. ¶¶ 40–57. But a plaintiff's choice to initiate suit in a defendant's supposed home forum – as opposed to any other forum where the defendant is also amenable to suit – "only merits heightened deference to the extent that the plaintiff and the case possess bona fide connections to, and convenience factors favor, that forum." *Pollux*, 329 F.3d at 74. Here, as Plaintiffs have no connection to the chosen forum and the convenience factors do not favor their choice, the fact that some of the Defendants live here counts for virtually nothing.

The core operative facts underlying Plaintiffs' claim "arise mostly out of the operations of [a foreign entity] outside of the United States," *Erausquin*, 806 F.Supp.2d at 725 (citing *In re Alcon*, 719 F.Supp.2d at 269), and bear little connection to the Southern District of New York. *In re Alcon*, 719 F.Supp.2d at 269. In their moving papers, Defendants characterize the instant action as follows: "Plaintiffs assert a single claim, which is brought under Swiss law against former personnel of a Swiss bank for alleged losses that arose from the actions of a Swiss regulator in

Switzerland." Despite Plaintiffs' protests, that is an absolutely accurate assessment of what this lawsuit is about.

Plaintiffs accuse Defendants of "distort[ing] the facts to incorrectly claim that this case has, at best, a 'tangential' connection to New York" and maintain that their lawsuit has bona fide connections to the United States and to the Southern District of New York. Opp. Memo, at 16. Plaintiffs allege that the losses of the proposed Class were the product of "endemic compliance failures at Credit Suisse's investment bank in New York that led to multiple high-profile, trust-eviscerating scandals and regulatory censures in New York and, ultimately, a total 'loss of trust' in Credit Suisse itself." Opp. Memo, at 14; *see* Compl. ¶¶ 1–27. Plaintiffs place the blame for these compliance failures on Defendants, whose inaction, they allege, was in breach of their Swiss law statutory duties to AT1 bondholders. Opp. Memo, at 14; *see* Compl. ¶¶ 90–112, 195–96. Plaintiffs add, "Here, the negligence lay in the conduct of actors working at Credit Suisse's New York investment bank headquarters and the evidence relating to damages is in New York." Opp. Memo, at 16. Again, in an attempt to downplay the case's connections to Switzerland, Plaintiffs try to de-center the role of FINMA, the Swiss regulator, in their bonds' loss of value and instead insist that "The case is *not* about FINMA or its March 19 Decree. It *is* about the acts and omissions that led Credit Suisse to the brink of collapse. The focus is on Credit Suisse's New York-based Investment Bank." Opp. Memo, at 5 (emphasis in original).

But as much as Plaintiffs attempt to paint their case as one involving a New York-based investment bank and not Swiss regulators, "[e]very significant aspect of this case – which is based on board-level and executive level decisions of a Swiss corporation – boils down to Switzerland: . . . the location of the alleged wrongdoing, the applicable law, and the majority of witnesses and

documents." *Cattan v. Rohner*, 2023 N.Y. Slip Op. 31213, 2023 WL 2868337, at *8 (N.Y. Sup. Ct. Apr. 10, 2023) (citation omitted).

Moreover, Plaintiffs' efforts to limit the alleged misconduct and mismanagement to New York are undercut within the Complaint, which alleges broad and enterprise-wide mismanagement. For example, while explaining how Defendants allegedly violated the duties they owed under Swiss law to the AT1 bondholders, Plaintiffs state that many of the Defendants had "duties encompassing the entire enterprise" and several of the Defendants who had served as Credit Suisse CEOs "had responsibility for managing Credit Suisse as a whole." Compl. ¶¶ 193, 195, 198–99. And as Defendants aptly summarize in their reply papers: (1) Plaintiffs' sole claim alleges violations of Swiss law; (2) this case is about the management of a Swiss bank; (3) Plaintiffs' AT1 bonds were not written down until the Swiss regulator, FINMA, ordered Credit Suisse to do so in Switzerland; (4) Plaintiffs have no connections to the United States, let alone New York; and (5) the Complaint names as Defendants individuals from seven countries whose sole common denominator is that they were directors of a Swiss banking corporation. Claiming – as Plaintiffs have in their opposition papers – that "Switzerland, rather than New York, bears indication of forum-shopping," Opp. Memo, at 18, is nonsense in light of these facts.

Plaintiffs compare the instant action to *Stewart v. Manhattan Yacht Club, Inc.*, 2018 WL 3579849 (S.D.N.Y. July 25, 2018), where Judge Nathan denied a *forum non conveniens* motion; Plaintiffs suggest that *Stewart* and *Star Colbert* are both cases in which a plaintiff sues in New York based on the central role of a New York-based organization in the alleged wrong. Opp. Memo, at 14.

But *Stewart* is distinguishable for several reasons. First, *Stewart* is a negligence suit stemming from a car accident in the British Virgin Islands with claims arising under common law,

General Maritime laws, and U.S. federal law. 2018 WL 3579849, at *1. This action, by contrast, involves several European investment funds that have brought, on behalf of a proposed worldwide Class of AT1 bondholders, the terms of whose bonds are governed by Swiss law, a claim arising under Swiss law of mismanagement by the Board of Directors and officers of a Swiss corporation, which mismanagement allegedly caused the Government of Switzerland to direct that the bonds be written down to zero. Unlike in *Stewart*, no U.S. or maritime laws are implicated.

Second, all of the Plaintiffs in this case are European investment funds attempting to bring a lawsuit in the Southern District of New York, while the plaintiff in *Stewart* was a U.S. citizen and resident of Maine who brought suit in the Southern District of New York. *Id.*

Third, in *Stewart*, all of the defendants were based in New York. Here, the Defendants are from seven different countries and currently reside in at least four different countries, Compl. ¶¶ 40–57; Belzer Decl. ¶ 8; as mentioned above, their connection is that they were all directors of a Swiss corporation.

Plaintiffs argue that *Iragorri* supports their effort to bring their Swiss-law based negligence suit in the Southern District of New York. 274 F.3d 65. In *Iragorri*, plaintiffs who resided in Florida brought suit against United Technologies ("UT") and its subsidiary, Otis Elevator ("Otis"), in the District of Connecticut (where, as is well known, both corporations are headquartered) for injuries suffered in a fatal elevator accident in Colombia involving an Otis elevator. UT and Otis moved to dismiss on *forum non conveniens* grounds, and Judge Arterton granted the motion, largely because at the time of the accident, the decedent and his family were domiciled in Colombia, the accident occurred in Colombia, and the elevator was manufactured in Colombia and Brazil. *Iragorri v. United Tech. Corp.*, 46 F.Supp.2d 159, 164, 167 (D. Conn. 1999). In light of those facts, even though the plaintiffs had moved back to their accustomed residence in Florida

after the accident, Judge Arterton gave the plaintiffs' chosen forum diminished deference, as "the connection between the United States, particularly Connecticut, and the circumstances of the accident [was] tenuous at best." *Iragorri v. United Tech. Corp.*, 46 F.Supp.2d 159, 164 (D. Conn. 1999).

The Second Circuit reversed in an *en banc* opinion and remanded so that the district court could reconsider the degree of deference owed a non-resident plaintiffs' choice of forum. 274 F. 3d at 75. The Second Circuit concluded that Judge Arterton had erred in assuming that heightened deference should be given to the plaintiffs' choice of a U.S. forum only when the plaintiffs sue in their home district. The Court of Appeals also concluded that the plaintiffs had been temporarily residing in Colombia at the time of the accident was not entitled to great weight. *Id.* In its discussion of the degree of deference owed to the Florida plaintiffs' choice of forum, the Second Circuit noted that one thing to consider was whether the chosen forum was the only place where the plaintiffs could obtain jurisdiction over the defendants – a factor that it believed the district judge had not taken into account. *Id.* at 73, 75.

Here, Plaintiffs state that their choice of New York as a forum is entitled to a high degree of deference – notwithstanding the fact that they have no connection to New York – because they are alleging that negligent conduct in the management of Credit Suisse occurred in New York, which means that the parties will have better access to evidence in New York. Relying on *Iragorri*, Plaintiffs assert that "the level of deference given to a plaintiff's choice of forum 'in a suit alleging negligence' depends on factors such as 'whether the alleged negligence lay in the conduct of actors at the scene of the accident' and 'where the parties will have better access to the evidence relating to those damages[.]'" Opp. Memo, at 16 (citing *Iragorri*, 274 F.3d at 74).

But *Iragorri* is of little help to Plaintiffs. In *Iragorri*, the plaintiffs – residents of the United States – sued U.S. corporations for violations of U.S. common law governing products liability, even though the actual elevator was manufactured and installed entirely in South America and the accident took place there. *Iragorri*, 46 F.Supp.2d at 167. The facts here are radically different. No matter how they try to characterize it, this is not a case about what happened at Credit Suisse in New York. In this case, the alleged negligence consists of actions taken, not by Credit Suisse's New York subsidiaries, but by its officers and Board of Directors – the officers and Board of Directors of the Swiss parent company – in connection with the overall management of a Swiss bank's business. Those actions and inactions are alleged to have violated Swiss law, not U.S. law. Concededly, some of the actions that Plaintiffs say the Credit Suisse officers and Board ignored or failed to monitor have a connection to the New York subsidiaries. But others do not. And the New York subsidiaries are not defendants here. The officers and Board members are, and their alleged negligence took place in Zurich, where Credit Suisse's worldwide operations were headquartered and run.

Furthermore, the action that was the proximate cause of the Plaintiffs' loss – the write-down of the bonds – took place in Switzerland at the insistence of Swiss regulators. Plaintiffs insist that it was the Credit Suisse officers and Board's years of negligent mismanagement that caused the write-down, not the actions of the regulators; but the fact is, the regulators issued the write-down order, and that government action will play a key role in the trial of this case.

Also, in *Iragorri*, Connecticut was the only place in which all the defendants plaintiffs wanted to sue could be sued. 274 F.3d at 75. Here, it is not at all clear that the non-U.S. citizens who served as officers and directors of Credit Suisse can be sued in New York for anything at all,

let alone for negligent mismanagement of a Swiss corporation in violation of Swiss law. It would be surprising if they could be. But they can all be sued in Zurich. Grolimund Decl. ¶¶ 43–46.

Finally, in this case, there is no reason for the Plaintiffs to fear for their safety if they go to court in Zurich, unlike the *Iragorri* plaintiffs who claimed that they would fear for their safety if they sued in Cali, Colombia – a fact of which the Second Circuit took particular note. *Id.*

Most important of all, the Second Circuit in *Iragorri* court said: "Rather than simply characterizing the case as one in negligence, contract, or some other area of law, the court should focus on the precise issues that are likely to be actually tried, taking into consideration the convenience of the parties and the availability of witnesses and the evidence needed for the trial of these issues" – i.e., the *Gilbert* factors, which are discussed below (*infra* pp. 33–52). *Iragorri*, 274 F.3d at 74. The actions of the Credit Suisse officers and Board took place in Zurich and it is the *Credit Suisse officers and Board's* actions – not the actions of the various subsidiaries or divisions, including New York-based subsidiaries or divisions, that the Credit Suisse officers and Board allegedly failed to supervise – that form the basis for this lawsuit. As it is undisputed and indisputable that the immediate proximate cause of the write off of the bonds' value was an order of the Swiss government, the issues to be litigated will include not only the negligence of the Credit Suisse officers and Board members, but the reasons why the Swiss government took the action it did – a fact that raises foreign relations comity issues that were in no way implicated in the products liability case brought by the Iragorris. And as will be seen below when the *Gilbert* factors are discussed, the convenience factors overwhelmingly favor litigation of this case in Switzerland.

Thus, Plaintiffs' choice of forum will not be given the deference for which Plaintiffs hoped. *See Niv v. Hilton Hotels Corp.*, 710 F.Supp.2d 328, 335 (S.D.N.Y. 2008). As in *In re Alcon*, 719 F.Supp.2d at 271 n.6, the Court notes "that the level of deference here is tied

primarily to the overwhelmingly Swiss nature of the . . . conduct at issue." But while "a lesser

degree of deference to the plaintiff's choice bolsters the defendant's case," it "does not guarantee

dismissal." *Iragorri*, 274 F.3d at 74.

And so we turn to the next factor.

### (2) Adequacy of Switzerland as a Forum

"Having found that Plaintiffs' choice of forum is entitled to limited deference," *In re*

*Alcon*, 719 F.Supp.2d at 271, the Court's next step in the *forum non conveniens* inquiry is to

determine the existence of a presently available alternative forum in which Plaintiffs can litigate

their claim. *Ramirez de Arellano v. Starwood Hotels & Resorts Worldwide, Inc.*, 448 F.Supp.2d

520, 527 (S.D.N.Y. 2006) (citing *Norex*, 416 F.3d at 160; *Iragorri*, 274 F.3d at 73). Defendants,

as the movants, bear the burden of demonstrating that an adequate alternative forum exists. *In re*

*Alcon*, 719 F.Supp.2d at 272 (citing *Bank of Credit & Com. Int'l (Overseas) Ltd. v. State Bank of*

*Pak.*, 273 F.3d 241, 248 (2d Cir. 2001)).

"An alternative forum is generally adequate if: (1) the defendants are subject to service of

process there; and (2) the forum permits litigation of the subject matter of the dispute" "and

offers remedies for the wrongs the plaintiff alleges, even if the causes of action and relief

provided there are not identical in every respect to the claims the plaintiff demands or redress he

seeks in his chosen forum." *Bank of Credit*, 273 F.3d at 246 (internal quotation and citations

omitted); *Do Rosario Veiga*, 486 F.Supp.2d at 303 (citations omitted); *R. Maganlal & Co.*, 942

F.2d at 167. "[A]n adequate forum does not exist if a statute of limitations bars the bringing of

the case in that forum," *Bank of Credit*, 273 F.3d at 246, and "'[i]n rare circumstances, . . . where

the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an

adequate alternative . . . .'" *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 476–77 (2d Cir. 2002) (quoting *Piper*, 454 U.S. at 255 n.22).

Defendants offer Switzerland as a presently available adequate alternative forum. They submit that all Defendants are amenable to process in Switzerland because they are directors or officers of a Swiss corporation. And Defendants assert that Swiss – specifically, Zurich – courts permit litigation of the subject matter of the dispute. *In re Alcon*, 719 F.Supp.2d at 272.

Defendants' Swiss law expert, Prof. Dr. Pascal Grolimund, establishes without contradiction that all of the defendants are all amenable to service of process in Switzerland. According to Prof. Dr. Grolimund, "Under Swiss law, the basic forum for all claims in corporate law matters including actions against directors and officers is at the statutory seat of the company (Art. 151 para. 1 PILA[3]). As the statutory seat of Credit Suisse (or its legal successor) is in Zurich and the CO Claim exceeds (the equivalent of) CHF 30,000, the Commercial Court of Zurich is competent to consider the present Action . . . ." Grolimund Decl. ¶ 43. Prof. Dr. Grolimund states that for Defendants domiciled in Switzerland, "the jurisdiction of the Commercial Court of Zurich follows from Art. 151 para. 1 PILA in conjunction with Art. 2 para. 1 of the Convention on Jurisdiction and the Recognition and Enforcement of Judgments in Civil and Commercial Matters closed in Lugano on October 30, 2007 ("Lugano Convention")." *Id.* ¶ 44. For Defendants domiciled in another state bound by the Lugano Convention, "the jurisdiction of the Zurich courts results from the application of Art. 6 para. 1" which provides, "where a person is one of a number of defendants, *that person may also be sued in the courts for the place where any one of them is domiciled, provided the claims are so closely connected that it is*

---

[3] An English translation of the Swiss Federal Act on Private International Law (PILA) can be found on the Swiss Confederation's online platform for federal law: https://www.fedlex.admin.ch/eli/cc/1988/1776_1776_1776/en, *archived at* https://perma.cc/2JTL-AC8Z.

*expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings.*" *Id.* ¶ 45 (emphasis added). Prof. Dr. Grolimund explains why this Art. 6 para. 1 is applicable to some of the Defendants: "As the CO Claim alleges one loss incurred due to asserted conduct by the Defendants, the conditions for this provision would be met and the CO Claim could be brought against all Defendants in Zurich." *Id.* Finally, for Defendants domiciled in the United States or in any other country not bound by the Lugano Convention, Prof. Dr. Grolimund states that "the jurisdiction of the Commercial Court in Zurich follows directly from Art. 151 para. 1 [of the Swiss Private International Law ("PILA")] providing for jurisdiction at the statutory seat of the company for actions against persons liable under company law, i.e., the company's directors and officers." *Id.* ¶ 46.

Plaintiffs do not argue to the contrary. They offer no expert testimony raising any issue of fact in this regard. It seems that if you choose to become a director or an officer of a Swiss corporation, you consent to be sued for any misconduct you may commit in the statutory seat of the company (in this case, Zurich). As all of the Defendants became directors or officers of a Swiss corporation, they consented to the jurisdiction of the Zurich court for actions brought against them under Swiss company law.

Furthermore, it is not at all apparent that all of the defendants can be sued in New York. At least five of the eighteen directors do not currently reside in the United States. Belzer Decl. ¶ 8. On the record before the court, it appears that Zurich may be the only location in which all eighteen directors can be sued – just as, in *Iragorri,* Connecticut was the only place where all three defendants could be sued. 274 F.3d at 75.

As to the second prong of the adequate alternative forum analysis, this court has no doubt that Switzerland permits litigation of the subject matter in dispute. The essence of the Plaintiffs'

claim is that the Defendants allegedly breached the statutory duties they owed Credit Suisse

bondholders under the Swiss Code of Obligations. *See In re Alcon*, 719 F.Supp.2d at 273. In

light of this, as Defendants write in their moving papers, "It would be nonsensical for Plaintiffs

to maintain that a Swiss-law claim should not be brought in Switzerland against directors and

senior employees of a Swiss company . . . ." Prof. Dr. Grolimund goes as far to state that "where

a claim is not based on a breach of duty of a single director but involves allegations of systemic

failure of the company's management generally, only the courts at the statutory seat of the

company are suited to handle the action." Grolimund Decl. ¶ 42. Even Plaintiffs' Swiss law

experts, Prof. Anton Schnyder and Andreas Hauenstein, point out that according to Article 151,

Sec. 1 of the Swiss Private International Law Act (PILA), "the Swiss courts at the registered

office of the (Swiss) company have jurisdiction for actions against the company, the shareholders

or the persons liable under company law." Schnyder/Hauenstein ¶ 96. Prof. Schnyder and Mr.

Hauenstein confirm that Prof. Dr. Grolimund is correct in that the Commercial Court of Zurich

would have jurisdiction for this action over the Defendants had Plaintiffs filed their lawsuit in

Switzerland. *Id.*

      Plaintiffs' position is that Art. 151 of PILA is **"neither exclusive nor mandatory"** and

that "The forum at the company's registered office is thus **not the only, but merely one possible**

**place of jurisdiction**." *Id.* (emphasis in original). But so what? The question before the Court

during step two of its *forum non conveniens* analysis is not whether Switzerland is the *only*

forum where Plaintiffs can litigate their claim, but whether the foreign court would decline to

take jurisdiction over their claim. Prof. Schnyder and Mr. Hauenstein do not disagree that a

Swiss court is vested with jurisdiction over the dispute here pleaded and do not opine that a

Swiss court would refuse to entertain it were the case transferred there.

As was the case in *Stevenson* and *Lawtone-Bowles*, I find that a Swiss court is a better place to litigate a dispute arising under Swiss law against the directors and officers of a Swiss corporation for participating in the alleged mismanagement of that Swiss corporation that was required to write down its bonds by the Swiss government.

Additionally, the parties have provided the Court with expert testimony on the statute of limitations applicable to Plaintiffs' Swiss law claim, as "an adequate forum does not exist if a statute of limitations bars the bringing of the case in that forum." *Bank of Credit*, 273 F.3d at 246 (citation omitted). The experts seem to disagree about which Swiss statute of limitations applies and how the Swiss statutes of limitations should be applied to the instant action. *Compare* Grolimund Decl. ¶ 33 *with* Schnyder/Hauenstein ¶¶ 78–88.

In the United States, courts overwhelmingly hold that analysis of a foreign legal system's statute of limitations issues is more appropriately conducted by the foreign court. *See In re Air Crash Off Long Island, N.Y., on July 17, 1996*, 65 F.Supp.2d 207, 215 (S.D.N.Y. 1999); *Awadallah v. W. Union Co.*, No. 14-cv-3493, 2016 WL 11469858, at *5 (E.D.N.Y. Mar. 30, 2016). As no one has argued that *all* of Plaintiffs' Swiss law claim is barred by either statute of limitations discussed by the Swiss law experts, the open statute of limitations questions do not render Switzerland an inadequate forum. On the contrary, they render Switzerland the correct forum in which to resolve this dispute.

Moreover, if a claim arising under Swiss law is barred by limitations in Switzerland, it will be barred by limitations in the United States. The courts of this country do not expand the rights available to litigants under foreign law. There is no reason to believe that a United States court would apply some longer United States statute of limitations to a claim for negligence/breach of fiduciary duty that arises under Swiss law. *See Baena v. Woori Bank*, No.

05 Civ. 7018, 2006 WL 2935752, at *8 (S.D.N.Y. Oct. 11, 2006); *Younis v. Am. Univ. in Cairo*, 30 F.Supp.2d 390, 395 (S.D.N.Y. 1998). And the experts agree on one thing: the applicable statute of limitations is dictated by Swiss law.

Plaintiffs' remaining objections to Switzerland as a forum for their Swiss law claim are based on procedural differences between the United States and Switzerland. But, "The unavailability of beneficial litigation procedures similar to those available in the federal district courts does not render an alternative forum inadequate," *Blanco v. Banco Indus. de Venez., S.A.*, 997 F.2d 974, 982 (2d Cir. 1993), and a forum need not be identical to a United States court in order to be a convenient forum for the litigation of a fundamentally foreign dispute – as here, over the alleged mismanagement of a foreign corporation under foreign law. There is no reason why an American court should take cognizance of such a claim – especially when brought by non-U.S. entities – simply because of things like the requirement under Swiss law that a bond be posted or the lack of recognition of class actions. As we found in *Stevenson v. Thornburgh*, No. 23 Civ. 4458, 2024 WL 645187, at *35–37 (S.D.N.Y. Feb. 14, 2024), the following factors do not defeat a *forum non conveniens* motion: fronting fees,[4] the lack of a class action mechanism that mirrors Rule 23 of the Federal Rules of Civil Procedure,[5] and different discovery procedures,[6] among others.

---

[4]  *See Glob. Art Exhibitions, Inc. v. Kuhn & Bülow Italia Versicherungsmakler GmbH*, 607 F.Supp.3d 421, 437 (S.D.N.Y. 2022); *Petersen Energia Inversora, S.A.U. v. Arg. Republic*, No. 15-cv-2739, 2016 WL 4735367, at *11 (S.D.N.Y. Sept. 9, 2016); *Red Rock Holdings, Ltd. v. Union Bank Tr. Co.*, No. 97 Civ. 5008, 1998 WL 474094, at *6 (S.D.N.Y. Aug. 11, 1998); *In re Bancredit Cayman Ltd.*, Bankr. No. 06-11026, 2008 WL 5396618, at *5 (Bankr. S.D.N.Y. Nov. 25, 2008).

[5]  *See In re Herald*, 540 Fed.Appx. 19, 28 (2d Cir. 2013); *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 478 (2d Cir. 2002); *In re Optimal U.S. Litig.*, 886 F.Supp.2d 298, 308 n.55 (S.D.N.Y. 2012); *In re Alcon S'holder Litig.*, 719 F.Supp.2d 263, 273 (S.D.N.Y. 2010); *In re Eur. Aeronautic Def. & Space Co. Sec. Litig.*, 703 F.Supp.2d 348, 360–61 (S.D.N.Y. 2010); *Gilstrap v. Radianz Ltd.*, 443 F.Supp.2d 474, 482 (S.D.N.Y. 2006); *In re Lloyd's Am. Tr. Fund Litig.*, 954 F.Supp. 656, 673 (S.D.N.Y. 1997); *In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India in Dec., 1984*, 634 F.Supp.842, 851 (S.D.N.Y. 1986).

[6]  *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 247, 253 n.18 (1981); *In re Alcon*, 719 F.Supp.2d at 273; *Potomac Cap. Inv. Corp. v. Koninklijke Luchtvaapt Maatschapplj N.V.*, No. 97 Civ. 8141, 1998 WL 92416, at *5 (S.D.N.Y. Mar. 4, 1998); *Doe v. Hyland Therapeutics Div.*, 807 F.Supp. 1117, 1124 (S.D.N.Y. 1992).

None of the arguments advanced by Plaintiffs in the instant action renders Switzerland an inadequate forum in which to litigate their claim alleging violations of the Swiss Code of Obligations. *Cattan*, 2023 WL 2868337, at *8. But even that does not mean the case must be dismissed on *forum non conveniens* grounds. And so we turn to the convenience and interest of justice factors.

### (3) The *Gilbert* Factors

The third step in the *forum non conveniens* analysis is to weigh two sets of factors – the private interest factors and the public interest factors – to determine whether adjudication is more appropriate in the present forum or in an alternative forum. *Gilbert*, 330 U.S. at 508–09; *Online Payment Sols. Inc. v. Svenska Handelsbanken AB*, 638 F.Supp.2d 375, 386 (S.D.N.Y. 2009). "Because much of the [*forum non conveniens*] doctrine's strength derives from its flexibility and each case turns on its own facts, a single factor is rarely dispositive." *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 29 (2d Cir. 2002). "*Gilbert* instructs reviewing courts to disturb a plaintiff's choice of forum only where the balance of private and public interest considerations 'strongly favors' the moving defendant." *In re Alcon*, 719 F.Supp.2d at 275.

In this case, it does.

### 1. Private Interests

The private interests enumerated in *Gilbert*, 330 U.S. at 508–09, embrace: the ease of access to evidence; the cost for witnesses to attend trial; the availability of compulsory process; and all other factors that make trial of a case easy, expeditious, and inexpensive. *Gilbert*, 330 U.S. at 508; *Cap. Currency Exch., N.V. v. Nat'l Westminster Bank PLC*, 155 F.3d 603, 609 (2d

Cir. 1998) (citing *Piper*, 454 U.S. at 241; *Gilbert*, 330 U.S. at 508). These factors all weigh in favor of dismissal.

### a. Ease of Access to Evidence

"[I]n light of technological advances in transportation and communication, . . . the location of documents is a factor which is to be given less weight now." *Shtofmakher v. David*, No. 14 Civ. 6934, 2015 WL 5148832, at *3 (S.D.N.Y. Aug. 17, 2015). Given the breadth of Plaintiffs' corporate mismanagement claim, documents will be found in both Switzerland and New York – and likely in other locations around the world as well. Nevertheless, after reviewing the parties' submissions, the Court is inclined to believe that the bulk of the evidence relevant to Plaintiffs' Swiss law claim will be far more accessible in Switzerland. *See In re Alcon*, 719 F.Supp.2d at 276.

"The parties, unsurprisingly, each contend that the bulk of relevant evidence is located in the jurisdiction in which they wish to try the case." *Van Der Velde ex rel. Van Der Velde v. Philip Morris Inc.*, No. 02 Civ. 783, 2004 WL 48891, at *4 (S.D.N.Y. Jan. 9, 2004). Plaintiffs claim that "The preponderance of the 'core evidence' is in, or easily accessible from, New York." Opp. Memo, at 5–6. They add, "Even if some discovery in Switzerland is needed, it is far from as unwieldy Defendants suggest." *Id.*, at 22. Conversely, Defendants argue that much of the key evidence related to Plaintiffs' claims is in Switzerland since Credit Suisse's Board of Directors regularly met in Switzerland, "Records of Board meetings, including agendas and minutes of such are all stored on Swiss servers," Belzer Decl. ¶ 7, and documentary evidence related to decisions made by Swiss government agencies will be present in – and possibly only accessible from – that forum.

The parties' ability to access the highly pertinent Swiss documents tips this factor in favor of Defendants' chosen forum. As the FINMA Decree was "the ultimate instrumentality by which the AT1 bonds were wiped out," Compl. ¶ 24, it is likely, as Defendants suggest, that "Representatives of FINMA or other divisions of the Swiss government would also have relevant information given that Plaintiffs put their decisions, and their analyses concerning what led to the Credit Suisse-UBS merger and the write-down of the AT1 bonds, directly at issue." Certainly, information about those decisions is located in Switzerland. Additionally, by order of the Swiss government, Credit Suisse no longer exists. It has been subsumed by another Swiss bank, UBS. UBS is not a party to this case, but it undoubtedly has custody of many of the corporate documents that would be needed to litigate Plaintiffs' claim of mismanagement – which is yet another fact that favors sending the case to Switzerland.

An additional problem this documentary evidence – and other documentary evidence in this action – presents is the possibility that the relevant documents are in French, Italian, or German. *See Fustok v. Banque Populaire Suisse*, 546 F.Supp. 506, 511 (S.D.N.Y. 1982). It is likely that many of these documents will have to be translated into English so that they can be used in this court, which would increase the cost of litigation. *Id.*

Were the case to remain in this court, the parties could only access documentary evidence in Switzerland (or in many other countries) in a manner that is compliant with Swiss legal restrictions. The parties would need to take evidence in Switzerland by way of international legal assistance, specifically based on the Hague Convention of March 18, 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters ("Hague Evidence Convention"), which Switzerland has accepted, subject to certain limitations. Grolimund Decl. ¶ 61–63; Schnyder/Hauenstein Decl. ¶¶ 128–29. Prof. Dr. Grolimund acknowledges that "provided that

requests are drafted and filed in accordance with the applicable rules, Switzerland regularly provides judicial cooperation under the Hague Evidence Convention, and this form of cooperation constitutes a proven and commonly used practice in Switzerland." *Id.* ¶ 63. Prof. Schnyder and Mr. Hauenstein agree; they cite to an article on pre-trial discovery authored by David Rosenthal, a Swiss law firm partner and data protection expert, in which he states, "In the context of pre-trial discovery, [providing data and documents from Switzerland to their US lawyers and the other side] is usually possible as long as data protection and third-party trade secrets are respected." Schnyder/Hauenstein ¶ 131.

U.S. courts engage in Hague Evidence Convention discovery with some frequency – at least, this court does. However, I am constrained to observe that such discovery is time consuming and frequently cumbersome.

"To the extent plaintiffs are concerned that, should this action be dismissed in favor of an [Swiss] forum, they would be unable to obtain pretrial discovery of persons and documents located within the United States, they may, of course, request that this Court—and any other district court with jurisdiction over individuals they believe to have relevant testimony and/or documents—order such persons to provide such discovery in aid of a foreign proceeding." *Gilstrap*, 443 F.Supp.29 at 489 (citing 28 U.S.C. § 1782).

Altogether, the points discussed above cause the ease of evidence factor to weigh in favor of Switzerland. *See LaSala v. TSB Bank, PLC*, 514 F.Supp.2d 447, 459 (S.D.N.Y. 2007).

### b. Cost for Witnesses

"Courts are . . . instructed to weigh the costs of producing . . . witnesses." *Gilstrap*, 443 F.Supp.2d at 488 (citation omitted). Though "the inevitable costs associated with this aspect of the suit can be alleviated under U.S. law by the submission of letters rogatory and the availability of

videotaped depositions," *Maersk, Inc.*, 554 F.Supp.2d at 454, "such a process has been recognized as time-consuming, and there is, of course, a preference for live testimony." *Gilstrap*, 443 F.Supp.2d at 488 (citing *DiRienzo*, 294 F.3d at 30).

Defendants claim that "Unsurprisingly, many key witnesses . . . related to Plaintiffs' claims are in Switzerland, not New York." Their position is that "it is a virtual certainty that non-party witnesses located in Switzerland—who would be likely to have considerably more relevant knowledge about the actual events and communications leading up to the write-down than the named Defendants (most of whom left Credit Suisse years before the write-down)—will be critical to this case." Examples of potential witnesses include current and former employees of Credit Suisse, UBS, FINMA, and the Swiss government or Swiss agencies (e.g., the Swiss Ministry of Finance, Swiss National Bank) -- especially in light of how Plaintiffs repeatedly reference statements by Swiss officials throughout the Complaint. *See* Compl. ¶¶ 21, 25, 182–83; *see also* Ex. 2 to Matuschak Decl., at 1. Even the Plaintiffs are located in Europe! Not only would it be costly for all of these Europeans (most of them Swiss) to travel to the United States, but also there are difficulties related to effecting compulsory process on non-party witnesses residing in Switzerland. *See infra* pp. 38–40. Due to those difficulties, the Defendants indicate that were this case to remain in the Southern District, the Defendants' ability to mount their defense will be hindered, as they might be unable to call individuals affiliated with pertinent Swiss governmental agencies.

On the other hand, Plaintiffs merely state that it is not a hardship for the non-U.S. based Defendants to come to New York to trial, in light of their ample compensation from their time at Credit Suisse. Opp. Memo, at 23. Plaintiffs do not even acknowledge the costs for non-party witnesses to attend trial or the fact that a U.S. court might well be imposing costs on a foreign

government, which has foreign policy implications that can easily be avoided by requiring the eleven U.S.-based defendants to fly to Europe – something they undoubtedly did for Board meetings while directors of Credit Suisse – to have their testimony taken.

Based on the record, it seems that only a few of the Individual Defendants live in Switzerland. There will be witnesses who are not parties who live elsewhere, and taking their testimony will be cumbersome and subject to local restrictions. To the extent that travel is involved, the cost will "be borne by the parties regardless of where the litigation takes place." *Celestin*, 2023 WL 6385339, at *8. And while ordinarily, those facts would render this factor neutral, the involvement of the Swiss government in this case pushes this factor in favor of Switzerland. Both sides will likely need to call multiple Swiss government officials as non-party witnesses. Rather than navigate the process of attempting to compel those officials to travel to the Southern District, it is far more convenient for the case to instead proceed within the Swiss court system.

### c. Compulsory Process

As discussed above, were this case to remain in the Southern District of New York, obtaining evidence and testimony will likely implicate the Hague Evidence Convention. *See supra* pp. 35–36. "Courts in the Second Circuit have widely recognized that obtaining evidence through the Hague Convention and letters rogatory are [sic] cumbersome and inefficient, and hardly make litigation in the United States convenient." *Rabbi Jacob Joseph Sch. v. Allied Irish Banks, P.L.C.*, No. 11-cv-05801, 2012 WL 3746220, at *7 (E.D.N.Y. Aug. 27, 2012) (citations omitted). Issues of compulsory process and non-United-States-resident individual defendants were discussed at length by the court *In re Alcon*, 719 F.Supp.2d at 276:

> [I]f this dispute were litigated in this forum as Plaintiffs urge, the non-United-States-resident individual Defendants, unless subject to

personal jurisdiction in the United States, would likely not be
subject to compulsory process. There is also substantial risk that
other key third-party witnesses, who reside in Switzerland or
elsewhere in Europe, would not be within this Court's subpoena
power. Even if some testimony could be obtained and preserved by
deposition, to do so would implicate proceedings under the Hague
Convention on the Taking of Evidence Abroad in Civil or
Commercial Matters, a prospect that entails significant amounts of
time even in ordinary cases, and far more in complicated litigation
such as this action. In all probability, these circumstances would
cause not only greater financial hardships, but additional litigation
and attendant significant delays in preparing the case for trial
before this Court, and ultimately in resolving the merits of the
dispute.

In addition to the possible delays and increased expenses mentioned in *In re Alcon*, 719

F.Supp.2d at 276, there is potential legal exposure. Prof. Dr. Grolimund states, "Plaintiffs in this

Action would not be able to compel individuals or entities in Switzerland (including Defendants)

to produce documents from Switzerland that are not available in the U.S. without risking

violation of Swiss law, in particular Art. 271 and 273 SPC," which govern "Unlawful activities

on behalf of a foreign state," and "Industrial espionage," respectively.[7] *See* Grolimund Decl. ¶

48. Plaintiffs offer two solutions – both of which only apply to Defendants, and do not apply to

non-party witnesses: "To the extent that some seek to evade process, Plaintiffs can either serve

them in due time or drop them from the case and allow other Defendants to seek contribution

from the absent Defendants pursuant to the joint and several liability provisions of Swiss law."

Opp. Memo, at 22–23. Neither is optimal.

Overall, "[t]his massive inefficiency and inconvenience that [using the Hague Evidence

Convention] would create for defendants and plaintiffs is all the more striking given the

existence of an alternative forum where many of these problems would not arise." *Rabbi Jacob*

---

[7]    An English translation of the Swiss Criminal Code can be found on the Swiss Confederation's online platform
for federal law: https://www.fedlex.admin.ch/eli/cc/54/757_781_799/en, archived at https://perma.cc/WY2K-
QDJ9.

*Joseph Sch.*, 2012 WL 3746220, at *7 (citing *Reers*, 320 F.Supp.2d at 162) (internal quotation marks omitted)).

It seems as if these problems would not arise if the parties litigated Plaintiffs' Swiss law claim in Switzerland. Prof. Dr. Grolimund has opined that Plaintiffs would be entitled to Swiss discovery procedures in pursuing their action. He explains that pursuant to Art. 160 of the Swiss Civil Procedure Code,[8] in a civil action, parties and third parties have a duty to cooperate in the taking of evidence – they have to make truthful depositions as a party or a witness, produce physical records (with certain exceptions, e.g., documents forming correspondence between a party or a third party and a lawyer who is entitled to act as a professional representative), and allow an examination of their person or property by an expert. *See* Grolimund Decl. ¶ 47. As provided in Art. 164 of the Swiss Civil Procedure Code, "if a party refuses to cooperate without valid reasons, the court shall take this into account when appraising the evidence." *See id.* ¶ 48. The Swiss Civil Procedure Code also contains articles that permit Swiss courts to summon witnesses to give testimony under penalty of perjury. *Id.* Pursuant to articles within the Swiss Civil Procedure Code and the Swiss Criminal Code, if a third party does not comply with a summons to appear as a witness, he or she can be compelled to appear under the threat of a disciplinary fine, police summons, sanctions, or criminal prosecution for contempt of an official order. *Id.*

### d. Other Considerations

First, Plaintiffs appear to severely overstate the financial burden of bringing this lawsuit in Switzerland. Their Swiss law experts state, "Apart from a party's own lawyer's fees, the costs

---

[8]    An English translation of the Swiss Civil Procedure Code can be found on the Swiss Confederation's online platform for federal law: https://www.fedlex.admin.ch/eli/cc/2010/262/en, archived at https://perma.cc/WY2K-QDJ9.

of litigation in Switzerland consist of (a) the **court fee** and (b) the **compensation for party cost**
which the unsuccessful party has to pay to the successful party." (emphasis in original, internal
citation removed). Schnyder/Hauenstein ¶ 104. With respect to the court fee, they explain that in
the Commercial Court of Zurich, "The basis for the calculation of the costs of court proceedings
is **the amount in dispute**. The amount in dispute is quantified by the Plaintiff(s) in his/their
statement of claim. In the event of the voluntary **joinder of parties or joinder of actions**, the
values of the claims are added up insofar as they are not mutually exclusive." *Id.* ¶ 106
(emphasis in original). Apparently, this means that "in the case of joinder of AT1 Bondholders,
the amount in dispute would be the sum of their claims;" or, as Prof. Schnyder and Mr.
Hauenstein estimate, USD 17 billion. *Id.* ¶¶ 105–06. Based on Prof. Schnyder and Mr.
Hauenstein's calculations using the Ordinance on Costs of the Cantonal Appeal Court of the
Canton of Zurich's formula for court fees, the basic court fee would be more than CHF 78.5
million. *Id.* ¶¶ 105, 108. Prof. Schnyder and Mr. Hauenstein claim that the court can increase the
court fee by one third, or even double it, after taking into consideration the time spent by the
court and the complexity of the case. *Id.* ¶ 109. However, they also "do not exclude that the
Commercial Court of the Canton of Zurich may reduce or even significantly reduce the court
costs in application of the principle of proportionality or equivalence" – though they "conclude
that it would be speculative to simply assume a reduction." *Id.* ¶ 121.

But according to Prof. Dr. Grolimund, though "a Swiss court may require a plaintiff to
make an advance payment of the expected court costs," and "A defendant may also move for
security for party costs if plaintiff does not have a residence or registered office in Switzerland,"
"A court order on the advance on costs and/or security for party costs can be appealed at the
outset and independently." Grolimund Decl. ¶ 49. Additionally, "the court may reduce the basic

41

court fee without any lower limit based on the time required by the court to handle the matter and the difficulty of the case." *Id.* ¶ 50.

Further, Prof. Dr. Grolimund states that "According to the Swiss Federal Supreme Court, costs must not render court access prohibitive or excessively cumbersome;" and "The cantonal tariffs must respect the constitutional principle of proportionality and must not be arbitrary." *Id.* ¶ 51. Prof. Dr. Grolimund claims that Swiss court fees and security for party costs must respect certain criteria, including a cost recovery principle that puts an upper limit on payments for costs, and a principle of proportionality, which means that a fee is not to be manifestly disproportionate and is to remain within reasonable limits. *Id.* ¶¶ 51–52.

In *Cattan*, 2023 WL 2868337 at *7, when faced with conflicting opinions by Swiss law experts on possible costs levied on the plaintiff by a Swiss court, Justice Masley sided with the defendants' expert, noting that, "Swiss courts look to a variety of facts and circumstances in determining the amount of a plaintiff's advance, and would not impose an excessive fee by rote, as plaintiff suggests." This court is inclined to agree with her.

Second, there are other proceedings relating to the AT1 bonds presently pending in Zurich. It is true that "the Second Circuit has stated repeatedly that the existence of related proceedings is not even mentioned in *Gilbert*, and therefore should not be given much consideration." *In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 230 F.Supp.2d 376, 391 (S.D.N.Y. 2002) (citations omitted); *see DiRienzo*, 294 F.3d at 31. But it is not totally irrelevant that there is *already* litigation in Switzerland concerning the AT1 bonds – which is unsurprising, as "The decision by FINMA to direct Credit Suisse to write down the value of its AT1 bonds to zero in March 2023 has attracted significant attention in Switzerland." Grolimund Decl. ¶ 64 (internal citation omitted). As Prof. Dr. Grolimund notes in his Declaration,

Switzerland's Federal Administrative Court has received at least 230 claims related to at least 2,500 individual Credit Suisse AT1 bondholders seeking redress from FINMA. *Id.* ¶ 65. He adds that "At least some of those claims allege that FINMA 's decision to write down the value of the bonds to zero should be considered invalid and the value of the bonds should be reinstated." *Id.* These individuals are, of course, all putative members of (and probable opt outs from) the proposed Class.

While Defendants are not parties to those proceedings and those claims have been brought against FINMA rather than against Credit Suisse's Directors, the outcomes of the Swiss proceedings could theoretically affect the instant action, since "whether FINMA's intervention was lawful may also be a relevant and material preliminary issue for claims of bondholders against Credit Suisse (or its legal successor) and/or officers and directors. If FINMA's intervention was lawful, this intervention could be found to preclude adequate causation between the bondholders' alleged loss and the breaches on which they rely for their claims. If it was unlawful, the writedown [sic] directive could be reversed and, as such, Plaintiffs would no longer have suffered any alleged losses." *Id.* ¶ 66.  Prof. Dr. Grolimund opines, "Since the (preliminary) issues of the various alleged claims against FINMA, Credit Suisse (or its legal successor) and the officers and directors are closely intertwined, Switzerland is the suitable forum to decide on these issues in a consistent way to avoid irreconcilable decisions." *Id.* ¶ 67.

The Court agrees. And, as Defendants represent, "Switzerland has a strong interest in adjudicating this claim, particularly to ensure consistency with AT1-bond-related litigation that is already proceeding in Switzerland." The risk of inconsistent judgments weighs in favor of dismissal.

Third, the Plaintiffs have directed the Court's attention to a recent decision by the First Department of the Appellate Division of the New York Supreme Court in *Emp. Ret. Sys. for the City of Providence v. Rohner, et al.*, No. 2023-01215 (N.Y. App. Div. Feb. 8, 2024), which affirmed a decision by Justice Masley that denied a *forum non conveniens* motion to dismiss brought by a group of Credit Suisse directors and officers. They cite this decision as yet another reason why this court should deny the Defendants' motion to dismiss. Dkt. No. 62. This argument is unpersuasive since *Providence* is distinguishable from the instant action.

The First Department affirmed Justice Masley's denial of the *Providence* defendants' *forum non conveniens* motion for the following reasons: (1) there was no credible argument that a substantial nexus between *Providence* and New York was lacking; (2) New York, as a preeminent commercial center, had a significant interest in adjudicating the suit – and Switzerland's interest in the suit did not compel dismissal; (3) there was no parallel litigation pending in Switzerland that might weigh in favor of adjudicating the dispute there; and (4) the defendants did not establish that the Commercial Division was unduly burdened by or incapable of handling the case. Ex. 1 to Dkt. 62.

The First Department's reasoning does not comport with the facts and circumstances that are pertinent to this case. First, while the "substantial nexus" language is not part of the federal *forum non conveniens* standard, the nexus between this litigation and New York is lacking. As Defendants argue in letter filed with this court dated February 26th, 2024, Dkt. No. 63, the *Providence* Complaint's primary focus is on the actions of Credit Suisse's New York-based prime brokerage business in 2020–2021 as they relate to the downfall of Archegos Capital Management, a New York-based "family office" and to other risk and compliance failures. Compl. ¶¶ 144; Ex. 1 to Matuschak Decl., at 6.  Here, though Plaintiffs mention Archegos in

their Complaint, the Complaint includes allegations about over a decades' worth of scandals that involve employees and divisions of Credit Suisse that are located around the world. As discussed above, *supra* pp. 22, 25, many of the Defendants are alleged to have had enterprise-wide duties and responsibilities – which necessarily means that their actions or inactions were not limited to New York. Compl. ¶¶ 53, 136, 193, 195, 198–99.

Next, as discussed above, *supra* pp. 22–25, and below, *infra* pp. 48–50, whatever interest New York has in this case is significantly outweighed by the interest of Switzerland – and certain factual distinctions between this case and *Providence* strengthen Switzerland's interest in the outcome. The *Providence* Complaint was filed on April 26, 2022, approximately one year before the Swiss government-ordered merger between Credit Suisse and UBS, and the FINMA ordered write-down of the AT1 bonds to zero. Litigation in Switzerland against FINMA by AT1 bondholders about the AT1 write-down, though not parallel, is related, and its outcome may have an effect on the bondholders' losses. As stated above, *supra* pp. 42–43, and as Prof. Dr. Grolimund opines, "While these claims are directed against FINMA, whether FINMA's intervention was lawful may also be a relevant and material preliminary issue for claims of bondholders against Credit Suisse (or its legal successor) and/or officers and directors." Grolimund Decl. ¶ 66.

And again, no single factor is dispositive for *forum non conveniens* dismissal. Even if Defendants cannot establish that this court will be unduly burdened by adjudicating this case (I dismiss out of hand any suggestion that this court is incapable of handling the case), the Court may still, in its discretion, dismiss this action on the basis of *forum non conveniens*.

Finally, like in *In re Alcon*, 719 F.Supp.2d at 276, "[q]uestions surrounding the enforceability of a judgment rendered by this Court also weigh in favor of dismissal." Prof. Dr.

Grolimund states that "The United States and Switzerland do not have a treaty providing for reciprocal recognition and enforcement of judgments in civil and commercial matters. The recognition and enforcement of a U.S. judgment in Switzerland is therefore governed by the principles laid out in the PILA." Grolimund Decl. ¶ 54 (internal citation omitted). According to Prof. Dr. Grolimund's interpretation of the relevant PILA provisions, "a New York court judgment would be recognized and enforced in Switzerland only against defendants domiciled in the United States. To obtain a judgment that would be enforceable in Switzerland against all Defendants in the Action (and that would in addition allow the right of recourse between all of the Defendants in the Action), the proceedings must occur in Switzerland." *Id.* ¶ 57.

Prof. Schnyder and Mr. Hauenstein concede that "It is correct that a U.S. judgment would not be enforceable in Switzerland except against Defendants domiciled in the U.S." Schnyder/Hauenstein Decl. ¶ 127. They attempt to downplay this concession in two ways: (1) they emphasize that most of the Defendants are U.S. residents; and (2) they contend that "Swiss law is not an obstacle for enforcing a U.S. judgment against (assets of) any of the Defendants in other countries." *Id.* (citation omitted).

Nevertheless, as in *In re Alcon*, 719 F.Supp.2d at 278, the Court concludes, based on the parties' submissions, that "were the issue to be presented, there would be no compelling reason to extend the reach of its authority extraterritorially and to force a Swiss court to decide whether to recognize a foreign court's resolution of this decisively Swiss dispute."

### 2.   Public Interests

The public interest factors enumerated in *Gilbert*, 330 U.S. at 508–09, include: the administrative difficulties associated with court congestion; the unfairness of imposing jury duty

on a community with no relation to the litigation; the local interest in having localized controversies decided at home; and the avoidance of difficult problems in conflict of laws and the application of foreign law. *Murray v. British Broad. Corp.*, 81 F.3d 287, 293 (2d Cir. 1996); *DiRienzo*, 294 F.3d at 31. These considerations also weigh heavily in favor of dismissal of this action. *Do Rosario Veiga*, 486 F.Supp.2d at 307.

### a. Administrative Difficulties

Here, the administrative difficulties flowing from court congestion is not a significant factor. *See Giro, Inc.*, 2011 WL 2183171, at *9. Despite Defendants' claim that this case could be a significant strain on the Court's resources, the parties do not offer any evidence that indicates that Swiss courts are any more or less congested than the busy courts in this District. *Do Rosario Veiga*, 486 F.Supp.2d at 307. And while "The Southern District of New York may have one of the nation's busiest dockets . . . its administration is very efficient." *Glob. Art Exhibitions, Inc. v. Kuhn & Bülow Italia Versicherungsmakler GmbH*, 607 F.Supp.3d 421, 440 (S.D.N.Y. 2022).

The Court sees little administrative advantage in retaining Plaintiffs' Swiss law claim while presiding over the Credit Suisse securities fraud cases, e.g., *Diabat v. Credit Suisse Group AG et al.*, No. 1:23-cv-5874, that remain pending before this court. *See DiRienzo*, 294 F.3d at 31. Plaintiffs attempt to have it both ways – they suggest in their opposition papers that the complementary discovery and evidence in the securities fraud cases tips this public interest factor in their favor, Opp. Memo, at 21, but assert in the Complaint that, "This action is not based on fraud or false or misleading statements by Credit Suisse in connection with the purchase or sale of securities. . . ." Compl. ¶ 31.

While it is possible that some of the issues in the instant action will overlap with those in the securities fraud cases, a key difference is that the securities fraud cases involve the application of American, rather than Swiss law, and do not implicate any action of the Swiss government, which is very much at issue in the AT1 bond cases. "In any event, this circumstance is of little weight because the existence of related litigation is not one of the factors enumerated in *Gilbert*." *DiRienzo*, 294 F.3d at 31 (citing *Guidi*, 224 F.3d at 148).

### b. Jury Duty

It would be unfair to impose jury duty on individuals in the Southern District of New York, a community with, at best, limited relations to this litigation. The dominant Swiss contacts identified above and below diminish any purported connection to the New York jury pool. *Palacios v. The Coca-Cola Co.*, 757 F.Supp.2d 347, 362 (S.D.N.Y. 2010).

Defendants assert that this case, if ever tried, would prove complex and time-consuming for a New York jury. Likely, they are correct – "the notion that a New York federal jury is better equipped than [a Swiss] judge to apply [Swiss] law to [foreign]-language testimony and documents relating to [decades] of activities by [a Swiss bank] is preposterous." *Aguinda v. Texaco, Inc.*, 142 F.Supp.2d 534, 552 (S.D.N.Y. 2001).

"As a result, '[t]he interest in protecting jurors from sitting on cases with no relevance to their own community weighs heavily' in favor of dismissal." *Palacios*, 757 F.Supp.2d at 362–63 (quoting *Alfadda v. Fenn*, 159 F.3d 41, 46 (2d Cir. 1998)).

### c. Local Interest

"[T]he public interest in having localized controversies decided at home" "requires an evaluation of which forum possesses a stronger local interest in the controversy" – the United States, or Switzerland. *LaSala*, 514 F.Supp.2d at 461.

Plaintiffs argue that "New York has every interest in adjudicating this local matter," Opp. Memo, at 20, but that is errant nonsense. "Whatever interest the United States has, it pales in comparison with that of Switzerland. Switzerland possesses a strong interest in regulating the conduct of banks within its borders," *LaSala*, 510 F.Supp.2d at 229 (citation omitted), and "There is a significant interest in having localized matters decided in the local forum in accordance with domestic law governing the case." *Do Rosario Veiga*, 486 F.Supp.2d at 307 (citing *Gilbert*, 330 U.S. at 509; *In re Arb. between Monegasque de Reassurances S.A.M. v. Nak Naftogaz of Ukr. and Ukr.*, 311 F.3d 488, 500–01 (2d Cir. 2002)). This is especially true here since, as Defendants say, "the travails of Switzerland's second-largest bank (Credit Suisse) and its government-brokered merger with Switzerland's largest bank (UBS) *are matters of historic importance in Switzerland.*" MTD, at 8 (emphasis added).

The FINMA-ordered write-down of Credit Suisse's AT1 bonds is at the heart of this case. While Plaintiffs profess that, "This is a case alleging a festering toxic risk culture at Credit Suisse's New York office that, as financial records show, caused billions of dollars to investors in New York and elsewhere across the United States," Opp. Memo, at 20, even they acknowledge that the FINMA Decree was "the immediate instrumentality by which the AT1 bonds were wiped out." Compl. ¶ 183. And whether, as Plaintiffs allege, Credit Suisse executives sought to delink their own and employees' compensation from AT1 bonds in January 2023, *id.* ¶¶ 184–88 – because they knew the AT1 bonds had lost substantial value – is of no moment to the instant action, as those individuals are excluded from the proposed Class, *id.* ¶ 207, and their supposed knowledge does not minimize the effect of the FINMA Decree on the value of the AT1 bonds.

The parties are free to debate whether the FINMA Decree or other misconduct establishes causation. But they must do so in Switzerland. The uncontested role of the Swiss regulator in

ordering the write-down of the AT1 bonds "necessarily lessens the United States' interest in the litigation while further increasing that of" Switzerland. *Aguinda*, 142 F.Supp.2d at 551.

I admit it is likely that some of the misconduct alleged in the Complaint occurred in New York. But Defendants are correct in their contention that "Any tangential connection to New York this case may have does not come close to overriding the other relevant factors." "Because the core events, operative facts, and associated private and institutional interests at issue are local to Switzerland, the dispute should be resolved in that country." *Do Rosario Veiga*, 486 F.Supp.2d at 307 (citing *Gilbert*, 330 U.S. at 509; *In re Arb. between Monegasque de Reassurances S.A.M. v. Nak Naftogaz of Ukr. and Ukr.*, 311 F.3d at 500–01). And I note that everyone who bought an AT1 bond did so with the presumed knowledge, as set forth in the Offering documents, that if there were disputes about the Bonds – most specifically about their cancellation (and what is writing down a bond to zero if not effectively cancelling it?) – those disputes would be litigated in Zurich. Ex. 1 to Grolimund Decl., at 5.

### d.  Conflict of Laws and Application of Foreign Law

"The prevalence of foreign law in the [C]omplaint is also a factor in *forum non conveniens* analysis." *LaSala*, 510 F.Supp.2d at 230. "United States courts have 'virtually no interest in resolving' disputes governed *exclusively* by foreign law." *Holzman v. Guoqiang Xin*, No. 12-cv-8405, 2015 WL 5544357, at \*10 (S.D.N.Y. Sept. 18, 2015) (quoting *Murray*, 81 F.3d at 293 (emphasis in original)).

As stated by Defendants, "This case implicates *only* Swiss law . . . " (emphasis in original). Prof. Schnyder and Mr. Hauenstein confirm this in their Declaration, as they state that "the exclusive source of the Plaintiffs' claims is Swiss company law, more specifically claims for damages based on Art. 754 CO which provides that directors and managers of a Swiss stock

50

company are liable vis-à-vis the company, its creditors and its shareholders for breaches of their duties." Schnyder/Hauenstein Decl. ¶ 20. Prof. Dr. Grolimund offers context: "At the time of drafting the relevant statutory rules on jurisdiction, the Swiss government expressly noted . . . that disputes concerning company law regarding companies incorporated in Switzerland should primarily be brought before Swiss courts. This approach was in particular deemed appropriate because such disputes are, from the perspective of Swiss conflict of law rules, necessarily governed by Swiss company law ( coordination of forum and applicable law)." Grolimund Decl. ¶ 40.

Although "[d]etermining the content of Swiss law is obviously easier at trial in Geneva," *Schertenleib v. Traum*, 589 F.2d 1156, 1165 (2d Cir. 1978), U.S. "[t]rial courts may find and apply foreign law" and "may even use experts on foreign law to assist them." *In re Ski Train Fire*, 230 F.Supp.2d at 391. However, this "necessitates the introduction of inevitably conflicting expert evidence on numerous questions of Swiss law, and it creates the uncertain and time-consuming task of resolving such questions by an American judge unversed in civil law tradition." *Schertenleib*, 589 F.2d at 1165. Parsing through the foreign law issues in this case will likely require "the interpretation and translation of foreign legal statutes, texts, and treatises." *Cattan*, 2023 WL 2868337, at *6. The parties disagree about the complexity of the Swiss law issues in this case – and yet the lengthy declarations by their dueling Swiss law experts contain conflicting opinions and conclusions.

While the task of applying foreign law when necessary is "far from impossible," *Ramirez de Arellano*, 448 F.Supp.2d at 531, as articulated above, there are many reasons not to do so in the instant action. "Switzerland is the forum with the most significant legal contacts with and the greatest jurisdictional interest in the adjudication of the controversy before the Court. Also for these reasons, an action should be tried in a forum familiar with the law governing the case. By

contrast, the Court finds no compelling reason why the law and judicial resources of this forum should be applied to resolve this dispute, nor any overriding American policy interest that would be promoted or enforced by doing so." *Do Rosario Veiga*, 486 F.Supp.2d at 307–08.

### b. Dismissal Is Warranted Based Upon Balancing the Relevant Factors

After balancing all of the relevant factors, the Court finds that dismissal on *forum non conveniens* grounds is appropriate. "The dispute at issue is decidedly Swiss, and the Court is persuaded that Plaintiffs, if they so choose, would be able to adequately and more appropriately litigate this dispute in Switzerland." *In re Alcon*, 719 F.Supp.2d at 279. "Retaining jurisdiction in this district would not be convenient for the parties or the witnesses and would not promote principles of efficient and economically prudent litigation." *Tel. Sys. Intern., Inc. v. Network Telecom PLC*, 303 F.Supp.2d 377, 385 (S.D.N.Y. 2003). Proceeding in Switzerland would be far more convenient than litigating in the Southern District of New York. "Whatever witnesses, events, and documents associated with relevant conduct may be found outside of Switzerland, the point is that the connection of this action with the United States is marginal at best in comparison to the magnitude of the factual and legal links of all material aspects of the dispute to Switzerland." *Do Rosario Veiga*, 486 F.Supp.2d at 307.

### II.    Plaintiffs' Claim Against the Remaining Defendants Is Dismissed

Several of the Defendants – Gaël de Boissard, Urs Röhner, and António Horta-Osório – have not been served with process in this case and did not join in the motion to dismiss. Dkt. No. 86. Nevertheless, "dismissal of the claim[] against them is warranted because the Court's holdings above necessarily establish the inadequacy of the [Complaint] as to them." *In re*

*Hebron Tech. Co. Sec. Litig.*, No. 20 Civ. 4420, 2021 WL 4341500, at \*24 n.31 (S.D.N.Y. Sept. 22, 2021).

Accordingly, Plaintiffs' Swiss law claim against the unserved Defendants is dismissed on *forum non conveniens* grounds. *See Cartwright v. D'Alleva*, No. 17 Civ. 5953, 2018 WL 9343524, at \*9 (S.D.N.Y. Aug. 27, 2018); *Johnson v. New York City*, No. 12 Civ. 4379, 2013 WL 950870, at \*3 (S.D.N.Y. Mar. 7, 2013); *Virtual Dates, Inc. v. Afternic.com, Inc.*, No. 01 Civ. 4023, 2001 WL 1646451, at \*2 (S.D.N.Y. Dec. 20, 2001).[9]

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Complaint is GRANTED.

The Clerk of Court is not to close the file in this action until further order of the Court (*see* n.9). However, the motion at Docket #32 should be removed from the Court's list of open motions.

This constitutes the decision and order of the Court. It is a written opinion.

Dated: March 20, 2024

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

---

[9]   Although I believe that the Officer/Director Defendants are amenable to suit in Zurich, in an excess of caution, I will condition the dismissal of this action on the Officer/Director Defendants' filing with the Court a consent to jurisdiction in Zurich. They have fourteen days to file written consents with the Court; counsel may file representations on behalf of their clients. For the avoidance of doubt, the *forum non conveniens* dismissal does not depend on the filing of a consent by any defendant who has not appeared in this action.